𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔅𝔞𝔫𝔨𝔯𝔲𝔭𝔱𝔠𝔶 𝔔𝔬𝔲𝔯𝔱

𝔇𝔦𝔰𝔱𝔯𝔦𝔠𝔱 𝔬𝔣 𝔐𝔞𝔰𝔰𝔞𝔠𝔥𝔲𝔰𝔢𝔱𝔱𝔰

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

**AMERICAN BRIDGE PRODUCTS, INC.,**                Chapter 7
　　　Debtor                                                           Case No. 96-16620-JNF

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

**LYNNE RILEY, CHAPTER 7 TRUSTEE OF
AMERICAN BRIDGE PRODUCTS, INC.,**
　　　Plaintiff
v.                                                                           Adv. P. No. 00-1142
**NICHOLAS J. DECOULOS, ESQ.,
DECOULOS & DECOULOS, CITIZENS
BANK OF MASSACHUSETTS, AND
MICHAEL GILLERAN, ESQ.**
　　　Defendants

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

<div align="center">

**MEMORANDUM**

</div>

## I. INTRODUCTION

　　This is an action brought by the Chapter 7 trustee against a state court receiver and his law firm for negligence in their conduct of a receivership prior to the filing of an involuntary petition against the debtor. Specifically, the matters before the Court are Counts I through VI and Counts IX and X of the First Amended Complaint filed by Lynne Riley, the duly elected, successor Chapter 7 Trustee of the estate of American Bridge Products, Inc. (the "Trustee"), against the Citizens Bank of Massachusetts, Michael Gilleran, Esq., Nicholas J. Decoulos, Esq., and the law firm of Decoulos & Decoulos. As a result of

<div align="center">1</div>

previous orders of the Court, Nicholas J. Decoulos, Esq. and the firm of Decoulos &
Decoulos are the only remaining defendants. Moreover, pursuant to an order dated June
4, 2004 with respect to the Trustee's Motion to Strike Jury Demand of Defendants Nicholas
J. Decoulos, Esq., and Decoulos & Decoulos, this Court determined that the firm of
Decoulos & Decoulos was entitled to a jury trial on Count VII - Professional Negligence/
Attorney Malpractice of Decoulos & Decoulos as well as Count VIII - Breach of Attorney
Fiduciary Duty of Care and Loyalty by Decoulos & Decoulos. The Court granted the
Trustee's Motion to Strike with respect to the remaining Counts against Nicholas J.
Decoulos and the firm of Decoulos & Decoulos, finding 1) that Nicholas J. Decoulos waived
his right to a jury trial with respect to Counts I through IV by filing a Motion of Receiver
for Payment of Compensation; and 2) that there is no right to a jury trial for Counts V and
VI and IX and X under Mass. Gen. Laws ch. 93A,[1] but that there was such a right for the
firm of Decoulos & Decoulos with respect to Counts VII and VIII . The Court ruled that,
if necessary, it would bifurcate the trial for purposes of resolving factual issues as to the
liability of the partnership for the conduct of Nicholas J. Decoulos, Esq.

As a result of the Court's prior rulings, the following Counts are before the Court:
Count I - Negligence of Nicholas J. Decoulos, Esq.; Count II - Breach of Fiduciary Duty of
Care and Loyalty by Nicholas Decoulos, Esq.; Count III - Professional Negligence/ Attorney
Malpractice of Nicholas Decoulos, Esq.; Count IV - Breach of Attorney Fiduciary Duty of

---

[1] *See* Nei v. Burley, 388 Mass. 307, 315, 446 N.E.2d 674, 679 (1983). *See also* Wallace
Motor Sales, Inc. v. Amer. Motor Sales Corp., 780 F.2d 1049, 1052 n.1 (1st Cir. 1985).

2

Care and Loyalty by Nicholas Decoulos, Esq.; Count V - Violation of Mass. Gen. Laws ch. 93A, § 11 by Nicholas Decoulos, Esq.; Count VI - Willful or Knowing Violation of Mass. Gen. Laws ch. 93A, § 11 by Nicholas Decoulos, Esq.; Count IX- Violation of Mass. Gen. Laws ch. 93A, § 11 by Decoulos & Decoulos; and Count X - Willful and Knowing Violation of Mass. Gen. Laws ch. 93A, § 11 by Decoulos & Decoulos. This Court has jurisdiction over these counts as a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2) (A), (B), (C), and (O), and 1334. Additionally, this Court has jurisdiction as a result of 11 U.S.C. § 543(b)(2) and Fed. R. Bankr. P. 6002 and because Nicholas J. Decoulos submitted himself to the jurisdiction of this Court by applying for compensation as receiver.[2]

The Court conducted a 15-day trial over a six month period between March 9, 2004

---

[2] Section 543(b)(2) provides the following:
(b) A custodian shall -
    (2) file an accounting of any property of the debtor, or proceeds, product, offspring, rents, or profits of such property, that, at any time, came into the possession, custody, or control of such custodian.
11 U.S.C. § 543(b)(2). Rule 6002 provides:
    (a) Accounting Required. Any custodian required by the Code to deliver property in the custodian's possession or control to the trustee shall promptly file and transmit to the United States trustee a report and account with respect to the property of the estate and the administration thereof.
    (b) Examination of Administration. On the filing and transmittal of the report and account required by subdivision (a) of this rule and after an examination has been made into the superseded administration, after notice and a hearing, the court shall determine the propriety of the administration, including the reasonableness of all disbursements.
Fed. R. Bankr. P. 6002. See also 11 U.S.C. § 543(c)(3)("The court, after notice and a hearing shall - . . . surcharge such custodian . . . for any improper or excessive disbursement, other than a disbursement that has been made in accordance with applicable law or that has been approved after notice and a hearing, by a court of competent jurisdiction before the commencement of the case under this title.").

3

and October 20, 2004. Fourteen witnesses testified and 64 exhibits were introduced in evidence. The issues presented include whether the conduct of Nicholas J. Decoulos, as court-appointed receiver of American Bridge Products, Inc. and as an attorney, exposed him and his law firm to liability for negligence, breach of fiduciary duty or malpractice, and, if so, whether the estate of American Bridge Products, Inc. was quantifiably damaged by misconduct on his part. Subsidiary issues involve the Trustee's standing, the expiration of the applicable statute of limitations and whether Decoulos and his firm were engaged in commerce for purposes of multiple damages under ch. 93A.

Upon consideration of the testimony presented, the exhibits introduced in evidence, as well as the proposed findings of fact, proposed rulings of law, and briefs submitted by the parties, the Court now makes its findings of fact and rulings of law in accordance with Fed. R. Bankr. P. 7052.

## II. FACTS

### A. Introduction

Nicholas J. Decoulos, Esquire ("Decoulos" or the "Receiver") was, at all times pertinent to the claims made by the Trustee, an attorney engaged in the practice of law in the Commonwealth of Massachusetts and a general partner in the law firm of Decoulos & Decoulos, which was and is a general partnership engaged in the practice of law in the Commonwealth of Massachusetts. On September 22, 1993, the Essex Superior Court, Department of the Trial Court, appointed Decoulos receiver of American Bridge Products, Inc. ("ABP") pursuant to an Order of Appointment signed by the Assistant Clerk.

4

Decoulos's appointment occurred in the context of a complaint filed by ABP and Agar

Industries, Inc. on August 25, 1993 in the Essex Superior Court against the following nine

defendants: Robert Conti ("Conti"), Avenue Finance, RCPC Realty Trust ("RCPC"),

Everett Aluminum, John Conti, Martha Talbot, INTS, Inc., James Donald Robson, Jr.

("Robson") and Everett Savings Bank (the "Essex Action"). Through their nine-count,

Verified Complaint, ABP and Agar Industries, Inc. alleged, in summary, that Conti, with

the aid and assistance of the other defendants, conspired to seize control of ABP and its

assets and defraud its creditors. Additionally, they alleged that Everett Savings Bank

breached its contractual relationship with ABP and assisted Conti in diverting ABP's assets

to various bank accounts at Everett Savings Bank which he controlled, although he was

neither a corporate officer, director or shareholder of ABP nor an authorized signatory on

ABP's bank accounts.

B. <u>The Metamorphosis of W. Sims & Associates, Inc.</u>

The Trustee's claims against Decoulos must be evaluated in the context of the claims

made by ABP against Conti and the other defendants in the Essex Action. Those claims,

in turn, can only be understood in the context of the formation and operation of ABP.

The story of ABP begins with an entity known as W. Sims & Associates, Inc. ("W.

Sims"), a corporation engaged in the industrial and residential painting business. Francis

Kilroy ("Kilroy") was an officer, director and shareholder of W. Sims together with Walter

Sims. Walter Sims owned 51% of the shares of W. Sims; Kilroy owned the remaining

shares, although the annual reports filed with the Office of the Secretary of State do not

reflect his ownership interest.[3]  According to Kilroy, W. Sims was certified by the  State

Office of Minority and Women Business Assistance, commonly known as "SOMBA," as a

minority business, a designation which requires at least 51% ownership by a minority

person and dominant control over management by the minority person.  In the case of W.

Sims, Walter Sims qualified as a minority.  W. Sims was a successful, SOMBA-certified

business, employing over a dozen painters and generating significant revenues, although

it did not have appreciable assets.  Kilroy testified that he was well-versed in the SOMBA

certification process.[4]

In the late 1980s, Walter Sims expressed a desire to leave the painting business.  At

the same time, Kilroy learned of a company located at 93-95 Brookline Street, Lynn,

Massachusetts owned by Robson known as American Bridge Railing Company, which had

experienced financial difficulties and filed for bankruptcy protection on at least one

occasion.  Recognizing a business opportunity from publicity about federal and state

highway projects to repair the nation's infrastructure, including its bridges, Kilroy

conceived the idea of transforming W. Sims into a manufacturing company to fabricate,

market, and sell bridge products.  Lacking financial resources of his own, in the spring of

1990, he approached Conti, a successful businessman known as "the home siding king of

the North Shore of Boston,"[5] with whom he had done business for approximately ten years.

---

[3] Plaintiff's Exhibit 11, Lg. Tab 2.

[4] *See* Mass. Gen. Laws ch. 7, § 40N. *See also* Mass. Gen. Laws ch. 23A, § 41.

[5] Transcript, October 20, 2004 at 36.

6

At the time, Conti owned an aluminum siding company known as Everett Aluminum, as well as Avenue Finance, and numerous real estate holdings in realty trusts, including RCPC and Amity Realty Trust.

In a Personal Financial Statement submitted to USTrust, Conti reported that as of June 30, 1988 he owned assets worth $12,115,000, including $300,000 in cash, $600,000 in government and marketable securities, $2,895,000 in partial interests in real estate equities, and $8,305,000 in real estate, subject to liabilities totaling $3,796,635. He also disclosed total income of $777,500 in 1987.[6] Approximately five years later, in a Personal Financial Statement dated September 8, 1993, prepared just weeks after the commencement of the Essex Action, Conti reported total assets of $4,832,137, subject to liabilities of $6,750,598. He reported income of $68,084, less than one-tenth of what it had been five years earlier.[7]

Through discussions with friends, including William Mahoney ("Mahoney"), Kilroy met Cesar Martinez ("Martinez"), a pipe designer with a Cambridge, Massachusetts engineering firm. Kilroy introduced Martinez to the prospect of succeeding Walter Sims as a minority business owner. Martinez agreed to acquire Walter Sims's 51% interest in W. Sims, a circumstance which preserved W. Sims's SOMBA certification.

In the spring and summer of 1990, Kilroy, Martinez, and Conti fashioned a "very

---

[6] Plaintiff's Exhibit 41.

[7] Id. Although Conti's Financial Statement suggested that his liabilities exceeded his assets at this time, it showed that he had $232,087 in marketable securities. Moreover, there was significant equity in real estate holdings in which he had a partial interest, as well as significant equity in individual holdings.

involved, intricate understanding,"[8] whereby W. Sims would cease its activities as a

painting contractor and begin operations as a producer of bridge products. Conti, through

a realty trust, purchased the real estate located at 93-95 Brookline Street, which was

appraised at $450,000, as well as the equipment located there. He executed a purchase and

sale agreement with Gilman J. Hallenbeck, Trustee of the Asbury Leasing Trust

("Hallenbeck"), for the purchase of the real estate for the sum of $250,000 and eventually

took title to the Brookline Street property as trustee of the RCPC Realty Trust.[9] On May

9, 1990, shortly after executing the purchase and sale agreement for the real estate, Conti

signed an "Agreement on Personal Property" with Hallenbeck pursuant to which he

agreed to purchase the equipment and personal property located on the premises for

$75,000.[10] The parties attached a list to the Agreement, which contained both a description

of and a value for items of equipment and personal property which Conti agreed to

purchase. The total value of the equipment, including motor vehicles, was $205,890,

although many of the items listed were old and inoperable.[11]

Kilroy testified that, in addition to acquiring the real property and equipment for

W. Sims to begin its operations as a producer of bridge products, Conti was obligated to

---

[8] Transcript, March 9, 2004 at 22. Although Conti executed the agreement with Gilman J. Hallenbeck, the parties recognized that the real property and equipment had belonged to Robson's company, American Bridge Railing Company.

[9] Plaintiff's Exhibit 1.

[10] Id.

[11] Id.

8

provide working capital for the company: "Mr. Conti's part of the agreement was that he would infuse enough capital to get the company up and running."[12] Kilroy stated that it was unclear how much capital Conti would be required to infuse but that from his conversations with Robson, the former owner of American Bridge Railing Company, he expected that "somewhere in the mid to - - around - - the low to mid six figures area would be required over a start up period of, say, a year and a half or so, a year and a half, two years."[13] Kilroy also testified that Conti borrowed $50,000 from USTrust as president of American Bridge Railing Corporation, an entity with which he had no affiliation as an officer or director.   According to Kilroy, Conti contributed the money to W. Sims,[14] although ABP eventually became obligated for repayment of the loan.[15]

As an inducement to Conti to finance the new business venture, Kilroy testified that Conti was to profit in two ways:

> He would profit big time by buying the piece of property at probably fifty per cent or less of its current market value.  He would get a healthy rent above market value while we were occupying, and at the end of the line would sell out to us at a highly profitable transaction to sell the land buildings and equipment over to us.[16]

Conti did not disagree with Kilroy's view, at least in a deposition taken in 1997.  At that

---

[12] Transcript, March 9, 2004 at 90.

[13] Id. at 36-37.

[14] Id. at 40-41.

[15] Id. at 103.

[16] Id. at 27.

9

time he stated:

> My role was to buy the property, buy the equipment, and in a few years I could get exactly what the whole thing cost, maybe [$]325,000, and when we sold it, I was to get [$]700 to [$]800,000, my end for doing all this, and I was supposed to fund or help fund the company.[17]

Conti described himself as an investor in ABP, although he admitted that in June of 1993 he borrowed $200,000 from Everett Savings Bank on behalf of "American Bridge a/k/a Agar Industry."[18]  Later in his testimony, he indicated that he was "a little more" than an investor.[19]

While Conti's contributions to the new venture were clear,  Kilroy's contributions were more amorphous.  He stated, in response to a question about what he "brought to the table,"[20] that he contributed "cash flow in the form of contracts to the tune of several hundreds of thousands of dollars that came with Sims,"[21] as well as W. Sims's SOMBA certification and his ability to market the business.  Martinez, for his part, acquired Walter Sims's shares of W. Sims and served as its new president, thus satisfying at least some of the SOMBA requirements.

In conjunction with the transformation of W. Sims from a painting contractor to an entity doing business as American Bridge Products, Inc., W. Sims executed a lease with

---

[17] Transcript, September 3, 2004 at 191.

[18] Id. at 211.

[19] Id. at 222.

[20] Transcript, March 9, 2004 at 87.

[21] Id. at 87.

10

RCPC, an entity controlled by Conti which came to hold title to the property formerly occupied by Robson's company, American Bridge Railing Company. The lease was not offered in evidence, and there was somewhat conflicting evidence as to the amount of the monthly rent.[22] The evidence established that W. Sims and later ABP did not pay monthly rent on a regular basis.

In addition to the lease, Kilroy and Martinez executed various documents intended to provide Conti with security for his capital investments. These documents included an "Agreement" in which Martinez and Kilroy agreed to consult Conti "on all matters pertaining to the corporation," including bidding on projects, entering into contracts to perform work in conjunction with bids, hiring personnel, increasing the salary of employees, purchasing material or supplies in excess of $5,000 and entering into contracts which might affect the financial stability of the corporation. In addition, Martinez and Kilroy granted Conti a veto power with respect to the management of the company in the event of *any* disagreement between the shareholders, officers and directors, on the one hand, and Conti, on the other. The Agreement further provided that the veto power "shall remain in effect until such time as all obligations by the corporation, its officers, directors, and shareholders to Robert Conti have been paid in full," and "[a]ll provisions of the by laws of the corporation which are in conflict with the above stated items are hereby

---

[22] Defendants' Exhibit 24. The Account Annexed to the Summary Process Complaint, discussed below, shows that Conti was claiming $90,000 per year in rent or $6,000 per month for rent plus taxes of $18,000 per year. Interestingly, Conti testified that he guessed ABP was obligated to pay $2,500 in monthly rent, a sum more consistent with the purchase price than the $6,000 per month figure. *See* Transcript, September 3, 2004 at 219.

11

suspended."[23]

In addition to the veto power they granted to Conti, Martinez and Kilroy, on August 1, 1990, executed a "Waiver of Restrictions" in which they waived all restrictions with respect to the transfer or pledging of shares of stock in W. Sims, and Kilroy granted Conti the option to purchase 50% of all his shares in W. Sims.[24]    On the same date, Kilroy executed an Option to Purchase in which he again agreed to grant Conti an option to purchase 50% of his shares in W. Sims.  Martinez executed similar documents.[25]  These agreements, had they been disclosed to the State Office of Minority and Women Business Assistance, likely would have resulted in the decertification of W. Sims as a minority-owned and controlled business.

On September 14, 1990, Martinez, on behalf of W. Sims, filed Articles of Amendment to reflect the changed business purpose of the corporation and to amend the provisions of the Articles with respect to stock pledges.  Although Kilroy interpreted Plaintiff's Exhibit 3 as effectuating a change of name from W. Sims to ABP, it did not do so.  Nevertheless, W. Sims did officially change its name to ABP on August 31, 1993 when it filed Articles of Amendment dated July 11, 1991.[26]  Conti never executed the option to purchase a portion

---

[23] Plaintiff's Exhibit 2.

[24] Id.

[25] Id. The documents accepted in evidence do not establish that Martinez granted Conti a similar purchase option for his stock. Mahoney, an attorney who is disbarred from the practice of law in the Commonwealth of Massachusetts and who drafted the various agreements, testified, however, that Martinez also executed a stock pledge in favor of Conti.

[26] Plaintiff's Exhibit 34.

of the shares belonging to either Kilroy or Martinez.[27]

Kilroy testified that ABP was successful in its marketing efforts. He stated that within a short period of time the company had 30 employees working three shifts, the engineering staff had tripled, and he was in the process of modernizing the welding procedures and the engineering office.[28] Additionally, ABP had obtained certification from the American Institute of Steel Construction ("AISC"). John Conti, Conti's son, as well as Robson, the former owner of American Bridge Railing, and his son were among the employees working at ABP. Kilroy's son also worked at ABP, and later, when Satyendra K. Agarwal ("Agrawal") replaced Martinez as president of ABP, his son was employed as a consultant.

Although Kilroy and Mahoney were optimistic about the prospects of W. Sims and later ABP, the unaudited financial statements prepared by the accounting firm of Sachetta, Cataldo & Sachetta, P.C. show that the company relied on institutional borrowings for its cash flow. The following chart contains a summary of the Statements of Income and Retained Deficit and the Statements of Cash Flows prepared by Sachetta, Cataldo & Sachetta, P.C. for various periods in 1990, 1991 and 1992. The first three Statements were in the name of W. Sims. The Statements for the year ending on December 31, 1991 and for the period ending on April 30, 1992 were in the name of ABP.

---

[27] Id.

[28] Transcript, March 9, 2004 at 88.

13

|  | 8 Mo. Ended 8/31/1990 | 5 Mo. Ended 5/31/1991 | 8 Mo. Ended 8/31/1991 | Yr. Ended 12/31/1991 | 4 Mo. Ended 4/30/1992 |
|---|---|---|---|---|---|
| Contract Income | $250,725 | $699,135 | $1,130,775 | $1,895,497 | $499,296 |
| Direct Expenses | $261,996 | $489,825 | $788,469 | $1,424,035 | $284,128 |
| Gross Profit | ($11,271) | $209,310 | $342,306 | $471,773 | $215,168 |
| Gen. and Admin. Expenses | $106,780 | $135,672 | $226,820 | $311,773 | $108,691 |
| Operating Loss/Income | ($118,051) | $73,638 | $115,486 | $159,689 | $106,477 |
| Interest Expenses | $14,960 | $12,480 | $25,405 | $38,407 | $15,275 |
| Net Loss/Income | ($133,011) | $61,158 | $90,081 | $121,282 | $91,202 |
| Ret'd Deficit/Beg. Period | ($301,872) | ($440,231) | ($440,231) | ($440,231) | ($318,949) |
| Ret'd Deficit/End Period | ($434,833) | ($379,073) | ($350,150) | ($318,949) | ($227,747) |
| Cash Flows from Operating Activities: Net Loss/Profit | ($133,011) | $61,158 | $90,081 | $121,282 | $91,202 |
| Net Cash used by Operating Activities | ($117,710) | ($60,029) | ($123,402) | ($99,547) | ($18,309) |
| Net Cash used by Investing Activities | ($205,890) |  | ($12,233) | ($24,206) | ($9,741) |
| Net Cash from Financing Activities | $335,461 | $65,241 | $144,142 | $125,357 | $51,990 |
| Net Cash Increase | $11,861 | $5,212 | $8,507 | $1,604 | $23,940 |
| Cash, Beg. of Period | $3,518 | $1,595 | $1,595 | $1,595 | $3,199 |
| Cash, End of Period | $14,401 | $6,807 | $10,102 | $3,199 | $27,139 |

The following chart provides more detail about the cash from financing activities for the relevant periods.

14

| Cash Flows from Financing Activities | 5 Mo. Ended 5/31/1991 | 8 Mo. Ended 8/31/1991 | Yr. Ended 12/31/1991 | 4 Mo. Ended 4/30/1992 |
|---|---|---|---|---|
| Purchase of property and equipment | ($3,500) | | | |
| Proceeds from Notes Payable | $128,050 | | | |
| Repayment of Notes Payable | ($71,600) | ($74,613) | ($74,613) | |
| Proceeds from Bank Credit Lines | $53,947 | $260,680 | $248,338 | $319,057 |
| Repayment of Bank Credit Lines | ($41,656) | ($41,925) | ($48,368) | ($267,067) |
| Net Cash Provided by Financing Activities | $65,241 | $144,142 | $125,357 | $51,990 |

The Statement for the year ending on December 31, 1991 contained a listing of the
credit lines available to ABP. According to its accountants, ABP had access to eight credit
lines totaling $457,476 and had $64,551 in available credit on the date of the Statement.
Four months later, the April 30, 1992 Statement showed that ABP had access to eight credit
lines totaling $472,057 and had $19,142 in available credit. Kilroy testified that W. Sims and
later ABP had banking relationships with USTrust and Everett Savings Bank, with which
Conti had strong ties as its largest commercial borrower and as an incorporator.[29]

With respect to the company's financial position in early 1992, John F. Hackett, a
Senior Vice President at USTrust at the time, stated the following in a memorandum to the
bank's internal credit folder dated January 16, 1992:

This day the writer was supplied with interim managment [sic] financial

---

[29] Transcript, March 9, 2004 at 78.

15

statements for the period ended 12/31/91. The company has greatly improved over this past year, income to date is slightly under $1.9 million. *Most importantly, the Company has improved its margin, and is showing a net income of $122,180.* Based on the loss carry forwards from prior years, the Company will not be obliged to pay any taxes. The Company has a positive net worth in excess of $230,000 as of the Balance Sheet date. Obviously, this shows a great turnaround, and this is due to the fact of additional work being acquired by the Company.

The Company is now listed as a minority contractor with Cesar Martinez owning the majority of stock, and they [sic] do have their SOMBA certificates. The Big Dig, in Boston, plus the approval of the transportation bill will place a tremendous amount of work available to be bid upon. The Company, which will have a priority because of its rating, and specializes in Bridgework, railing and expansion joints. [sic]

Management is looking optimistically towards 1992 . . . .[30]

Two months later, Hackett, in another memorandum to the credit file, stated the following:

This day we have received the year end financials submitted by the above listed Company compiled by Sichetta Cataldo & Sichetta CPA's. [sic] the [sic] writer was pleased to see that the volume of this Company has reached slightly below $1.9 million; but most importantly has showed a net income of $121,000. Cash flow of the Company has continued to improve generating approx. $200,000 for year end 1991. The Company continues to have a reasonable backlog beginning in 1992.

We have most recently been contacted by an officer of a local minority agency which will provide banks with additional comfort in lending to minority contractors. . . . The gameplan [sic] initially would be to term out the Bank debt via the agency lending directly to American Bridge, we would on assignment of specific contract receivables, continue to fund working

---

[30] Plaintiff's Exhibit 39 (emphasis supplied). Prior to preparing the memorandum, Hackett, in a letter to an official at the Small Business Administration dated October 2, 1991, informed her that a loan commitment was no longer needed as "[t]he Borrower is progressing reasonably well, and was able to generate sufficient funds through a rapid production of the job, so that borrowing against this loan commitment is not necessary." He added that a prior loan had been paid in full, that ABP's cash flow was improving, and that USTrust had obtained life insurance on Martinez and a second mortgage on his home.

capital.[31]

ABP's Financial Statements showed that it was generating a profit of at the end of 1991 and during the first four months of 1992, a circumstance corroborated by USTrust's Senior Vice President. Nevertheless, Conti testified that he controlled the money and "every week I had to put money in that place."[32] He stated: "that place from day one never made a dime."[33]

The Financial Statement for the eight month period ending August 31, 1990 is informative about the ownership of the equipment used by W. Sims. Conti purchased the equipment for $75,000 from Gilman J. Hallenbeck as Trustee of the Asbury Leasing Trust in the summer of 1990. On July 31, 1990, the day before executing the "Waiver of Restriction" and "Option to Purchase" pursuant to which Kilroy and Martinez each granted Conti the option to purchase 50% of their shares of W. Sims, they personally executed a promissory note to Conti in the sum of $35,000. The consideration for the note and the collateral securing it were described as follows: "Makers acknowledge that this $35,000.00 promissory note is in consideration for the purchase of $35,000.00 of various and sundry equipment from Robert Conti in July, 1990, said equipment serving as the underlying collateral for said promissory note. See listing of equipment attached hereto."[34]

---

[31] Id.

[32] Transcript, September 3, 2004 at 207.

[33] Id.

[34] Plaintiff's Exhibit 28.

17

Despite the evidence that the equipment and personal property were worth either $75,000, the price paid by Conti to Hallenbeck, or $35,000, on the Statement of Cash Flows for the eight month period ending August 31, 1990, W. Sims reported the purchase of property and equipment in the sum of $205,890, a sum identical to the total value of the equipment on the list attached to the "Agreement on Personal Property" signed by Conti on May 9, 1990. Moreover, on the Balance Sheet dated August 31, 1991, W. Sims reported property and equipment at cost with a value of $218,735. For the year ending December 31, 1991, ABP reported property and equipment with a value of $222,958 at cost and with a value of $124,507 after accumulated depreciation.[35]

Decoulos testified that the parties to the Essex Action never produced a bill of sale from Conti either to ABP or to Kilroy and Martinez.[36] Similarly, no assignment of the equipment from Kilroy and Martinez to ABP was produced. Nevertheless, the Financial Statements, which reflected ABP's ownership of equipment, are consistent with the decisions of USTrust and Everett Savings Bank to extend credit to ABP in the sums set forth above. Everett Savings Bank took a security interest in the equipment owned by ABP, along with all of its other collateral, including accounts receivable.[37] USTrust did the same.[38]

––––––––––––––––––––––

[35] Plaintiff's Exhibit 5.

[36] Transcript, September 24, 2004 at 59.

[37] Plaintiff's Exhibit 7 and 8.

[38] Transcript, October 20, 2004 at 14. The Court takes judicial notice that USTrust, in pleadings filed in this case, namely a Supplemental Memorandum in Support of Its Motion to

In the fall of 1992, ABP borrowed monies from both USTrust and Everett Savings Bank. For example, on September 11, 1992, Martinez and Kilroy executed a note payable to Everett Savings Bank in the sum of $137,700 with principal payments due on November 30, 1992 in the sum of $50,000, on December 30, 1992 in the sum of $70,000, and on January 30, 1993 in the sum of $17,700.[39] On October 5, 1992, Martinez executed a Commercial Promissory Note in favor of USTrust in the sum of $37,000;[40] and four days later, on October 9, 1992, he and Kilroy executed a note in the sum of $49,335 in favor of Everett Savings Bank with principal payments due on November 30, 1992 ($20,000), December 30, 1992 ($20,000), and January 30, 1993 ($9,335).[41] It was around this time, when ABP would have significant repayment obligations to its lenders, that problems began to surface at ABP.

Mahoney, who began working at W. Sims in the summer of 1991, testified that he became aware that Conti was siphoning funds from ABP in approximately July of 1992, although he did not report his suspicions to Martinez and Kilroy. He also suspected that

---

Order Trustee To Abandon Cash Proceeds to USTrust Pursuant to 11 U.S.C. § 544(b) and Rule 6007(b), attached a copy of a note in the sum of $189,949.85, dated May 1, 1992, executed by Martinez and guaranteed by Conti. Joseph Braunstein, the Chapter 7 Trustee at the time, challenged USTrust's right to monies he held, alleging it failed to establish that funds were proceeds of its collateral or actually advanced to ABP in consideration for the security interest it recorded.

[39] Plaintiff's Exhibit 8.

[40] Plaintiff's Exhibit 7. In the fall of 1991, Martinez executed a note on October 21, 1991 in favor of USTrust in the sum of $117,000. Three months later, on January 17, 1992, he executed a note in favor of USTrust in the sum of $45,000.

[41] Plaintiff's Exhibit 8.

19

Robson and Martha Talbot ("Talbot"), ABP's office manager, were cooperating with Conti,

when, in September of 1992, he discovered that monies from a Small Business

Administration loan which were allocated for specific projects were missing.[42] Mahoney

reported his suspicions to Kilroy and Martinez. He testified that although Martinez was

aware that Conti controlled ABP's finances, Martinez "did not realize that Mr. Conti was

actually stealing monies from and keeping American Bridge cash poor."[43]

Mahoney further testified as follows:

> [W]e found out that he [Conti] was taking other checks and taking the check
> and depositing it directly in one of his accounts or putting the check into
> American Bridge Products and was drawing the money on his own volition.
> That we found out, and then I told Mr. Martinez all about this, Martinez was
> afraid of him. Martinez's answer to the whole thing was to bail out. He
> grabbed Mr. Agarwal to take over.[44]

Kilroy testified that at the time Martinez left ABP, the company was rift with

factions. Kilroy indicated that he and Martinez, and, later, he and Agarwal, were in one

camp, and the Contis and the Robsons were in the other.

In the fall of 1992, Kilroy stated that he was laid off by Martinez, although he

continued to go to work without pay and "do whatever . . . [he] . . . could to contribute to

the company."[45] Despite his testimony that he was laid off, on November 5, 1992, he and

Martinez executed an employment agreement, effective November 9, 1992. The agreement

---

[42] Transcript, July 6, 2004 at 132-33.

[43] Id. at 134.

[44] Id. at 135.

[45] Transcript, April 5, 2004 at 26.

provided Kilroy with an annual salary of $49,000 as well as compensation equal to two years annual salary in the event of breach. One week later, on November 12, 1992, Agarwal obtained Martinez's shares in ABP and became its president, treasurer and clerk.

In June of 1993, Kilroy, with the assistance of Mahoney's sister, an attorney, commenced an action against ABP in the Essex Superior Court for breach of an earlier employment agreement dated March 1, 1989. The complaint was served on Agarwal at his home address in Methuen, Massachusetts. Kilroy eventually obtained a default judgment against ABP on May 17, 1995 in the sum of $111,208 and used that judgment to file a proof of claim in the Essex Action, to file the involuntary petition commencing this case, and to file a proof of claim in this case.[46]

Prior to acquiring Martinez's interest in ABP, Agarwal, a professional engineer with a Ph.D. in Engineering, had done some consulting work for ABP. Specifically, he approved and stamped shop drawings for ABP to submit to the Massachusetts Highway Department. Agarwal, a native of India, testified that he was unaware of the term "due diligence."[47] Prior to acquiring Martinez's shares, he examined ABP's quality control manual and satisfied himself that the company had sufficient equipment, expertise and contracts to make his association with the company worthwhile. He made no serious effort to discover the debt structure of ABP. He also did not compensate Martinez for his acquisition of Martinez's 51% interest in ABP, stating that his agreement to pay Martinez was contingent

---

[46] Transcript, April 5, 2004 at 34-36.

[47] Transcript, April 12, 2004 at 83.

21

upon the company doing well.

As the former president of ABP, Agarwal testified unequivocally that ABP never borrowed money from Conti or any of his business entities, including Avenue Finance, Everett Aluminum, RCPC , or Amity Realty Trust. Moreover, he testified that, except for a brief period of time in early 1993 when he was visiting India and transferred check writing and signing authority to Robson, no other person had authority to write or sign ABP's checks or to cash checks made payable to ABP.[48]

Agarwal further testified that in late July of 1993, he discovered that ABP's bank records, including canceled checks and business papers, were missing. Seven months earlier, however, in December of 1992, he learned that checks had been improperly endorsed by Conti and deposited in different accounts Conti controlled at Everett Savings Bank where Conti had significant influence. According to Agarwal, he instructed Kilroy to take appropriate legal action. Kilroy complied with Agarwal's request and contacted Attorney Paul Webber ("Webber") in January of 1993. It was at that time that Conti forced Kilroy to leave the Brookline Street premises permanently.

In late 1992 and early 1993, Kilroy, Mahoney and Agarwal, dissatisfied with the direction of ABP, explored opportunities to acquire other companies, including Flame Tech Steels, Inc. and Lawrence Aluminum, Inc., through which to conduct business.[49]   In November 1992, around the time Martinez sold his shares to Agarwal, Mahoney's

---

[48] Transcript, April 12, 2004 at 91-97.

[49] Defendants' Exhibits 4 and 5.

22

girlfriend, Brenda Chartoff, incorporated Atlas Bridge Supply, a company which bought products used in road and bridge construction projects and sold them for a profit to ABP and other companies.[50]  In January of 1993, Agarwal incorporated Agar Industries, Inc., although he stated the company never conducted any business.[51]

Although Kilroy and Mahoney were steadfast in their testimony that Conti looted ABP by converting its checks and depositing the proceeds into various accounts he controlled at Everett Savings Bank, Conti initially testified that Kilroy, as president of ABP, gave him authority to deposit and redeposit ABP checks.[52]  Conti later back peddled, indicating that he did not know who gave him the authority.  He stated: "I just did it."[53]  In short, Conti admitted that he took ABP checks without corporate authority, deposited the proceeds into accounts he controlled and then conferred with the officers and employees of Everett Savings Bank, including John Spagnese, on a daily basis to determine which checks presented for payment to ABP would be paid from its accounts.  Everett Savings Bank employees would then transfer sufficient funds into ABP's accounts from various accounts Conti controlled to pay ABP's obligations.  Conti rationalized this procedure by alluding to an IRS lien on ABP's accounts which would have resulted in the seizure of any sums deposited into its accounts.

---

[50] Transcript, July 6, 2002 at 156-58.

[51] Plaintiff's Exhibit 10; *see also* Transcript, May 3, 2004 at 127.

[52] Transcript, September 3, 2004 at 195.

[53] Id. at 196.

23

While Conti testified that ABP never made any money to justify his investment,
Kilroy opined that it was Conti, not ABP, that was in financial difficulty, asserting that
Conti's investment in the Wolfeboro Inn in New Hampshire "was bleeding him dry."[54]
Mahoney supplied yet another explanation for Conti's decision to take control over the
company: it was due to his son's interest in "taking over the place."[55]   Attorney G. Shepard
Bingham ("Bingham"), the attorney who succeeded Attorney Webber in the Essex Action,
concurred: "[N]otwithstanding whatever the intentions were originally, I think that the
Conti factions [sic] ultimately perceived that this was going to be a very profitable
company, and they wanted it."[56]   The Court can infer another motivation for Conti's
conduct.  In view of his conversions of accounts receivable and manipulation of accounts
at Everett Savings Bank, wresting control of ABP from its shareholders, officers and
director would enable him to conceal his conversion of ABP's checks and money in sums
in excess of $300,000, as well as his other illegal activity.

Agarwal stated that he confronted Conti about the missing checks.  Conti's response,
according to Agarwal, was to use "very filthy language."[57]   Agarwal, who was not a United
States citizen at the time, testified that Conti threatened to take steps to have his green card

---

[54] Transcript, March 9, 2004 at 104.

[55] Transcript July 7, 2004 at 148.

[56] Transcript, July 7, 2004 at 168.

[57] Transcript, April 12, 2004 at 104.

24

Case 00-01142   Doc 348   Filed 06/29/05   Entered 06/29/05 09:22:23   Desc Main
Document       Page 25 of 154

revoked.  Thereafter, Agarwal, whom Conti described as "a do-nothing person,"[58] kept a low profile, acceding to Conti's dominance of the affairs of ABP.  Indeed, beginning in December of 1992, Agarwal, at Conti's direction, sent letters to general contractors instructing them to send payments for work produced by ABP directly to Avenue Finance.  Agarwal explained his reasons as follows:

> Because the Avenue Finance [sic] was owned by Bob Conti and Bob Conti promised to invest money or to finance the American Bridge Products [sic], and on the request of Mr. Bob Conti, I signed these letters.  It doesn't mean I gave him the full authority to cash the checks.  Has to come in the joint name, whether it comes to my office or to his place, in my opinion made no difference.  I just write down the sentence to please him.[59]

Not long after Conti forced Kilroy from the Brookline Street property, Conti made it all but impossible for Agarwal to remain on the premises too.  Upon his return from India in early 1993, Conti informed Agarwal that he, Conti, was in full control of the corporation and intended to reduce his salary.  Agarwal, however, continued to work for ABP in his capacity as a professional engineer as ABP required his services for approving plans for the Massachusetts Highway Department.  Agarwal indicated that he made every effort to stay out of Conti's way until he ceased going to the Brookline Street property altogether in June or July of 1993.  At around this time, Conti borrowed $200,000 from Everett Savings Bank on behalf of "American Bridge a/k/a Agar Industry," an entity with a name virtually identical to the company Agarwal incorporated.[60]

---

[58] Transcript, September 3, 2004 at 214.

[59] Transcript, May 3, 2004 at 101.

[60] Transcript, September 3, 2004 at 212.

In addition to taking overt control of ABP in early 1993, Conti, in his capacity as Trustee of RCPC, commenced a summary process eviction proceeding against the company. In April of 1993, he sent Agarwal a letter informing him that he had obtained an execution for possession of the premises located at 93-95 Brookline Street, Lynn, Massachusetts, together with a judgment in excess of $200,000.[61] Mahoney, who notarized the "Account Annexes [sic]" to the Summary Process Complaint filed by Conti against ABP, explained that the Complaint was never properly served on Agarwal, who was in India at the time.[62]

Suspended from the practice of law and later disbarred, Mahoney began working for ABP as a "sales engineer" in the summer of 1991, developing territories outside of Massachusetts. He explained that he would "go through the plans and specifications for any bridge railing or bridge expansion joint jobs, pull the plans, do the take-offs, submit the bids, and negotiate the contracts."[63] Later he became the purchasing agent for ABP, becoming "involved in all aspects of the purchasing - - bolts, aluminum, steel"[64] as well as cost control measures. According to Mahoney, the job files were located adjacent to his desk and he "would periodically go through them to find out what materials they were

---

[61] Transcript, May 3, 2004 at 119

[62] Transcript, July 6, 2004 at 17; *see also* Defendant's Exhibit 24 showing service on Martha Talbot "AGENT IN CHARGE AT TIME OF SERVICE AUTHOIRZED [sic] TO ACCEPT PROCESS FOR AMERICAN BRIDGE PRODUCTS."

[63] Transcript, June 1, 2004 at 134-35.

[64] Id. at 135.

using and the progress that was being made and check them and correlate them with time

cards and materials."[65]  Based upon his knowledge of ABP's purchases, he opined that at

the beginning of September 1993, there were approximately $120,000 to $130,000 worth of

materials located at ABP's business location consisting of 118.5 tons of steel with a value

of $85,000; 15 tons of aluminum with a value between $15,000 and $25,000, and $20,000

worth of bolts.[66]

Mahoney also explained that the Massachusetts Highway Department employed

a professional services firm to monitor the status and quality of construction with respect

to its contracts with contractors, including ABP.  The reports were prepared by a gentleman

named Puffer who prepared so-called "PSI" or "Puffer Reports."   Mahoney described the

reports as follows:

> [They were] like a mini-synopsis of the project. [They] . . . set out the
> requirements for the project.  They would set out the tonnage of material,
> the type of job, . . . the location of the job.  As he would come along he would
> tell you how much of the material had been received; if the certifications
> were acceptable to him.  He'd tell you in detail the status off each phase of
> the project.
>
> ***
>
> His report would reflect how much of the job was shipped and when it was
> shipped and how much was ready to be shipped.  His job was pretty
> indicative of the exact - - it was a complete reflection of what the job status

---

[65] Id. at 139.

[66] Transcript, July 6, 2004 at 97-99.  Agarwal's estimate of the value of the materials was
even higher.  He said the steel and aluminum were worth at least $300,000. Transcript, May 3,
2004 at 27.

was at the particular date.[67]

Mahoney reviewed eight contracts that ABP had in September and opined that their value to ABP was in excess of $740,000.[68]   Indeed, Conti, in an affidavit used to refresh his recollection, stated that there were 25 contracts worth approximately $856,000.[69]

Although Mahoney continued working for ABP months after Kilroy stopped working, he left ABP in June of 1993 and commenced an action in the Essex Superior Court shortly thereafter alleging he was owed $50,000 in compensation.[70] He later recovered a judgment in the sum of $41,762.55.[71] After Mahoney and Agarwal left ABP, John Conti, who had begun work at ABP as an hourly, unskilled laborer, took over Agarwal's office.

While Mahoney continued to draw a salary from ABP, he, Kilroy and Agarwal were meeting with Webber about bringing a suit against Conti and others.  On August 25, 1993, ABP and Agar Industries, Inc., Agarwal's company, commenced the Essex Action.  A day after the suit was filed, there was a break-in at ABP and the police were summoned. Agarwal submitted to the Lynn police a list, dated August 31, 1993, of "Things Stolen," which contained the following items: all drawings, approved and certified by government departments, all job files, one file cabinet with closed files, computer, printer, fax machine,

---

[67] Transcript, June 1, 2004 at 141-42.

[68] Transcript, July 6, 2004 at 101-105.

[69] Transcript, September 3, 2004 at 217

[70] Transcript, July 6, 2004 at 129.

[71] Id. at 172.

28

CAD CAM release 12 discs, AME disc, blue line printing machine, all paper supplies, all canceled checks, all corporate records, all steel code and books, and AISC certification of fabrication shop.[72]

B. The Essex Action and the Receivership

On August 25, 1993, ABP and Agar Industries, Inc. (collectively, the "plaintiffs") commenced an action and obtained temporary restraining orders against Robert Conti, John Conti, RCPC, James Donald Robson, Jr., Avenue Finance, Martha Talbot and Everett Savings Bank (collectively, the "defendants"). One week later, on September 2, 1993, the court appointed Phillip Strome receiver and denied the plaintiffs' requests for permanent injunctions.[73] On September 14, 1993, the court in the Essex Action reinstated the temporary restraining orders against the defendants; on September 16, 1993, it issued a temporary restraining order against the plaintiffs, as well as Kilroy and Agarwal.[74] The court appointed Decoulos Receiver on September 22, 1993.[75] The order appointing the Receiver provided the following:

> This cause came on to be heard upon the return of an order of notice to show cause why a receiver should not be appointed as prayed for in the bill of complaint, and was argued by counsel (for the plaintiff, - the

---

[72] Plaintiff's Exhibit 9.

[73] This Court shall refer to the Essex Superior Court as the "court" to distinguish that court from either this Court or any others. Numerous judges of the Essex Superior Court heard matters in the Essex Action, including Judges Donovan, Whitehead, Forte, Barrett, Brady, Fremont-Smith, and Bohn.

[74] The restraining orders were not submitted in evidence.

[75] Plaintiff's Exhibit 11.

defendant, although duly served with process, not being present or represented by counsel); and thereupon, upon consideration thereof, it is ORDERED AND ADJUDGED:

1. That until further order of the Court Nicholas J. Decoulos, Esq., of 248 Andover St Peabody, be and hereby is appointed receiver of the estate, property, moneys, debts and effects of every kind and nature of or belonging to the defendant + pltf [sic] American Bridge Products, Inc.; and he is hereby authorized and directed to collect, get in, and take charge of all and singular thereof, and to hold the same subject to the further order of the court.

2. That the said defendant, its officers, servants, agents and attorneys, and each of them, are hereby required and ordered to deliver to said receiver all the property, moneys, stock in trade and effects of every kind and nature belonging to the said defendant in their hands, possession, or control, together with all books, deeds, documents, vouchers and papers relating thereto, and the said defendant and its officers, servants, agents and attorneys, and each of them are hereby restrained and enjoined from collecting any of the debts or accounts due to the said defendant and from using, spending, injuring, conveying, transferring, selling, or in any manner disposing of or encumbering any of the effects or property aforesaid, except to deliver them into the hands of said receiver.

***

4. *That the said receiver is required to file in the office of the clerk of this court, within thirty days after the date of entry of this decree, under oath, a detailed inventory of the property of which he has possession, or the right of possession, with the estimated values thereof, together with a list of the encumbrances thereon; and also a list of the creditors of the receivership and of the said defendant, so far as known to him.*

***

6. That either of the parties, or the said receiver, may apply to the court from time to time for such further directions, orders, or decrees as may be necessary.[76]

---

[76] Plaintiff's Exhibit 43 (emphasis supplied). The Order referred to "an order of notice to show cause why a receiver should not be appointed as prayed for in the bill of complaint." The plaintiff's complaint contained no such prayer for relief. The Order contemplated a receivership of the defendant, but ABP was one of two plaintiffs. Obviously, the Order Appointing Receiver

(emphasis added).

Decoulos accepted his appointment as Receiver. On September 23, 1993, the court terminated all temporary restraining orders. Decoulos's first action, after reviewing the Order of Appointment, was to review "appropriate statute and case [sic] regarding liability of Receiver."[77] Four days after accepting his appointment, he went to the Lynn Post Office to change the mailing address of ABP and to pick up the mail. In the meantime, Conti incorporated New England Bridge Products, Inc. ("NEBP"), which John Conti managed.[78]

Notwithstanding the appointment of a receiver, NEBP continued to use ABP's telephone number, and AISC certification to conduct business from the premises occupied by ABP. Additionally, it used ABP's job files, which had reportedly been stolen. According to Mahoney, NEBP "took over American Bridge Products without missing a beat."[79] Indeed, John Conti corroborated this testimony. Moreover, he stated that Robson contacted ABP's general contractors and informed them of the receivership proceedings. Although not an attorney, he opined that this resulted in cancellation of the contracts, an

_____

was not crafted for the unique circumstances presented in the Essex Action.

[77] Plaintiff's Exhibit 44, Statement of Professional Services Rendered, dated May 26, 2004.

[78] Plaintiff's Exhibit 42.

[79] Transcript, July 6, 2004 at 20. The Court accepts Mahoney's testimony as to the job files and other records as true. During the trial, counsel to Decoulos, in cross examining Kilroy, showed the witness canceled checks written on ABP accounts. In response to a question from the Trustee as to how he came by these records when Decoulos testified that he turned all his records over to the Trustee, counsel to Decoulos answered as follows: "I can clear this up. I went to this facility on Brookline Street and went through boxes of records. The checks were there and we retrieved them. . . . We got these last week." Transcript, April 5, 2004 at 37-38.

assertion which could not be verified as the contracts were not introduced in evidence. John Conti added: "[w]e basically had to tell the general contractors that we would be able to perform to finish those projects."[80] He conceded that NEBP would not have been able to complete ABP's existing contracts without its infrastructure.[81] Thus, NEBP, a non-SOMBA certified company completed the favorable contracts ABP had obtained as a SOMBA certified company.

Even though Conti testified that ABP "never made a dime,"[82] he recalled incorporating NEBP in the fall of 1993. He testified that he did not remember where he obtained the funds to start the company.[83] Later, he stated that he gave his son the money to start NEBP, that his son informed him the company was doing well, that he never had NEBP sign a lease, and that he never charged it rent.[84] In July of 1999, approximately six years after the commencement of the Essex Action and three years after the filing of the involuntary petition, John Conti delivered a check drawn on NEBP's account in the sum of $400,000 to his father with the notation, "7/29/99 Loan 215001."[85]

Agarwal, for his part, changed the mailing address of ABP to his home address in

---

[80] Transcript, September 3, 2004 at 248. John Conti testified he "probably" invested $50,000 in NEBP. Id. at 232.

[81] Id. at 252.

[82] Id. at 207.

[83] Id. at 208.

[84] Id. at 224-25.

[85] Plaintiff's Exhibit 41.

Methuen, Massachusetts and, in the fall of 1993, after the commencement of the Essex Action, received a check in the sum of $9,700 from an ABP account debtor which he deposited in the account of another entity with which he was involved, Greater Boston Construction Company. Agarwal eventually turned over the sum of $9,700 to the Receiver.[86] Additionally, Webber received funds belonging to ABP in the amount of $2,304.82, which funds were never recovered.[87]

In the first three months of the receivership, Decoulos conferred with Attorney John Mackey, John Conti's counsel, as well as Attorney Webber and others, including Conti, Robson, Kilroy and Agarwal. Between the date of his appointment in September of 1993 and June 1, 1994, the bulk of Decoulos's time was spent conferring with the parties, and their various representatives. Additionally, he prepared and submitted to the Superior Court four applications for orders, the first two of which contained his requests for authority to complete unfinished work in progress including contracts with entities identified as follows: Converse Construction Company, Inc., Petricca Industries, James Gross, Sciaba Construction, Gagliarducci and T.A. Loving.

In his Application for Order #3, dated October 27, 1993, filed over a month after his appointment, Decoulos sought permission to vacate the Brookline Street premises on the ground that ABP had completed its work in progress. Decoulos also sought authority to retain Barton K. Hyte Co., Inc. as his appraiser and Neal A. Price & Company as his

_____

[86] Transcript, May 3, 2004 at 138-40.

[87] Plaintiff's Exhibit 11, Lg. Tab 1.

33

accountant. In requesting authority to vacate the Brookline Street premises, Decoulos did

not mention the letter dated October 1, 1993, from Attorney John Mackey, John Conti's

counsel, in which Attorney Mackey stated:

> [M]y client would like to see the plaintiff corporations dissolved and
> liquidated as soon as possible. It may be in the best interest of all parties that
> both corporations be placed into bankruptcy and all the outstanding debts
> be discharged to the extent possible under federal codes.
>
> ***
>
> [A]t this point there is a continual rental obligation on the part of the
> corporation due to the Defendant, Robert Conti. At this point, we would like
> to terminate the rental obligation, but also, have the plaintiffs corporations
> [sic] vacate the premises and allow Mr. Conti to either use the premises
> himself, or rent it out to someone who will pay a fair market rental.
> Additionally, Mr. Conti currently holds an execution approximately
> $225,000.00 against the plaintiff [sic]. He will be willing to accept all tools
> that are not his, equipment, machinery and materials on board in lieu of
> payment of this $225,000.00 debt. My client believes at this time there is
> approximately thirty to thirty-five thousand dollars worth of equipment
> being held by the corporations and some fifteen thousand dollars worth of
> materials on the site.[88]

Although Decoulos obtained authority to retain Barton K. Hyte Co., Inc., Barton

Hyte ("Hyte") did not visit the Brookline Street premises for purposes of conducting an

inspection and appraisal of ABP's assets until December 14, 1993, 11 weeks after Decoulos's

appointment. Decoulos did not accompany Hyte to the Lynn property,[89] advising Hyte to

contact John Conti. John Conti, not Decoulos, provided Hyte with "a list as to what he

---

[88] Plaintiff's Exhibit 45.

[89] Plaintiff's Exhibit 44, Statement for Professional Services Rendered dated May 26, 1994.

34

[John Conti] said was the property to be appraised."[90] Hyte questioned John Conti about "the large amount of other assets on the premises at which he said 'that's part of another company, nothing else belongs to them [ABP].'"[91] Neither Hyte nor Decoulos conducted any independent inquiry of Conti's assertion at the time.

Agarwal and Kilroy became disenchanted with Decoulos's performance as Receiver of ABP within months, if not weeks, of his appointment. Both complained of his refusal to listen to them and consider their points of view. As a result, with the advice of their attorney, ABP filed a Chapter 11 bankruptcy petition, which was dismissed shortly after it was filed on the motion of the United States Trustee. Kilroy explained the motivation for the bankruptcy filing as follows:

> We couldn't do anything under Decoulos, he would have no communication with us. He was doing nothing about anything, as far as securing funds and protecting the company from losses, and absolutely less than nothing in the lines of communication. . . . He had to be removed for the company to survive.[92]

Agarwal shared Kilroy's assessment of Decoulos's performance, particularly because as president of ABP he was receiving demands from the IRS and the Massachusetts Department of Revenue with respect to the need to file tax returns. He urged Decoulos to employ an accountant to prepare the necessary returns and to pay the company's tax

---

[90] Plaintiff's Exhibit 13.

[91] Id.

[92] Transcript, March 10, 2004 at 55. The U.S. Trustee's motion was not introduced in evidence. Thus, the Court is unaware of the grounds for seeking dismissal.

obligations.[93]  His frustration with Decoulos eventually led him to send a letter, dated

January 28, 1994, to the Massachusetts Board of Bar Overseers in which he stated, among

other things, the following:

> When he put the Defendants in charge of my businesses he never took
> an inventory of what was on the premises.  He has allowed the Defendants
> to set up a new company called New England Bridge Products, Inc.  This
> new company has taken the telephone number of my company, its
> equipment, materials and contracts as its own, all with the help and
> assistance of Mr. DeCoulas [sic]. Mr. DeCoulas [sic] now informs me that the
> equipment and material belonging to my companies is only a bunch of junk
> worth about $500.00.  Without my knowledge Mr. Decoulas [sic] gave cash
> money from my account to Defendants.[94]

The Board of Bar Overseers did not take action against Decoulos based upon Agarwal's

complaint.  Nevertheless, Agarwal was correct in at least one respect: at the time he wrote

the letter, Decoulos had not filed "a detailed inventory of the property of which he has

possession, or the right of possession, with the estimated values thereof, together with a

list of the encumbrances thereon."[95]  Indeed, Decoulos never filed the type of inventory

required by the court's September 22, 1993 Order of Appointment.

On February 25, 1994, six months after the commencement of the Essex Action, ABP

by its shareholders, Agarwal and Kilroy, retained Bingham to represent it.  Neither ABP

nor its shareholders paid Bingham a retainer for his services.[96]

--------

[93] Plaintiff's Exhibit 15.

[94] Plaintiff's Exhibit 16.

[95] Plaintiff's Exhibit 43.

[96] Defendants' Exhibit 11.

36

Bingham explained his initial approach to the case presented to him by Agarwal and Kilroy: "gather as much information as . . . [I] . . . could, put it in a concise fashion, and get it to Attorney Decoulos, that . . . was my function in terms of trying to help Mr. Kilroy and Mr. Agarwal."[97]  After conducting a preliminary investigation, Bingham testified that he perceived the following:

> [T]here was a claim involving improper negotiation of checks payable to American Bridge by either people who were not authorized by American Bridge to execute or negotiate those checks.  There were - - there were [sic] conversion of receivables directly . . . checks made payable to American Bridge that ended up in . . . non-American Bridge accounts, and - - and I found that - - early on I was provided with a list of . . . what appeared to be a compilation of checks of that nature, receivables that were due American Bridge that didn't get to American Bridge accounts.  I saw that in one aspect of the claim, and - - , you know, that was something that developed more and more over time.  I thought it was a - - a very good and a very valid claim, and I, in my sense, that there was a strict liability associated with that to Everett Savings Bank.[98]

Bingham also considered NEBP an alter ego of ABP as part of his initial assessment of what was transpiring at the Brookline Street location.  He testified that he conducted an exhaustive investigation.  He went to the Massachusetts Highway Department and examined the Puffer Reports, he contacted resident engineers, he sought out bank records, and he examined copies of checks.

On June 3, 1994, over eight months after his appointment, Decoulos filed his first Receiver's Report, along with an Application for Order #6 through which he sought

---

[97] Transcript, July 7, 2004 at 157.

[98] Transcript, July 7, 2004 at 160.

payment of his fees in the sum of $11,540 for 57.7 hours of time expended at an hourly rate

of $200, as well as payment of his accountant, Neil A. Price & Co., in the sum of $2,175 and

his appraiser, Barton K. Hyte Co, Inc., in the sum of $150.   Bingham objected to the

Application on behalf of the plaintiffs on the following grounds:

> [T]he Receiver has failed to properly document and account for Plaintiffs'
> work-in-process, inventory, equipment, contract receivables and contract
> rights existing as of the date of his appointment. The Plaintiffs further state
> that the Receiver had failed to account for and recover corporate funds which
> were fraudulently negotiated and wrongfully converted to the account(s)
> and/or benefit of unrelated third parties.[99]

Decoulos admitted that he did not file an inventory of the estate's assets within 30

days as required by the Order of Appointment.[100] He testified, however, that he kept

contemporaneous time records for purposes of billing the receivership for his professional

services and that it was unnecessary for him to work more than 57 hours to fulfill his duty

to the court with respect to the filing of an inventory, even though he had not succeeded

in getting "a handle on the whole situation."[101]

In this First Receiver's Report, Decoulos reported that he had received and

deposited $97,455.37 from seven contracts and that he had expended $20,596.93.[102]

Specifically he stated that he paid Everett Aluminum Products, Inc., Conti's company, a

total of $7,772.   Although the court in its orders approving Decoulos's first two

---

[99] Plaintiff's Exhibit 11, Sm. Tab. 6.

[100] Transcript, September 24, 2004 at 6.

[101] Transcript, October 18, 2004 at 17.

[102] Plaintiff's Exhibit 11, Lg. Tab 1.

38

Applications for Orders permitted Decoulos to complete certain contracts, Decoulos did

not disclose or justify why payments to the defendants in the Essex Action were necessary,

and he did not disclose to the court that NEBP was operating at ABP's former place of

business.

Decoulos, in his First Report, stated that the inventory, which Mahoney estimated

had a value of at least $120,000, was appraised by Hyte at $750: "An appraisal of the

inventory was made and the Receiver was informed by the appraiser that only metal used

to fabricate the corporations's product was found on the premises and that it had a value

of $750."[103] Additionally Decoulos reported the following about ABP's equipment and

personal property

> [it] was surrendered to the Receiver by a third party who had taken
> possession thereof and *it was restored at the place of business of the corporation*.
> Since that time the personal property has been removed and there has been
> no accounting made by any person.  The last time that the Receiver saw the
> equipment it was in the possession of John Conti and Robert Conti who,
> together with Donald Robson, completed the contract as allowed by Order
> #1.[104]

Decoulos did not report that there was a dispute as to the ownership of the

equipment, that it was being used by NEBP, and he did not discuss the claims in the Essex

Action, which he admitted were assets of the receivership.[105]  He did not report that he had,

---

[103] Plaintiff's Exhibit 11, Large Tab 1. John Conti's attorney represented the materials at
the Brookline Street premises had a value of $15,000.  Decoulos failed to explain why they
would be worth $14,250 less at the time he filed his Report. *See also* Plaintiff's Exhibit 13 and
text *infra.*

[104] Plaintiff's Exhibit 11, Large Tab 1.

[105] Transcript, October 18, 2004 at 37, 43, 45.

39

in effect, resolved the dispute in favor of the defendants by letting the Contis obtain and retain possession of the personalty. Decoulos's representations to the court were so vague and devoid of substance that they constituted an admission that he failed to conduct a proper inventory and to secure possession of the equipment and materials, particularly as he had obtained court authority on November 20, 1993 to vacate the premises and NEBP was operating from them.

Decoulos also stated that his accountant had reviewed all records that "came into the possession of the Receiver" but that "he could find no checks and that the disbursement sheets of the corporation for the period June through April, 1993 were missing."[106] He also testified that the premises in Lynn looked like the inside of a dumpster and that he did not make an effort to find the books and records of ABP because he was "not in the habit of looking inside dumpsters."[107]

Decoulos attached to his Report a balance sheet as of December 31, 1992, a Statement of Earnings and Retained Earnings, and a Statement of Cash Flows. According to the account employed by Decoulos, for the year ended December 21, 1992, ABP had total sales of $937,890, in contrast to contract income of $1,895,497 for 1991; gross income of $380,693, in contrast to the gross profit of $471,773 for the year ended December 31, 1991; and net

---

[106] Decoulos testified that the Contis gave him checks and corporate records which he had been demanding and which they told him they did not have six months before his trial testimony and years after the receivership - - records which he then turned them over to the Trustee. Transcript, October 18, 2004 at 18-19.

[107] Transcript, October 18, 2004 at 28-29.

40

earnings of ($467,692), in contrast to the net income of $121,282 for the year ended December 31, 1991.[108] Although Attorney Mackey had informed Decoulos that Conti had a judgment of $225,000 for non-payment of rent, the accountant's report reflected the payment of $50,640 in rent.

Decoulos submitted a list of 41 creditors with his Report, showing that ABP's accounts payable totaled $379,694.84 . The list included Everett Savings Bank with a debt in the sum of $46,955.38 as well as Mahoney with a debt in the sum of $44,896.96. USTrust was not mentioned in the Report,[109] a circumstance from which this Court infers, and Decoulos's Statement for Professional Services Rendered corroborates, that Decoulos did not conduct a UCC search to determine the extent and priority of liens, including tax liens, against ABP's assets. The accountant, whose work papers were attached to Decoulos's Report, listed accountants payable in the sum of $323,504 on the balance sheet (approximately $50,000 less than the total on the creditor list), together with notes payable in the amount of $311,409, plus accrued expenses, payroll taxes and withholding taxes for total current liabilities of $647,979.

Although Bingham had objected to Decoulos's Report and Application for Order #6 on behalf of ABP, the court, on June 15, 1994, granted Decoulos's Application for Order #6

---

[108] Plaintiff's Exhibit 11, Lg. Tab 1.

[109] Within the first several months of the receivership, USTrust commenced an action against ABP with respect to its outstanding loans. It eventually obtained a judgment in the approximate amount of $400,000, which formed the basis of the proof of claim it filed in this bankruptcy case.

authorizing him to pay fees to his appraiser and accountant and to himself the sum of

$11,540. Although the court failed to sustain ABP's objection, in a letter dated to June 22,

1994 to Everett Savings Bank's counsel, Mark E. Tully, Esq. ("Tully"), Bingham stated:

> It would appear that the pendulum has finally begun to swing in favor of my
> clients. After a rather lengthy presentation, *Judge Brady opined that this case
> has a strong stench about it. As a result, he ordered the Receiver to adopt an
> aggressive/adversarial role in both ascertaining the truth and tracking down
> wrongfully converted assets of the companies, including contracts, receivables,
> fraudulently endorsed instruments, inventory and equipment.*[110]

In his letter, he also stated there was $401,478 in "fraudulently endorsed checks."[111]

Approximately one month later, in a letter dated July 20, 1994, Bingham advised

Tully that he had spoken with the Acting Commissioner of Banks for the Commonwealth

of Massachusetts and that the conduct of Everett Savings Bank in permitting fraudulent

endorsements and deposits to "non-related third party accounts" was "patently illegal"

and that transfers of funds from accounts by someone who was not a signatory was

"tantamount to larceny."[112]

On the same day, Bingham forwarded various documents to Decoulos, including

a police report dated July 14, 1994. According to the report, a Lynn police officer met

Agarwal at the apartment of Henry Gonzalez, a former ABP employee, where various

items of equipment belonging to ABP were found, including a blue print machine

purchased and paid for by ABP in early 1993. Bingham stated:

---

[110] Plaintiff's Exhibit 19 (emphasis supplied).

[111] Id.

[112] Plaintiff's Exhibit 35.

Obviously, this is in direct contravention of what had been represented to
you.  It is also a blatant disregard of Judge Forte's previous order to <u>all
parties</u> to surrender <u>all assets</u> to you as Receiver.  I would strongly advise
that Mr. Gonzalez be summoned in before Judge Brady to be examined as to
what he knows in this matter and what additional assets/work product of
American Bridge he might be holding.  I would also advise that a Complaint
for Contempt be sought against Robert Conti, John Conti and Donald Robson
for their blatant disregard of your's and the Court's orders.[113]

Despite the court's direction to Decoulos in June 1994 to take more aggressive action,

and the reference to fraud,[114] neither Decoulos nor any of the parties to the Essex Action

filed any pleadings until September of 1994.  Bingham, however, was busy writing letters

to the Everett Savings Bank, stressing its liability and proposing a settlement,[115] as well as

to Decoulos, urging him to take steps to secure the machinery, equipment, and inventory.

Bingham advised Decoulos that he had "a rigging company ready to load and move the

equipment at your immediate disposal."[116]

On September 6, 1994, Decoulos filed Application for Order #7 in which he sought

a short order of notice to issue against NEBP, Conti, John Conti, Henry Gonzalez, and

Donald Robson "ordering them to appear and show cause why they, or any one of them,

have not surrendered to the Receiver all of the property described on Exhibit 1, Exhibit 2

and Exhibit 3."[117]  In his Application, Decoulos represented that he had been informed by

---

[113] Plaintiff's Exhibit 28 (emphasis in original).

[114] Transcript, August 31, 1994 at 86.

[115] Plaintiff's Exhibit 20.

[116] Plaintiff's Exhibit 29.

[117] Plaintiff's Exhibit 11, Sm. Tab 7.

43

Bingham and Mahoney that property described on Exhibit 1 was owned by ABP and was in the possession or under the control of the named defendants and that property identified on Exhibits 1 and 2 was sold to ABP "by Kilroy, Cesar Martinez or Robert Conti." He added: "On July 14, 1994, a view at the property that was formerly occupied by American Bridge Products at 93-95 Brookline Street, Lynn, Massachusetts, was taken by the Receiver together with G. Shepard Bingham, Esquire, William Mahoney, Frank Kilroy, Robert Conti, John Conti, and Donald Robson, and the Receiver observed the equipment listed on Exhibit 3."[118] Decoulos also mentioned the property located at Henry Gonzalez's apartment.[119]

ABP, through Bingham, moved to amend Decoulos's Application for Order #7. Bingham asserted that the property listed on Exhibits 1 through 3 should be surrendered and stored in an appropriate warehouse facility and that Everett Savings Bank be ordered to account for and surrender to the Receiver "all monies represented by checks drawn to the order of American Bridge Products, Inc. from and after January 1, 1992 which were thereafter fraudulently endorsed and wrongfully <u>deposited</u> by said Bank to various 'non-Bridge" [sic] accounts maintained thereat by several of the Defendants named herein."[120]

In mid-September 1994, the court issued the order of notice requested by Decoulos, but deferred a ruling on ABP's Motion to Amend. Additionally, it discharged Decoulos

---

[118] <u>Id.</u>

[119] <u>Id.</u>

[120] <u>Id.</u> (emphasis in original).

as Receiver of Agar Industries, Inc.[121]

Bingham, as usual, continued to correspond with Decoulos. In a letter dated September 20, 1994, he outlined, in detail, demands for production of documents Decoulos should address to Everett Savings Bank and the other defendants.[122] He suggested that Decoulos contact USTrust and "ask it to produce a copy (front and back) of the actual loan proceed check supposedly supporting the original promissory note to <u>American Bridge Railing</u>."[123] He added: "I am sure you will that find [sic] the proceeds went directly to Mr. Conti's account; he signed the first note and only subsequent thereto did Caesar [sic] Martinez execute an assumption of that note as President of American Bridge Products, Inc."[124]

Decoulos filed an Application for Order #8 for the purpose of retaining Neal A. Price & Co. to review the documents produced by Everett Savings Bank. The court entered the order Decoulos requested on September 26, 1994. Approximately two weeks later, Decoulos filed an Application for Order #9 seeking an order requiring Everett Savings Bank "to furnish to the Receiver all of the documents set forth in the Plaintiff's First Request for Production of Documents to Everett Savings Bank, which documents would

------

[121] Plaintiff's Exhibit 11.

[122] Plaintiff's Exhibit 38.

[123] <u>Id.</u> (emphasis in original).

[124] <u>Id.</u> In October 1994, a Motion to Compel Production of Documents was filed. It is unclear from the Superior Court docket who filed the motion.

also include those relevant to New England Bridge Products, Inc."[125] Decoulos noted that

the court had ordered him on September 20, 1994 "to review the documents of the Everett

Savings Bank."[126] Decoulos also sought authority to sell the blue print machine to John

Conti for $800.[127]

ABP, through Bingham, objected to the Application for Order #9. Bingham sought

to amend the order to require the defendants to surrender, and the Receiver to store, all the

property listed by the Receiver in the Exhibits attached to his Application for Order #7.

He also sought an order requiring the defendants to account for and surrender to the

Receiver $620,392.82 in receivables seized by the defendants. Citing the receivables and

evidence that no less than $401,478 in checks made payable to American Bridge Products,

Inc. were fraudulently endorsed and thereafter deposited or transferred to one or more of

the defendants with the assistance of the Everett Savings Bank, he stated "it is premature

to begin disposing of American's assets."[128] Although the court denied ABP's Motion to

Amend, it is unclear whether it entered the order for production of documents by Everett

Savings Bank requested by Decoulos.[129]

In November of 1994, ABP moved to amend its original Complaint filed on August

---

[125] Plaintiff's Exhibit 11, Sm. Tab. 9.

[126] Id.

[127] Id.

[128] Id.

[129] There is a signed but undated Order #9 in Plaintiff's Exhibit 11, Sm. Tab 9, but the order does not appear on the docket.

25, 1993 to add NEBP as a defendant and to add two counts against it for conversion and intentional interference with advantageous contractual relationships.  The court allowed ABP's motion on December 29, 1994, the same day it allowed Decoulos's Application for Order #10 through which he requested fees totaling $5,240 for 26.2 hours of time spent between September 9, 1994 and December 8, 1994.[130]

While Decoulos received compensation for his services, Bingham's efforts to be compensated or employed as special counsel to the Receiver *nunc pro tunc* were unsuccessful because Decoulos believed that Bingham had a conflict of interest.  In a December 1, 1994 letter to Decoulos, Bingham, after enclosing a list of checks/receivables not properly credited to ABP and commenting on the documents produced by Everett Savings Bank, stated the following:

> In response to your comment regarding Judge Brady's expressed desire to secure payment of my legal fees, I wholeheartedly endorse his sentiment.  In this regard, I would once again ask for your help.
>
> ***
>
> I am advised that the Receiver clearly has the authority to file a Application [sic] authorizing my employment - nuc [sic] pro tunc - as special counsel to aid in both the collection of assets belonging to the debtor and in resolving claims against its estate.  Clearly, the record is replete with evidence that I have done everything possible to enhance the debtor's estate; i.e., uncovered improperly converted equipment, inventory, receivables and contractor back charges.  I have also vacated a $200,000.00 judgement [sic] against American Bridge from the Lynn District Court.
>
> ***

---

[130] Plaintiff's Exhibit 11.

47

The only parties who would object to my being paid are the those [sic] who committed the fraud in the first instance. All you have to do is bring the Application For Order; let Judge Brady do the rest. I would be deeply appreciative as I just cannot continue to subsidize the further prosecution of this case on my own.[131]

Decoulos refused Bingham's request.

In January of 1995, approximately fifteen months after his appointment, Decoulos filed Application for Order #11. He sought copies of all cash receipt journals, and the deposit slips utilized by the Amity Realty Trust, Agar Industry Company, Agar Industries, Inc., RCPC, Avenue Finance, NEBP, and ABP. The Application was granted on January 4, 1995. On February 27, 1995, Decoulos filed an Application for Order #13 seeking an order compelling the parties identified in his Application for Order #11 to comply with the court's order because "none of the parties have responded to that Order." He also sought an order compelling Everett Savings Bank to furnish the documents set forth in his Application for Order #9.[132] The court denied Decoulos's Application without prejudice for failure to file a Rule 9A certificate. Decoulos did not refile his Application for Order #13.

In the winter of 1995, Decoulos sought and obtained an order authorizing him to mail proof of claim forms to the creditors of ABP. At around the same time, the court allowed a Motion for Ex-parte Approval of Trustee Process Attachment in the sum of $232,881 filed by ABP, through which it sought trustee process attachments against the

---

[131] Plaintiff's Exhibit 36.

[132] Plaintiff's Exhibit 11, Sm. Tab. 13.

48

Shawmut Bank and Somerset Savings Bank with respect NEBP's alleged conversion of receivables from various ABP contracts and inventory.[133] The Motion was supported by Mahoney's affidavit.[134]  In his Receiver's Report #2, Decoulos reported that "the sum of $17,971.34 is being held by the Trustees."[135]  He added: "The Court should order this amount to be placed in an interest bearing account to be held by the Trustee or by the Receiver."[136]

In late January or February 1995, Bingham moved to be appointed special counsel to the Receiver *nunc pro tunc*.  Decoulos, as well as Conti and Everett Savings Bank, opposed his motion. The court denied Bingham's motion, noting that the Receiver had not petitioned for appointment of counsel.[137]

Throughout the spring of 1995, Bingham continued to correspond with Decoulos, urging him to take forceful action.  For example, in a letter dated March 17, 1995, he stated his belief that a Motion/Application for Order directing NEBP to surrender wrongfully converted receivables should be filed.  He concluded: "In my opinion, your failure to undertake such an action will seriously impair and prejudice the rights of American's

---

[133] Defendants' Exhibit 9, Plaintiff's Exhibit 11 (docket).

[134] Plaintiff's Exhibit 18.

[135] Plaintiff's Exhibit 11, Lg. Tab. 2.

[136] Id.

[137] Plaintiff's Exhibit 11 (docket).

legitimate creditors as well as those of my clients."[138] Decoulos demurred: "I am sorry to say I cannot do that. I recently received a communication from New England Bridge indicating that they [sic] did not convert those receivables. Accordingly, I would need a judgment of the court before complying with your request."[139]

On March 24, 1995, Bingham again wrote to Decoulos, advocating a more aggressive approach to his duties. He noted that, after reviewing the "Proof of Claims Summary Sheet," $1,107,151 of the total claims submitted were held by parties to the Essex Action. He also noted USTrust's claim was suspect because the proceeds may not have gone to ABP. He concluded:

> For too long, the burden has been unfairly placed on American to prove its ownership interest in the above items. Of course, the presumption should have run in its favor from the beginning; nevertheless, having now shown fraud, deceit and wrongful conversion, still no action is being taken by you against the respective Defendants. It is incredulous [sic] to me that in the face of all the hard evidence presented by the Plaintiff (i.e. actual fraudulently endorsed/improperly deposited checks and the PSI [Puffer] Reports) you would simply rely on an unsworn statement by the Defendants, who you know have repeatedly lied to you in the past, denying improper conversion of assets. The burden is on them to prove such a statement; until they can do so, the burden is on you to seize and protect American's property.[140]

Less than one week later, in a letter to Decoulos dated March 30, 1995, Bingham discussed the "PSI [Puffer] contract files subpoenaed by this office for your analysis." [141]

---

[138] Plaintiff's Exhibit 21 (emphasis in original).

[139] Plaintiff's Exhibit 22.

[140] Plaintiff's Exhibit 37.

[141] Plaintiff's Exhibit 23.

50

He observed that "the ball has again been dropped regarding Everett Savings Bank's production of documents,"[142] a matter he stated was related to "our ability to trace misappropriated receivables and fraudulently endorsed checks."[143]   Finally, Bingham warned that "as each day passes, the Defendants are given greater opportunity to 'cover tracks' and conceal assets which might otherwise be attached for American's benefit."[144]

In April of 1995, Bingham continued to exhort Decoulos.   On April 7, 1995, he advised Decoulos that NEBP had received $55,000 in November and December of 1994 "from Sciaba for the Williamstown job."  He observed: "Had you undertaken a proper investigation and steps to secure such receivables at that time, American Bridge's estate would be considerably improved as of this writing."[145]   On April 24, 1995, Bingham forwarded Decoulos a copy of his March 24, 1995 letter, warning as follows:

> [U]nless you move to both seize and store American Bridge's machinery and equipment while attaching the various Defendants' real and/or personal assets in order to secure American Bridge's legitimate claims on or before May 10, 1995, I have been instructed to file a Motion seeking an immediate accounting as well as your removal as Receiver.[146]

On May 11, 1995, one day after the deadline set by Bingham, Decoulos filed

---

[142] Id.

[143] Id. On April 12, 1995, Bingham, on behalf of ABP, filed a Motion to Find the Defendant Everett Savings Bank in Contempt and for the Assessment of Sanctions and Attorney's Fees. Defendants' Exhibit 11.

[144] Plaintiff's Exhibit 23.

[145] Plaintiff's Exhibit 24.

[146] Plaintiff's Exhibit 30.

51

Application for Order #14, requesting authority "to institute the necessary legal

proceedings in the Suffolk County Superior Court to set aside a Judgment rendered in

favor of U.S. Trust [sic] Company against W. Sims & Associates, Inc., d/b/a American

Bridge Products, Inc. in the amount of $252,175.52;" "to institute the necessary legal

proceedings to depose all of the Defendants and the vendees of the Defendants;" to

institute the necessary legal proceedings to attach assets of all of the Defendants;" and "to

enter into a contract to store the personal property of American Bridge Products, Inc."[147]

In support of his Application #14, Decoulos represented to the court that the institution of

legal proceedings was necessary "in order to secure the payment of any judgment that the

Receiver may obtain against those parties for obtaining funds subsequent to his

appointment as Receiver, which funds the Receiver believes belong to American Bridge

Products, Inc."[148] He added "the Defendants have retained possession of personal property

belonging to American Bridge Products, Inc. and the stockholders of American Bridge are

of the opinion that the personal property should not be sold to any third party, including

any of the Defendants, and that the personal property should be stored in a warehouse

---

[147] Plaintiff's Exhibit 11, Sm. Tab #14 (emphasis added).  The Court takes judicial notice
from the record of proceedings in this case that USTrust commenced an action against W. Sims
& Associates, Inc., d/b/a American Bridge Products, Inc., Conti and Martinez in October of 1993
in Suffolk Superior Court seeking to recover money loaned pursuant to two promissory notes
either from ABP or from Martinez and Conti as guarantors.  It named Conti, his spouse, Lillian
Conti and various realty trusts as reach and apply defendants and Everett Savings Bank and other
banks as trustee process defendants. Further, it identified two notes, one executed in May of 1992
in the principal amount of $189,949.85, and the other executed in October of 1992 in the
principal amount of $37,000.  Michael Gilleran, Esq. testified in broad terms about the USTrust's
efforts to collect the money loaned.

[148] Id.

until these proceedings are concluded."[149]  Decoulos further sought authority to institute

proceedings to vacate the judgment obtained by USTrust on June 30, 1994, noting that he

had "requested the attorney for U.S. Trust [sic] on more than one occasion to reveal to him

the original documents which created the obligation that the U.S. Trust claims to be due."[150]

In accordance with his representations to the court and the entry of Order #14,

Decoulos did file a motion to vacate the judgment obtained by USTrust.[151]  Decoulos was

unsuccessful in his effort to vacate the USTrust judgment and, on June 20, 1995, he filed a

notice of appeal.[152]  These actions, as well as others, unequivocally establish that Decoulos

performed legal services in addition to acting in his capacity as receiver.  Decoulos,

however, did not take any of the other actions authorized pursuant to order entered by the

court granting his Application for Order #14.

On June 2, 1995, Decoulos filed Application for Order #15, seeking a short order of

notice against Conti, John Conti, NEBP, and Henry Gonzales "ordering them to appear and

show cause why they, or any one of them, have not surrendered to the Receiver all of the

property described on Exhibit 1, Exhibit 2 and Exhibit 3."[153]  The relief requested by

---

[149] Id.

[150] Id.

[151] His time records suggest that the motion was filed on May, 12, 1995, see Plaintiff's
Exhibit 44, but on May 19, 1995, Bingham wrote to Decoulos urging he to "[m]ove to stay
execution and vacate the judgment of U.S.Trust [sic], . . . because . . . [t]his would eradicate all
secured debt but for the Everett Savings Bank."  Defendant's Exhibit 12 (emphasis in orginal).

[152] Plaintiff's Exhibit 44.

[153] Plaintiff's Exhibit 11, Sm. Tab 15.

Decoulos was identical to the relief he requested ten months earlier in his Application for

Order #7.  In his June 2, 1995 Application, Decoulos stated: "At the hearing on that Order

of Notice, it was never fully determined by the Court who in fact does own the property

listed on Exhibit 1, Exhibit 2 and Exhibit 3."[154]  Although he obtained court orders requiring

the turnover records, he never sought contempt orders against the defendants for their

failure to furnish him with the requested records.[155]  Decoulos testified that he only

obtained checks and corporate records from the Contis in the spring of 2004.[156]

On July 14, 1995, Decoulos filed Receiver's Report #2 for the Period June 3, 1994

through July 13, 1995, noting that he had cash on had of $95,820.30.[157]  He reported that he

had received $37,333 with respect to a contract with Sciaba and had expended $19,409.75

for professional fees and other expenses, including the payment of $16,780.00 to Decoulos

& Decoulos.  In his report, he concluded Kilroy was not a stockholder of ABP and that

ABP's allegations that NEBP converted work in progress to its own use and received funds

from the vendees of the contracts completed through the use of work in progress "appear

to be valid."[158]  Additionally, he reported receipt of proofs of claim totaling $1,640,428.05,

including a $507,000 claim filed by Avenue Finance, a $29,157.15 claim filed by Bingham,

---

[154] Id.

[155] Transcript, October 18, 2004 at 22.

[156] Id. at 18-19.

[157] Plaintiff's Exhibit 11, Lg. Tab 2.

[158] Id.

54

a $114,000 claim filed by John Conti, a $216,134.02 claim filed by Robert Conti as Trustee

of RCPC, a $73,7000 claim filed by Conti, a $51,420.20 claim filed by Everett Savings Bank,

a $100,000 claim filed by Kilroy, a $44,896.96 claim filed by Mahoney, and $252,175.532

claim filed by USTrust. Decoulos reported that he was unsuccessful in getting USTrust's

default judgment vacated and had filed an appeal. At the conclusion of his Report, he

requested that he be allowed "to complete discovery," that "the Everett Savings Bank claim

be resolved," that he be "ordered to enter into negotiations to resolve the claim of the

USTrust," and that "action be taken on the Proofs of Claim as to whether they should be

approved or disapproved."[159]

On July 19, 1995, the court entered an order requiring Conti, NEBP, John Conti,

Henry Gonzalez, and Donald Robson to "immediately and forthwith, but no later than 72

hours from the date of this Order, communicate with the Receiver and within 48 hours

thereafter surrender and deliver all of the property listed on Exhibits 1, 2 and 3 to the

Receiver."[160]   The court further directed: "The Receiver is to immediately cause an

inventory and appraisal to be made of the property and determine the cost of moving and

storing the property and to report to the Court no later than August 15, 1995, as to the

property received and the cost of moving and storing that property."[161] The same day it

entered that order, the court awarded the Receiver $7,370.44 in fees pursuant to his

---

[159] Id.

[160] Plaintiff's Exhibit 11, Sm. Tab 16.

[161] Id.

Application for Order #17, bringing the total fees awarded to him to $24,150.44.[162]

Five days before awarding Decoulos his fees for services performed between December 12, 1994 and June 29, 1995, the court, on July 13, 1995, denied the Plaintiff's Motion to Remove Nicholas J. Decoulos, Esq. as Receiver of American Bridge Products, Inc. In an endorsement order, the court sated: "After hearing parties, I find no cause to remove the Receiver."[163]   In its Motion to Remove the Receiver, ABP, relying upon a six-page, single spaced Affidavit executed by Kilroy on June 9, 1995, had averred that "[t]he Receiver by his acts of omission and/or commission, all as set forth more particularly in the attached Affidavit, failed to gather and preserve the assets of ABP; he has allowed the same to be stolen and/or otherwise wrongfully converted and/or dissipated by the Defendants."[164] Prior to filing the Motion on behalf of ABP, Bingham wrote to Decoulos on July 3, 1995 stating that ABP would look to him "to compensate it for any losses and/or damages sustained as a result of the Receiver's obvious delay tactics."[165]   Bingham also raised an issue as to when Decoulos learned of USTrust's Motion for Partial Summary Judgment, suggesting that he had "ample opportunity to intercede on American Bridge's behalf and interpose a good and meritorious answer/defense, thereby quite possibly avoiding any

---

[162] Defendant's Exhibit 11, Sm. Tab 17.

[163] Defendants' Exhibit 14. No transcript of the hearing before the Superior Court was submitted in evidence.

[164] Id.

[165] Defendants' Exhibit 13.

liability for the debt claimed due."[166]

At the same time Bingham was writing to Decoulos, he was corresponding with Barton K. Hyte Co., Inc. On July 13, 1995 Hyte, noting that he had received a subpoena to appear in court on July 14, 1995, indicated that he conducted an appraisal of certain assets in December of 1993. He further stated to Bingham that "Mr. Decoulos instructed us to contact Mr. John Conti to make arrangements for our on site inspection."[167]

Both before and after the denial of the first Motion to Remove the Receiver, Bingham's correspondence with Decoulos became less conciliatory. On June 28, 1995, he observed that NEBP filed its Quality Control Manual and Equipment List with the Massachusetts Highway Department using the equipment listed on Exhibit 1 to Decoulos's Applications for Orders #7 and #16. He stated: "Interestingly enough, Exhibit #1 was the actual Equipment List submitted therewith and said document was attested to by John Conti. Said Manual and List was re-certified as of June, 1994. Now, if said equipment existed on 9-28-93 and 6-94, I would suggest that it better damn well exist today - or - you, as Receiver, have some hard questions to answer to."[168]

Approximately one month after receiving this letter, Decoulos arranged for Hyte to visit the Brookline Street property again. On July 31, 1995, almost two years after

---

[166] Id.

[167] Plaintiff's Exhibit 13. *See, supra*, at 33-34.

[168] Plaintiff's Exhibit 31. Bingham also referenced the June 3, 1994 account prepared by Neal A. Price & Co., which reflected machinery and equipment valued at $226,541.00 and which incorporated Exhibit #1 as a listing of the equipment owned by ABP. Id.

Decoulos's appointment, Hyte reported that he had been to Lynn "for the purpose of evaluating and conducting a thorough on site inspection of the assets."[169] In a letter to Decoulos, dated August 10, 1995, he stated "we . . . feel assured that all the assets in question were viewed."[170] He stated that the assets were separated into two categories: the furniture, fixtures and equipment ("FF & E") left on the premises by American Bridge and the FF & E claimed as property of John Conti.[171] He opined the following:

> The inspected FF & E was either obsolete, exceptionally old or in poor condition. The AC welding equipment is no longer approved for certain applications is extremely old and in generally poor condition therefore accounting for our low opinions of value placed. A major portion of the larger machinery is virtually inoperable and in our opinion would have a value for salvage only. The inspected facility was not well organized and would be considered disorderly with debris throughout the inspected buildings. We understand that the nature of this business may lend itself to being in a various stage of containing debris, but in our opinion the amount of scrap, older and rusted obsolete stock should not be at the site. . . .
>
> We arrived at our opinion of value in the range of $10,033.00 for the assets belonging to American Bridge and $7,165.00 for the assets claimed as property of John Conti for an aggregate dollar recovery amount in the range of $17,198.00 if sold at a properly organized, advertised and conducted "Public Auction Sale."[172]

Hyte also opined that the "In Place" value of the assets, namely the value if the assets were to remain where they were and used for the purpose for which they were

---

[169] Plaintiff's Exhibit 14.

[170] Id.

[171] Id.

[172] Id. Hyte's appraisal of both ABP's assets as well as those claimed by John Conti is a tacit admission that Decoulos abandoned assets to John Conti and NEBP, particularly as neither produced evidence that they bought any property belonging to ABP.

58

purchased taking into consideration the costs of re-purchasing, transportation, applicable taxes, fees, electrical and all related expenses, was $15,049.50 for the assets belonging to American Bridge and $14,330.00 for the assets claimed as property by John Conti.[173] Finally, he stated that removal costs for riggers and movers would be in the range of $9,000 to $12,000 excluding storage which would cost a minimum of $600.00 per month. He indicated that a decision to incur such costs would be neither prudent nor cost effective.[174]

Although in his Receiver's Report #2, Decoulos indicated that ABP's claims against NEBP appeared to have merit, he took no immediate action. In the fall of 1995, Bingham, on behalf of ABP, filed "Plaintiff's Motion for an Evidentiary Hearing to Determine the Amount of Its Accounts Receivable Wrongfully Converted by the Defendant, New England Bridge Products, Inc., and, thereafter, for the Appointment of a Receiver to Seize, Secure and Take Possession of the Accounts Receivable of Said New England Bridge Products, Inc. Pending Resolution of the Within Matter,"[175] as well as a second Motion to Remove the Receiver.[176]  The court denied the request for an evidentiary hearing, and it denied the Motion to Remove the Receiver on October 17, 1995, the same day it authorized Decoulos to pay Barton K. Hyte & Co., Inc. $1,500 for appraisal services pursuant to Application for

---

[173] Id.

[174] Id.

[175] Defendants' Exhibit 15.

[176] Defendants' Exhibit 16

59

Order #18.[177] The court gave no reasons for its decisions in its endorsement orders.  Its

decision to consider the second Motion to Remove Receiver, however, is indicative that the

court did not consider the denial of the first motion to have collateral estoppel effect with

respect to the second motion.

At the end of 1995, Decoulos and Bingham continued to exchange letters.  On

December 7, 1995, Bingham advised Decoulos that ABP's case against the defendants had

been placed on the trial list for January 2, 1996.  He stated that "it is my belief that the

responsibility of prosecuting American Bridge's claims falls squarely on your shoulders."

He added: "I believe this was the specific conclusion reached by Judge Brady at your very

behest."[178]

In a letter dated December 18, 1995, Decoulos, citing Rule 11, stated: "I wish to

advise you that I do not concur with your belief that it is my responsibility to prosecute the

claims of American Bridge, the reason being that I did not file the pleadings."[179]  He added

that he never sought authorization to prosecute the claims of American Bridge, noting that

"[i]f I did intend to prosecute these claims, you can rest assured that I would have all of the

facts before me, which I do not now have, in order to make the appropriate representations

to the Court."[180]  In an earlier letter to Bingham dated September 19, 1995, Decoulos had

_____

[177] Plaintiff's Exhibit 11, Sm. Tab 18.

[178] Plaintiff's Exhibit 48.

[179] Plaintiff's Exhibit 26.

[180] Id.

60

stated: "I will not expose myself to any claims or additional litigation."[181]

Decoulos's response to Bingham is at odds with the contents of his Application for Order #14 in which he strongly intimated to the court that he would be pursuing the action against the defendants. In that Application, to repeat, he requested authority "to depose all of the Defendants and the vendees of the Defendants" and "to institute the necessary legal proceedings to attach assets of all of the Defendants" because he believed "monies have been misappropriated by the Defendants."[182]

Bingham responded with outrage to Decoulos's letter of December 18, 1995. In a letter dated December 22, 1995, he noted that he had offered to act as special counsel to Decoulos on four separate occasions to conduct the trial of the matter but was rebuffed. He stated: "in each instance, you not only filed your written objection thereto but also argued orally against the same - repeatedly stating to the Court that you didn't require any assistance in the prosecution of American Bridge's claims."[183] He added: "In fact, shortly after one [of] my companion Motions to secure your removal, all of which were also denied, wasn't it you who, in an effort to appease me and show some semblance of competency, secured an order approving your taking the depositions of all of the defendants in this case. Of course, you didn't take a single deposition and now you want

---

[181] Plaintiff's Exhibit 47.

[182] Plaintiff's Exhibit 11, Sm. Tab 14.

[183] Plaintiff's Exhibit 27 (emphasis in original).

out!"[184]  Bingham concluded his letter by advising Decoulos that the claims/causes of

action were assets of the estate just like inventory and equipment.

The trial did not go forward on January 2, 1996.  Judge Fremont-Smith, however,

issued an order requiring the Receiver to file a report, presumably a draft report, by

January 15, 1996.  He also ordered counsel to meet with the Receiver on January 22, 1996

and the Receiver to file a report by January 29, 1996.  The court scheduled a conference for

February 5, 1996.

Decoulos filed his Report #3 on January 30, 1996, together with Applications for

Orders #20, #21 and #22.[185] Through Application for Order #20, Decoulos sought authority

"to sell the personal property for the reason that the property cannot be utilized by the

Receiver or by the Corporation in the conduct of its business."[186] He averred that it would

be in the best interest of the Corporation for the Receiver to sell the personal property, even

though the validity of liens and mortgages had not been determined.  He represented that

NEBP had made a $6,000 offer for the personalty and that Hyte had informed him that it

would cost $3,000 to conduct the auction sale.  Decoulos did not specifically identify the

property he proposed to sell.

Through Application for Order #21, Decoulos sought authority to dismiss the claims

---

[184] Id.

[185] In his testimony, Decoulos agreed to the following characterization of his duty as
Receiver: "to find facts, recommend some obvious conclusions, and if there weren't any obvious
conclusions, state each party's side and let the Court decide what to do." Transcript, October 18,
2004 at 66.

[186] Defendants' Exhibit 18. Plaintiff's Exhibit 11, Sm. Tab. 20.

of ABP against Martha Talbot, RCPC, and INTS, Inc. because "[t]he Receiver has been given no factual evidence that any of the claims against [these defendants] . . . have any validity" and that it would be in the best interest of the corporation to have those claims dismissed, with prejudice.[187]  Decoulos sought permission to dismiss the counts against these defendants, even though he also testified that he would have needed to obtain court authority to prosecute the Essex Action.[188]  Additionally, through Application for Order #22, the Receiver sought an order requiring the stockholders and the principals of New England Bridge Products, Inc. to furnish records, within ten days, although he did not specify what records he wanted.[189]

On February 6, 1996, the Superior Court entered an order granting the Receiver the authority to employ Barton K. Hyte Co., Inc. to conduct a public auction for the purpose of selling ABP's personal property to the highest bidder.  The court, in the alternative, authorized the Receiver to sell the personalty to John Conti if he paid the Receiver $6,000 within seven days of the date of the order.  The court also authorized the Receiver to dismiss ABP's claims against Talbot and INTS, Inc.  It directed RCPC, however, to file a motion for summary judgment.  Finally, the court directed NEBP to furnish its records to the Receiver within ten days of the date of its order.

The Receiver's Report #3 covered the period from July 14, 1995 through December

---

[187] Id.

[188] Transcript, October 18, 2004 at 40.

[189] Id.

31, 1995.[190]  Decoulos reported cash on had of $88,480.95, as well as payment of fees to

himself ($7,370.44), to Barton K. Hyte Co., Inc. ($1,500.00), and to CSC Networks for

corporate documents for W. Sims & Associates ($44.00).  Additionally, Decoulos reported

that ABP claimed to be owed $196,724.07 for work it completed and the balance due on

other contracts totaling $856,220.78.  He also outlined ABP's claims in both the Complaint

and Amended Complaint, count by count, against the defendants and stated that he had

obtained documentation from the various parties relating to the claims and defenses of the

defendants.

With respect to ABP's claims against Everett Savings Bank he stated the following:

*"Everett Savings Bank admits that funds were diverted from American Bridge to entities owned by*

*Robert Conti.*  Everett Savings Bank has submitted to the Receiver an accounting. . . .

According to this accounting Conti could claim an overpayment in the amount of

$41,260.38."[191]  In a chart, attached to his Report, he listed 25 checks payable to ABP or ABP

and Avenue Finance totaling $337,594.18, which were deposited to Conti Entity Accounts,

noting that $378,854.56 was deposited in ABP's accounts at Conti's direction.  In the

conclusion of his Report, Decoulos stated: "There is no question that the Everett Savings

Bank acted improperly; however, American Bridge did not suffer any damages as a result

of this impropriety."  Decoulos recommended dismissal of the claims against the Everett

Savings Bank. In his testimony, Decoulos justified his conclusions with reference to an IRS

---

[190] Defendants' Exhibit 17.

[191] Id. (emphasis supplied).

64

lien, which he admitted he never investigated.[192] Indeed, no evidence was submitted to substantiate whether the IRS had a lien against ABP's property and, if so, the amount of the lien. Indeed, Decoulos did not list the IRS among the creditors in his appendix to his Report #3.[193]

Decoulos's statement in his letter to Bingham that he did not have "all the facts" before him[194] is irreconcilable with his representations in his Report #3, which contained unequivocal recommendations as to how the Essex Action should be handled, namely dismissal of ABP's claims against most of the defendants, including dismissal of the claim against Everett Savings Bank. Indeed, Decoulos's recommendation that dismissal and abandonment of the claims were warranted was an admission that he, in fact, was responsible for and controlled the Essex Action, even though he stated to Bingham that "I have never sought nor have I been authorized to prosecute the claims of American Bridge."[195]

With respect to ABP's claims that NEBP used its material to complete contracts - - contracts which Mahoney testified had a value to ABP in September of 1993 of approximately $740,000 - - Decoulos reported that ABP had contracts worth $691,105.95 at the commencement of the receivership and that he collected $70,713.13. Decoulos stated

---

[192] Transcript, October 18, 2004 at 74.

[193] The Court takes judicial notice that the IRS filed in this case an unsecured claim in the sum of $3,324.84 and a priority claim in the sum of $26,585.74.

[194] Plaintiff's Exhibit 26.

[195] Id.

that NEBP claimed that it received money from various former ABP vendees as a result of *new* contracts with those vendors and that it paid ABP's outstanding indebtedness to various vendees.[196]

In Report #3, Decoulos identified several issues: whether NEBP owed money to ABP for fabricated material found on site; whether it was entitled to credits for payments it made to ABP's suppliers; whether ABP was entitled to the profit made by NEBP in completing the contracts; and whether NEBP would be entitled to costs it incurred in completing the contracts. Decoulos concluded, based upon the summary of the contracts, that ABP was "possibly entitled to a surplus of $60,529.12," absent a credit for payments made by NEBP to vendors, adding that "[t]his amount could be further reduced if New England makes a claim for completing the work."[197] He did not address whether in fact NEBP actually entered into new contracts with ABP's customers for completing its contracts or whether it was proper for NEBP to pay some, but not all, of ABP's creditors who would otherwise have had to file proofs of claim in the receivership proceeding and share pro rata with other similarly situated creditors of ABP with allowed claims.[198]

In his Report #3, Decoulos summarized various contracts as follows:

---

[196] Defendants' Exhibit 17, Plaintiff's Exhibit 11, Lg. Tab 3.

[197] Id.

[198] Transcript, October 19, 2004 at 90. Attorney John Ottenberg testifying as an expert witness, stated: "in a receivership situation just as in a bankruptcy situation, one creditor can't get a larger recovery than another creditor. So one creditor can't take the assets and simply pay off certain obligations and essentially get a full disbursement for, . . . what they've done, can't basically get full value for their claims and everyone else gets nothing."

| Cntrct # | Gen. Cntrctr | Cntrct Amt. | % Cmpltd | Amt Pd to NEBP | Amt Pd by NEBP | Surplus | Add'l Csts Clmd by NEBP |
|---|---|---|---|---|---|---|---|
| BR-75 | Aetna Bridge | $23,232.71 | 50% Fbrct | $19,925.08 | $6,632.11 | $12,301.97 | $20,160.00 |
| BR-84 | Sciaba | $111,343.34 | 70% Fbrct | $102,014.00 | $81,623.22 | $20,390.78 | |
| BR-86 | Gagliarducci | $23,911.56 | 100% Shp | $23,911.56 | $10,060.72 | $13,850.84 | |
| BR-87 | Cardi | $2,560.91 | 100% | $884.91 | ($884.91) | | $2,304.82 |
| BR-91 | Petricca | $6,595.15 | 70% Shp | $6,595.15 | $2,833.82 | $3,761.30 | |
| BR-93 | Bates | $8,032.72 | 100% Assm | $7,791.81 | 3,879.50 | $3,912.31 | |
| BR-94 | Bates | $13,505.00 | 100% Assm | $12,227.50 | $7,415.31 | $4,812.19 | |
| BR-96 | P.W.Brown | $3,613.38 | 100% Shp | $3,613.38 | $2,219.77 | $1,393.61 | |

Of the contracts listed above, Decoulos obtained court authority to complete four contracts: Sciaba (BR-84), Gagliarducci (BR-86), Cardi (BR-87), and Petricca (BR-91) through Application for Order #2. ABP had fully performed two contracts, BR-86 and BR-96. Decoulos did not seek court authority to complete the remaining two contracts, BR-93 and BR-94. He noted that the proceeds of BR-75 were pledged to Avenue Finance; that the proceeds of the BR-84 were pledged to Everett Savings Bank; that a check issued by Cardi was improperly negotiated by ABP's former attorney, Webber, and that the total received by NEBP, i.e., $176,078.48, did not reflect "completing Contract BR-75 and BR-84 or any work, if any, that may have been performed to complete the contracts on the site after the material was delivered to the site."[199]

With respect to the T.A. Loving contract, a $230,630.40 contract which he had obtained authority to complete through his Application for Order #2, Decoulos noted that "New England Bridge alleges that T.A. Loving informed the Receiver that a notice of

---

[199] Defendants' Exhibit 17, Plaintiff's Exhibit 11, Lg. Tab 3 (summary chart).

termination was mailed to American Bridge at its addresses in Lynn and Methuen, Massachusetts."[200] Decoulos add that he "did inform the attorney for T.A. Loving that he would seek an order terminating the contract and also informed the attorney that it was not the intention of the Receiver to complete the contract and requested a general release relieving American Bridge of any liability."[201] He added that NEBP subsequently entered into a contract with T.A. Loving and completed the contract for $153,852 less a $2,000 payment for attorneys' fees.[202]

> Finally, Decoulos discussed the so-called claims of the stockholders. He stated:

> The claims set forth in this report do not affect the claims of the stockholders as a result of the alleged improprieties by the defendants relating to the improper negotiation of checks, conversion of assets, the interference with advantageous contracts and other claims that the stockholders may allege for the conversion of funds which were ultimately refunded to American Bridge but for the period that those were withheld, American Bridge was unable to meet its obligations to its creditors. G. Shepard Bingham, the attorney for the stockholders, has stated that it is the intention of the stockholders to amend the complaint and include the stockholders as parties plaintiff against the defendants. . . . [203]

Finally, Decoulos recommended that the claims against the NEBP, the Contis, Avenue Finance, Everett Aluminum and Donald Robson should be settled or litigated. He admitted, however, that he did not "have in his possession the additional documentation

---

[200] Plaintiff's Exhibit 11, Lg. Tab 3. Decoulos did not explain how NEBP would have know about the Notice of Termination.

[201] Id.

[202] Id.

[203] Id.

that would be needed to resolve the claims,[204] even though the Superior Court had ordered

the defendants, including NEBP, to produce documents.

After the Receiver filed his Report #3, he filed a Joint Stipulation of Dismissal and

an Application for Order #23 seeking $12,795.12 for his services.  RCPC filed a motion for

summary judgment, which appears never to have been addressed by the court.  Agarwal

and Kilroy moved to be named as additional parties plaintiff, but their motion was denied

by the Superior Court without explanation.  On April 30, 1996, USTrust moved to intervene

in the Essex Action.  Its motion was allowed.  On July 17, 1996, the court issued a trial

notice for September 11, 1996.[205]  On August 30, 1996, less than two weeks before the trial,

an involuntary petition was commenced against ABP.  The involuntary petitioners

included USTrust, Kilroy and Mahoney.

Decoulos moved to dismiss the involuntary petition on September 23, 1996.  In his

Motion to Dismiss, he made the following representations to this Court:

> The entire matter is presently pending before the Essex County Superior
> Court and was scheduled to be heard on September 11, 1996, and was
> continued as a result of the suggestion of bankruptcy filed by Michael
> Gilleran, representing US Trust.  There remains outstanding issues to be
> determined by the Superior Court; [sic] (a) a claim against the Everett
> Savings Bank for conversion, (b) a claim against New England Bridge
> Products, Inc. for conversion of work in process.[206]

He added:

---

[204] Id.

[205] Plaintiff's Exhibit 11.

[206] Motion of Receiver to Dismiss Involuntary Petition filed on September 23, 1996
(emphasis supplied).

In view of the fact that the estate has almost been completely administered, it would make no economic sense to add additional administrative costs. The Superior Court forum has protected all of the rights of all of the parties and there is no need for intervention by the Bankruptcy Court to reach any additional solution. *The proofs of claim have been filed and all of the claims made by the parties in the case pending in the Superior Court have been adjudicated,* except for the two remaining issues [with respect to the Everett Savings Bank and NEBP] which can been [sic] appropriately litigated at the Superior Court level.[207]

This Court denied the Receiver's Motion to Dismiss. Although Decoulos represented that all of the claims had been adjudicated, neither the docket from the Essex Action nor his Statements for Professional Services Rendered support this assertion, unless Decoulos intended to accept the proofs of claims as filed in the receivership without objection, including the claims of Avenue Finance for $507,000, RCPC for $216,134, Robert Conti for $73,700, as well as those of the petitioning creditors, Kilroy for $100,000, Mahoney for $44,896.96, and USTrust for $252,175.52. Decoulos testified, however that, at least with respect to Conti's claim, his proof of claim was never approved.[208]

Decoulos never filed a formal accounting or report in this case with respect to the property of ABP or his administration as required by 11 U.S.C. § 543(b) and Fed. R. Bankr. P. 6002. The Essex Superior Court never entered an order discharging Decoulos as Receiver prior to closing the action commenced by ABP.[209]

---

[207] Id. This representation was untrue. Decoulos testified at trial, referring to Conti's proof of claim filed in the receivership: "[w]e never approved his proof of claim." Transcript, September 24, 2004 at 97.

[208] Transcript, September 24, 2004 at 97.

[209] See Riley v. Decoulos, Adv. P. No. 00-1142, Slip Op. at 13 (Bankr. D. Mass. February 5, 2002).

C. <u>Decoulos's Testimony</u>

Decoulos testified that he and his son and fellow partner in the firm of Decoulos &
Decoulos were the sole signatories of the law firm's operating checking account.
Additionally, he stated that when the court authorized compensation pursuant to his
Statements for Professional Services Rendered, his secretary drew up a check payable to
the firm of Decoulos & Decoulos for his signature and then, as was her custom, deposited
it in the firm's operating account.[210]

Decoulos testified at length as to his perceived role as receiver. He stated:

> My duty was to make sure that neither party absconded with any funds, and
> my duty was that in the event that there was [sic] any funds generated, that
> I was to set them aside and hold them and report that to the Court . . . .
> Insofar as the litigation was concerned, I had a duty to make sure that it was
> being handled properly and that nobody would settle the case and then not
> report it to the Court.[211]

Noting that he "got appointed because there were two factions fighting over the assets of
the corporation, and . . . [his] . . .role was to make sure that neither party took any assets
and walked away with them,"[212] he summarized his position as "the watchdog for the
Court."[213] Later in his testimony, he stated: "I was advocating the Court's cause to get this
thing, matter resolved so that the creditors would, and if any money was left over, the

---

[210] Transcript, September 24, 2004 at 14-15.

[211] <u>Id</u> at 17.

[212] <u>Id.</u> at 25.

[213] <u>Id.</u> at 18.

shareholders would get it."[214]

With respect to the Complaint filed by ABP, Decoulos testified that he analyzed the complaint and the defenses -- that he performed a legal analysis and made legal judgments about them and was responsible for reporting "each and every facet of the case" to the court.[215] He further testified that he protected ABP's interest in the lawsuit it filed against Conti and the other defendants by monitoring the proceedings.[216] Although at his deposition, Decoulos stated that ABP was unrepresented in the Essex Action, at trial he stated that he was wrong and that Bingham represented the corporation. He testified that it was Bingham's responsibility to prosecute the lawsuit, "with my looking over their shoulders."[217] Decoulos admitted that the claims in the Essex Action were assets of the receivership. He testified that he, along with ABP and the court, "were pursuing . . . to a conclusion the validity of their [sic] claims."[218] He added that he was investigating the claims "[t]o make sure that if any monies-- if there was any success to the claim, to make sure that that would enter the Receiver's account."[219]

_____

[214] Id. at 28.

[215] Id. at 19-20.

[216] Id. at 24.

[217] Id. at 28.

[218] Transcript, October 18, 2004 at 48.

[219] Id. at 48-49. Presumably, then, Decoulos expected Bingham to conduct discovery and try the action against the defendants under his oversight, without compensation, for the benefit of the receivership from which only he (Decoulos) could be compensated. Moreover, his view of his duties did not stop him from seeking court authority to dismiss claims against the various

72

Decoulos testified at an August 30, 2001 deposition about ABP's claims against Everett Savings Bank. He admitted stating that he "was trying to get all the facts and apply the law to it [sic]," after which he "would have made up. . .[his] . . . mind as to whether or not . . .[he] . . . would go ahead and file, ask the Court to represent American Bridge so . . .[he] . . . could sue them."[220] With respect to the claims against Everett Savings Bank and the other defendants, Decoulos admitted that the court instructed him to get the bottom of the fraud in the case; that he told the Superior Court he was going to take the depositions of the defendants but did not do so because he "made a determination that it would be just a waste of time."[221]  He indicated that he took one deposition of the keeper of the records of PSI, the company that generated the Puffer Reports, adding that there was no need for additional discovery because NEBP cooperated with him and gave him all the documents he needed.[222]  He testified that his Report #3 set forth the claims for the court to make a determination, although at his deposition he stated his belief that ABP's claims against NEBP were "shallow."[223]  He maintained that he did not draw conclusions without specific documentation and that he did not need to engage counsel, not because he was a

_____

defendants.                    .

[220] Transcript, September 24, 2004 at 32.

[221] Id. at 38.

[222] Id. at 40.  This obviously was not the case because Decoulos's attorney obtained documents withheld from Decoulos in 2004.

[223] Id. at 44.

73

lawyer, but because he was "finding facts more than doing legal work,"[224] although he admitted making legal judgments.

Although Decoulos maintained he was protecting the assets of ABP, he did not take actions to secure any potential judgment ABP might obtain against the various defendants in the Essex Action. Specifically, Decoulos admitted that he did not inquire as to Conti's assets because "he had no reason to determine whether he had assets or not."[225] He also did not inquire about the financial status of NEBP.[226] Bingham, however, sought and obtained trustee process attachments in January of 1995.

Decoulos indicated that the judgment obtained against ABP by RCPC did not make any difference to him "because I wasn't in possession of the place and I certainly didn't want to get involved with a lawsuit where there was a judgment, a possible judgment of a quarter of million dollars against American Bridge . . . it was just a waste of time in my mind against RCPC Realty Trust."[227] Decoulos opined that it was a waste of the creditors' time and money to pursue any conspiracy theories involving RCPC.[228] Additionally, Decoulos sought and obtained dismissal of ABP's counts against Talbot and INTS, Inc. without first taking the depositions of Talbot or Robson, INTS Inc.'s principal, or

---

[224] Id. at 72.

[225] Id. at 46. This is in contrast to his representations to the court in his Application for Order #14.

[226] Id. at 98.

[227] Id. at 77.

[228] Id. at 79.

Case 00-01142    Doc 348    Filed 06/29/05    Entered 06/29/05 09:22:23    Desc Main
Document    Page 75 of 154


conducting any other discovery because there was no documentary evidence that Talbot conspired with the Conti faction.[229]

Decoulos also admitted that he suggested that the claims against Everett Savings Bank be dismissed because Conti ostensibly put $41,000 more money into ABP after December 1992 than he withdrew through forged endorsements of ABP checks or other means. He stated that Conti would have had a defense of unjust enrichment. He also cited the intentions of the parties, which were to protect the checking account from an IRS seizure,[230] although he made no attempt to determine whether the IRS had a lien,[231] or to investigate the relationship between Conti and Everett Savings Bank's employee, John Spagnese. Decoulos testified:

> It was really at the end of, by the time I filed my Report #3 it was evident that it didn't matter what he [Conti] was doing with that monies that he improperly negotiated those checks. The fact of the matter is that everybody agreed after all of the   time - - because that was a culmination of all my work, to get to the  very bottom of what happened over at the at the Everett Savings Bank, and it was laid out there by documents.[232]

With respect to the claims against NEBP for conversion of materials, Decoulos testified at a deposition on May 21, 1997 that he did not find the steel and aluminum described by Mahoney, stating that he had no idea where it went.[233] He concluded that

---

[229] Id. at 84.

[230] Id. at 89-90.

[231] Id. at 92.

[232] Id. at 95.

[233] Id. at 107.

75

NEBP converted the materials based on the Puffer Reports, although he never took a single step to recover the value of the inventory used.[234] He stated: "I never filed a claim against them [NEBP]. American Bridge had their own lawyer. . . It wasn't my job to bring it to fruition. It was up to their lawyer. It was my job to recover as many assets as I possibly could and then sift out the various claims that had validity and the claims that I thought that didn't have any validity, and I made that report to the Court in #3."[235] Because NEBP was incorporated the day after he was appointed Receiver, Decoulos concluded "there was nothing for them [sic] to take over."[236] With respect to ABP's claim that NEBP converted its receivables, Decoulos testified that he investigated nine contracts, which in his view were declared void as a result of the insolvency. He admitted that he never authorized NEBP to expend money to finish ABP's contract, explaining as follows:

> [E]verything stopped because of the insolvency covenance [sic] agreements and then we got New England Bridge, who [sic] knew about those [contracts], that's obvious because Robson knew everything that was going on. Without Robson the place would have been a failure, the contracts - - Robson was the brains behind the whole corporation, just that he had a substance abuse problem, and New England Bridge went ahead and finished those contracts. . . . They took it upon themselves to do it. . . . [T]hey did it for the good will of the new business.[237]

---

[234] Id. at 108.

[235] Id. at 109.

[236] Id. at 110.

[237] Id. at 116-17. John Conti in his testimony admitted that NEBP used ABP's telephone number and AISC manual. He indicated that he neither asked for or was granted permission to use these assets. Transcript, September 3, 2004 at 235-238. He also admitted that in producing a new manual NEBP simply copied ABP's equipment list. Id. at 237.

Decoulos testified that it was his job to marshal the assets of ABP, but, except for a retainage held by Sciaba, he took no steps to collect retainages, relying on Mahoney and Robson to collect the retainages.[238] Moreover, he required Kilroy to turnover various hand tools to Conti, without taking an inventory of the tools. He testified: "I gave them to Mr. Conti so he could finish the Tobin Bridge job."[239] He added that he did not know what happened to the tools. He thought they were part of the auction, adding "it was always a question as to who owned the tools."[240]

Decoulos also testified that the equipment ostensibly belonging to ABP was identified in several places: on the unaudited financial statements, on UCC-1s, and attached to the operating manual needed by both ABP and NEBP for AISC certification. At a deposition held on April 30, 1997, he stated that it would have been possible to discover the allegedly missing equipment by comparing the equipment lists from 1992 with the list of equipment attached to Barton K. Hyte's second appraisal. At trial, he testified that he did not undertake this exercise, while at a deposition taken on May 21, 1997 he stated that he did, concluding that "somebody stole things or misappropriated."[241] He also admitted that NEBP, in submitting its quality control manual to the Massachusetts Highway Department, utilized the identical list used by ABP, which was also the same

---

[238] Transcript, September 24 at 119-120.

[239] Id. at 121.

[240] Id.

[241] Id. at 129-31.

equipment list ABP submitted to its lenders.  Nevertheless, Decoulos insisted that "we all agreed - - Bingham and Kilroy and Mahoney all agreed that the equipment that is [sic] on the list being sold, that's all the equipment that American Bridge owned, and it didn't own anything else.  The Contis are still mad at me because I - - we resolved it.  They claimed that it was theirs."[242]

Decoulos admitted that he did not investigate the allegations that John Conti improperly elected himself to a position with Agar Industries.  He repeatedly stated that it was "up to the Court" to determine issues such as whether NEBP owed ABP money for fabricated materials and completed shop drawings it used to complete the contracts.[243] Decoulos never recovered job files,  but he relied upon insolvency provisions allegedly in the contracts to justify the completion of the contracts by NEBP, even though he never gave NEBP permission to finish any contracts or permission to charge any cost of completing the contracts back against the value of what American Bridge had produced.[244]  He stated that "they took it upon themselves [sic] to call up all of the companies that they had con - - that American Bridge had contracts with and they completed the contracts . . ."[245]

D. <u>The Testimony of the Trustee's Expert Witnesses</u>

1. Steven Lynch

---

[242] <u>Id.</u> at 136.

[243] Transcript, October 18, 2004 at 108.

[244] <u>Id.</u> at 110, 111.

[245] <u>Id.</u> at 109.

78

Steven Lynch ("Lynch") testified in his capacity as a Certified Valuation Analyst for the purpose of determining the value of ABP, specifically the value of its outstanding shares of stock, as of September 30, 1993, the month Decoulos was appointed receiver. He concluded, based upon his review of available financial information, that the shares of ABP had a value of $850,000.[246] His assumptions were that the company would have continued without major changes in ownership and that the company grew by 5% from 1992 through the valuation date. Lynch articulated risks associated with a "fairly capital-intensive industry," noting that ABP was closely held.[247] He discounted the value of the shares by 25% to reflect their lack of marketability.[248]

Lynch testified that there was no reliable financial information made available to him after April 30, 1992 and that the balance sheet as of April 30, 1992, including the trade and bank debt, was "the foundation for the process."[249] He admitted that he relied upon the valuations of the equipment appearing in the financial statements made available to him, stating that his approach was "to look at the earning capacity of this operation of which those pieces of equipment would be used to generate the products that they [sic] sell and install."[250]

---

[246] Transcript, October 19, 2004 at 11.

[247] Id.

[248] Id. at 34-35.

[249] Id. at 18.

[250] Id. at 21.

2. John Ottenberg, Esq.

Attorney John Ottenberg ("Ottenberg") testified as an expert based upon his experience both as a receiver and as counsel to receivers in approximately 100 cases. Asked to review various materials related to the prosecution of the Essex Action, he explained that he was requested to opine on whether Decoulos "had performed his duties as Receiver in accordance with standards of care applicable to the tasks of a Receiver."[251] He concluded that Decoulos failed to meet the appropriate standard of care in performing his duties as receiver.[252] He stated:

> . . . Mr. Decoulos failed to either understand or act upon what I viewed as the significant, pursuit of the significant asset in this situation, and that was that there seemed to be significant evidence which would lead a Receiver to believe . . . the Robert Conti group . . . had essentially misused the assets for their own benefit of American Bridge, usurped opportunities of American Bridge, had essentially dominated and controlled American Bridge in such a fashion that they had essentially stripped all of its worth and assets out of that company, and that there was in my mind a [sic] appropriate basis for bringing a claim, and in fact the claim had been filed. . . . There was [sic] no depositions taken, and from what I could see Mr. Decoulos did nothing to actively litigate or pursue those claims.[253]

Ottenberg also stated that Decoulos failed to recognize the value of other categories of assets, including the value of a cause of action for the forged and converted checks payable to ABP both before and after Decoulos's appointment and the value of ABP's inventory. Ottenberg testified that he believed Decoulos failed to make "adequate efforts" to account

---

[251] Id. at 41.

[252] Id. at 42.

[253] Id. at 42-43. *See also* id. at 127.

for the equipment. He also testified that Decoulos made no significant effort to recover the value of the fabrication and other work performed by ABP, which NEBP utilized in completing various contracts. He expressed the view that ABP may have had some going concern value, noting its phone number, which NEBP continued to utilize, as well as its reputation. He stated: "It seems that that going concern value would have been reflected in a claim against New England Bridge and Mr. Conti for essentially usurping that value, taking it over, without any compensation."[254] Noting that Decoulos did make efforts to collect information, Ottenberg observed that Decoulos failed to utilize that information to assert claims that ABP had and that he failed to even attempt to obtain any pre-judgment attachments against the defendants.

Ottenberg testified as follows as to the standard of care for receivers: "the first as they say golden rule is, you do whatever the Court orders you to do, and so that with respect to pursuing the claims against the defendants in the Essex action, it seems that Mr. Decoulos didn't do what the Court had directed him to do." [255] He added

> With respect to the general standard of care, this was a situation that required I think competent, thorough, aggressive litigation against the Conti faction which would have involved in my mind discovery in the form of depositions, document requests, subpoenas to third parties that had information, developing the appropriate legal theories . . . and then conducting a trial to prevail on the claim to recovery of assets.[256]

Ottenberg also opined that it was crucial for Decoulos to have obtained an inventory of the

---

[254] Id. at 51.

[255] Id. at 53.

[256] Id. at 53-54.

tools turned over to Conti, that it was necessary to immediately assess the value of ABP's contracts and seek to recover their value as well as the value of materials, accounts receivable, and retainages. He expressed the view that the Receiver had a *quantum meruit* claim against NEBP for the fair value of the work ABP contributed to contracts NEBP completed.[257]

Ottenberg admitted that Bingham's role in the receivership proceedings was unusual. He stated that Bingham "should not have been representing an entity that no longer possessed those claims," adding that "he had authority on behalf of the corporation to have input into the way in which the receivership estate was being administered by the Court,"[258] but "he lacked standing to make representations, take legal positions, undertake legal actions on behalf of the entity that at that point owned the claims."[259]

Although Ottenberg conceded that Conti may have put more money into ABP's accounts at Everett Savings Bank than he improperly obtained from ABP, he opined that such a view "miss[ed] the point."[260] Ottenberg explained: "Mr. Conti essentially used American Bridge as his alter-ego, that he was, he then at the end of the day essentially usurped the whole business and set up another entity and continued the entity under the

---

[257] Id. at 93.

[258] Id. at 70.

[259] Id. at 75.

[260] Id. at 79-80.

new business and left the creditors high and dry."[261]  Although Ottenberg opined as to

what he believed Decoulos should have done as Receiver, he conceded that he did not

undertake an analysis of the range of recovery that the Receiver should have obtained if

he had diligently pursued the claims.[262]

Ottenberg testified that receivers are rarely removed.  He stated, however, that

allowance of compensation is not necessarily a "stamp of approval."  He indicated

approval of a receiver's conduct occurs when a receiver is discharged.[263] He also indicated

that receivers have discretion as to what claims to pursue and what claims to abandon.

### 3. Peter B. McGlynn, Esq.

Attorney Peter B. McGlynn ("McGlynn"), an experienced trial attorney having tried

over 150 cases, reviewed the proceedings in the Essex Action, as well as proceedings in this

and other courts, for the purpose of rendering "an opinion with a reasonable degree of

legal certainty as to whether or not Nicholas Decoulos as a licensed attorney in

Massachusetts exercised the requisite level of skill and care in prosecuting the Essex

action."[264] He opined that Decoulos "failed to exercise the requisite degree of skill and care

. . . in prosecuting what has been identified as the Essex action."[265]  He explained:

---

[261] Id. at 80.

[262] Id. at 118.

[263] Id. at 133.

[264] Id. at 138.

[265] Id. at 140.

This particular action, American Bridge Products vs. Robert Conti, et al. was commenced on August 21, 1993. This was filed, this action was commenced by way of a verified complaint. It had serious allegations in there of fraud, violations of Chapter 93A, conversion, conspiracy, breach of fiduciary duty, there had been requested by the plaintiffs at that time and they had obtained various temporary restraining orders and preliminary injunctive relief. . . .

***

On or about May 11, 1995, some 18 to 20 months after Decoulos was appointed Receiver, he filed what was known as Application #14 in the Essex action, and in that application he sought authority to depose all the defendants.

***

The Court's authorization to take depositions and to attach assets was at the request of Mr. Decoulos, and as it appears in the pleadings, the order that was signed by the judge was specifically crafted by Nicholas Decoulos, and it makes it very clear that he was ordered to conduct these depositions and to take the action to attach the assets of the defendants.

***

No depositions of any of the named defendants were taken by Decoulos, and Decoulos was not fully prepared to try the Essex action at the time that this case . . . was commenced on or about August of 1996.[266]

McGlynn also observed that Decoulos failed to take depositions of, or even obtain sworn statements from, Talbot, INTS, Inc., and RCPC before dismissing the claims against them with prejudice.

McGlynn noted that Decoulos was aware of the seriousness of the allegations made against the defendants and reported that to the court. Referring to various ethical rules, including Canon 7 and Massachusetts Disciplinary Rules 7-101(a)(1) and 6-101(a)(3),

_____

[266] Id. at 140-44.

84

McGlynn testified Decoulos should have conducted his due diligence and investigated the

allegations immediately upon his appointment.  Had he done so, he would have be able

to obtain security for a potential judgment prior to USTrust, which obtained attachments

against Conti's assets in November of 1993.  Moreover, McGlynn indicated that commercial

litigation requires "ethically aggressive action" to secure a judgment,[267] and a malpractice

award can be measured by the damages resulting from a failure to secure a judgment.

McGlynn also highlighted the need for discovery, noting its salutary purposes.  He

testified as follows:

> First of all, it should be done as in my opinion, based upon my assessment
> of what the requisite level of skill and care of attorneys in Massachusetts
> would require, that an aggressive approach to a case like this be undertaken.
> Memories dim, witnesses leave the jurisdiction, witnesses are allowed to
> change or alter their testimony based upon what has transpired; that's why
> as a plaintiff, you should be the aggressor . . .to take control of the case early
> on and prosecute it and get your discovery done so that you have all of that
> done before people can change their minds or change their testimony.
>
> ***
>
> Aggressive handling of a case sends the message to the opposing parties and
> counsel that this is not going to be a case that is going to lay fallow, they're
> going to be forced to spend money to defend it.  Whatever frailties or
> weaknesses they have in their defense are going to be exposed straight off,
> and more likely than not, that is going to get the defendant to the settlement
> table a lot sooner if at all than if the case would lay fallow such as this case
> did essentially for three years.[268]

McGlynn indicated that he was unaware that Conti also obtained a temporary

---

[267] Id. at 151.

[268] Id. at 152-53.

restraining order.  He also indicated that he was unaware of the allegation that Attorney

Webber may have converted a check belonging to ABP and that Agarwal deposited a check

payable to ABP into the account of another corporation which he owned and caused ABP's

mail to be sent to his home in Methuen, Massachusetts.  He stated: "getting cooperation

from a prior attorney, whether he's guilty of converting checks or not, is not the point,[sic]

the point is that in my opinion an attorney has to do whatever he has to do in order to

undertake due diligence to ascertain whether these cases have merit."[269]   He added that

Webber's cooperation was irrelevant because Decoulos had the obligation to aggressively

pursue the claims in the Essex Action or drop them.

Like Ottenberg, McGlynn indicated that he was "amazed and aghast that a Receiver,

who was vested with the responsibility of overseeing this action and this potentially

significant asset," would allow Bingham to take the action, such as amending the complaint

and obtaining trustee process attachments, while at the same time denying his application

to be employed as counsel to the Receiver.[270]   Nevertheless, McGlynn refused to speculate

about the Superior Court's mixed signals about Bingham's involvement.

D. The Testimony of Joseph Braunstein, Esq., the Former Chapter 7 Trustee, and
   Michael Gilleran, Esq.

Joseph Braunstein, Esq. ("Braunstein") served as Chapter 7 Trustee from October

23, 1996 through March 29, 1999.  During his tenure as Trustee, he settled the estate's claims

---

[269] Id. at 159.

[270] Id. at 165.

86

against USTrust, a settlement which preserved the estate's claims against Everett Savings Bank.[271] The "Stipulation and Order Regarding Security Interest of USTrust," which this Court entered on July 8, 1997, provided that USTrust would "in good faith and with reasonable efforts," pursue the remaining claims in the Essex Action, with the proceeds and "any other recoveries obtained by USTrust, first to be paid to USTrust to the full extent of the debt owed by the Debtor to USTrust with the balance, if any, being paid to the bankruptcy estate."[272]   Braunstein explained that he did not believe the claim against Everett Savings Bank was subject to USTrust's security interest.

At trial, Attorney Michael Gilleran ("Gilleran") admitted that USTrust was pursuing Conti with respect to loans which did not involve ABP.[273] Specifically, he admitted that USTrust was pursuing Conti with respect to an $80,000 note unrelated to ABP and that he did not remember how the balance, if any, would be turned over to the Chapter 7 Trustee if USTrust recovered less than what it was owed under all of its notes, including the ones unrelated to ABP.

Gilleran indicated that he thought there was a viable claim against Decoulos which

---

[271] Braunstein's counsel and Michael Gilleran submitted a Stipulation and Order Regarding Security Interest of USTrust, which this Court entered on July 8, 1997.  In the Stipulation, the parties agreed that USTrust had a first position, fully secured, security interest in all of the assets of the Debtor, except the claim of the Debtor against Everett Savings Bank contained in count IX of the Essex Action.

[272] The Court takes judicial notice of its own order.

[273] Transcript, October 20, 2004 at 28-29.

87

should be pursued but that it was not a claim that USTrust thought it should pursue.[274]

Later in his testimony, he contradicted himself, stating "we concluded - - definitely we

concluded that there wasn't a claim." [275] Braunstein, in his testimony, agreed, stating that

he determined not to pursue any action against Decoulos.

Braunstein employed his firm, Reimer & Braunstein, as counsel. He indicated that

he relied upon Attorney Lawrence J. Crowley, Jr., Esq. to handle litigation matters.

Braunstein testified that he was unaware of any activity, or lack of activity, on the part of

Decoulos that impaired or prejudiced his ability to try his case against Everett Savings

Bank. He added: "We did not pursue a claim against the Receiver and I believe we did not

believe there was a claim against the receiver."[276]

E. The Dismissal of the Essex Action

A Suggestion of Bankruptcy was filed in the Essex Action on October 8, 1996.

Approximately three months later, Joseph Braunstein, in his capacity as Chapter 7 Trustee

of the estate of ABP, filed a motion to substitute himself as party plaintiff, which the court

allowed on January 31, 1997. Following the entry of the July 8, 1997 Stipulation and Order

with respect to USTrust's secured claim, USTrust pursued the Essex Action. In the spring

---

[274] Id. at 43.

[275] Id. at 45. Gilleran also indicated that his fee arrangement with USTrust changed in 1997 to a contingency fee agreement based upon monies collected from Conti and his various entities, id. at 45-46, and that he had commenced a second action against Conti and an individual named DeStefano in the Suffolk Superior Court to recover allegedly fraudulent conveyances. Id. at 24-25.

[276] Transcript, October 20, 2004 at 60.

of 1998, it filed an Agreement for Judgment between USTrust and Defendants, Robert

Conti, Everett Aluminum, Inc. and New England Bridge Products, Inc., as well as a motion

to substitute itself, in part, for the Chapter 7 Trustee and a motion to dismiss as to all non-

settling defendants except the Everett Savings Bank.[277]  On May 13, 1998, the Superior

Court ordered that "the action be and hereby is dismissed, NISI to be vacated if an

agreement for judgment is filed within 90 days."[278]

On July 21, 1998, this Court approved a Settlement Agreement, which was filed on

June 12, 1998 between and among the Trustee, Everett Savings Bank, Conti, Avenue

Finance, RCPC, Everett Aluminum Products, Inc., John Conti and NEBP.  Pursuant to the

Agreement, Everett Savings Bank agreed to pay the Trustee the sum of $180,000.

Moreover, the parties agreed that Everett Savings Bank, and the other named defendants

in the Essex Action "will be deemed to have waived and released for all time any and all

claims which they have asserted, or which they could have asserted, against the Debtor and

its Estate in this proceeding on the Effective Date."[279]  The parties also agreed to dismiss,

---

[277] Pursuant to the Agreement for Judgment, which is part of the file in this bankruptcy case, USTrust agreed to recover nothing from Conti on Count I, except it preserved its rights under executions issued in three actions it commenced against Conti and others in the Suffolk Superior Court.  With respect to Count II and V against Everett Aluminum, Inc. and John Conti, respectively, USTrust agreed to recover nothing and dismiss the counts.  With respect to Count IV, USTrust agreed to a judgment against Everett Aluminum, Inc. in the sum of $333,973.17.  It agreed to a judgment in the same amount against NEBP on Counts X and XI. *See* Exhibit D to the Opposition of USTrust to Ex Parte Motion of Kilroy (#73). The judgment amount is almost identical to the total checks made payable to ABP, which were deposited into Conti controlled accounts, namely $337,594.18, which was set forth in the Receivers Report #3.

[278] *See* Plaintiff's Exhibit 11 (docket).

[279] *See* Settlement Agreement (#80).

89

with prejudice and without costs, all claims, cross-claims, and counterclaims which were asserted, or which could have been asserted" in the Essex Action.[280]

## III. ARGUMENTS

### A. The Chapter 7 Trustee

The Trustee organized her Proposed Conclusions of Law with reference to the Counts in her Amended Complaint. She did not specifically address issues such as the applicable statute of limitations and collateral estoppel, although she filed a separate "Brief Regarding a Receiver's Business Judgment and a Receiver's Discretion with Regard to Legal Claims."

#### 1. Counts I and II

Through Counts I and II, the Trustee seeks damages she claims are as a direct and proximate result of Decoulos's negligence and breach of a fiduciary duty of care and loyalty, respectively, for actions taken by Decoulos *as Receiver* of ABP. Citing Shapiro v. Goldman, 253 Mass. 60, 148 N.E. 217 (1925), and Wood v. Comins, 303 Mass. 367, 369, 21 N.E.2d 977 (1939),[281] and distinguishing Kermit Constr. Corp. v. Banco Credito Y Ahorro

---

[280] Id.

[281] In Shapiro, the court, in considering the actions of a trustee, not a receiver, stated: "The defendant . . . is liable personally for transactions outside of his authority and in such matters may be sued without the consent of the bankruptcy court; and this is true even when the wrongful actions were in his capacity as an officer of the court without personal interest on his part." 253 Mass. at 63, 148 N.E. at 219. In Wood, a case involving a personal injury action against the executrix of a trustee, appointed under the Bankruptcy Act in effect at that time, who had operated a cafeteria, the court stated:

> An ordinary trustee is liable personally for torts committed by him or by his agent or servant in the administration of the trust. So also in general an executor or administrator is liable be bonis propriis for charges incurred by him in the

Ponceno, 547 F.2d 1 (1st Cir. 1976), the Trustee prefaces her argument by observing that a

receiver may be held personally liable for his actions, particularly if he fails to "faithfully

and carefully" carry out the orders of the appointing judge, resulting in forfeiture of the

extension of that judge's absolute immunity. She adds that she may recover damages for

breach of the requisite duty of care and fiduciary duty if the breach "proximately caused

damage to the ABP estate."[282]

The Trustee asks this Court to conclude that Decoulos owed a duty of care in his

capacity as Receiver to the Estate of ABP because he was "the representative of the court

and of all parties interested in the litigation," Wellman v. North, 256 Mass. 496, 501, 152

N.E. 886, 888 (1926), and that had an obligation to obey the orders of the appointing court,

and to protect and preserve the property subject to the receivership, which is held in

---

settlement of the estate. As to receivers, however, a different rule has become
established in this country. *Actions against receivers growing out of the
performance by them of their duties within the scope of their powers under the
valid orders of the court appointing them do not bind them personally, but are
regarded as brought against the receivership, and judgments recovered in such
actions are payable only from funds in the receiver's hands.* It is in part at least for
this reason that, unless some statute provides otherwise, *an action cannot be
brought against a receiver without leave of the court appointing him.* It results
from this rule that by the great weight of authority both here and elsewhere an
action cannot be maintained against a receiver, even for the purpose of
establishing the validity of the claim, after he has been discharged and has ceased
to hold any relation to the fund out of which alone payment can be secured.
303 Mass. at 368-69, 21 N.E.2d at 978 (citations omitted)(emphasis supplied). *See also*
Archambeau v. Platt, 173 Mass. 249, 53 N.E. 816 (1899).

[282] Plaintiff's Proposed Conclusions of Law at 2 and 17 (citing, *inter alia,* Correia v.
Firestone Tire & Rubber Co., 388 Mass. 342, 352, 446 N.E.2d 1033 (1983)).

91

custodia legis.[283]  She also asks the Court to conclude that as an officer of the court,

Decoulos, as Receiver, was a "fiduciary both for the court and for all parties that have an

interest in the receivership property."[284]

The Trustee asks this Court to find that Decoulos failed to meet the standard of care

of a diligent receiver in Massachusetts and violated his fiduciary duty because he did not

act diligently to recognize and take steps to collect ABP's assets, including the assets or the

value of assets usurped by the defendants in the Essex Action, checks made payable to ABP

which were not deposited into its accounts both before and after his appointment as

Receiver, and the value of steel and aluminum on the premises of ABP.  The Trustee also

cites Decoulos's failure to commence actions to collect accounts receivable, to investigate

what equipment belonged to ABP, to recover tools and equipment belonging to ABP, to

---

[283] Id. at 3-4.

[284] Id. at 17 (citing Fleet Nat'l Bank v. H & D Entm't, Inc., 926 F.Supp. 226, 240 (D. Mass. 1996)). In H & D Entertainment, the United States District Court for the District of Massachusetts explained the duties of a receiver:

> It is axiomatic that receivers are bound by fiduciary obligations to the court appointing them and to the estates they serve.
>
> In the case of a court-appointed receiver, those duties are framed by the task he or she is ordered to accomplish. Where a receiver is charged with liquidating an estate's assets, he or she is not required to adhere to imprudent restrictions that would unnecessarily impede achievement of that goal. Nor is the court required to impose restrictions that would bar individuals experienced in an industry or familiar with the estate's assets from serving as the estate's receiver or as an agent of that receiver. This is true both under the law of equity receivership  and within the more rigid confines of the modern Bankruptcy Code.

926 F.Supp.at 240-42 (citations omitted, footnotes omitted). The court also observed that "[i]n managing the estate, a receiver is bound to proceed with ordinary care and prudence, that is, exercising the care and diligence with which an ordinary and prudent individual would use in handling his own estate." Id. at 239 n. 51.

92

recover the value of material used by NEBP to complete contracts it took over from ABP,

to investigate and recover the retainages due on ABP contracts, to investigate the validity

of asserted back charges, to obtain prejudgment attachments against the defendants in the

Essex Action, to conduct discovery, and to "get to the bottom of the fraud" that was

palpable to the Superior Court.   The Trustee references Decoulos's failure to abide by

orders of the court, particularly with respect to his obligation to file an inventory within

30 days of his appointment. The Trustee emphasizes Decoulos's erroneous conclusions in

recommending dismissal of the claims against Everett Savings Bank on grounds that

"Conti had put more money into ABP than he took out . . . [and] . . . the receivership estate

had no claim against Conti."[285] According to the Trustee, these erroneous conclusions

resulted in "Decoulos effectively and impermissibly. . . [giving]. . . Conti's claims against

the estate first priority over all other creditors of ABP."[286]

The Trustee urges the Court to conclude that Decoulos's breach of his duty of care

and breach of his fiduciary duty were the proximate cause of the damages suffered by the

estate of ABP.  In this regard, the Trustee recognizes the following:

> it was necessary to conduct a "case within a case" to determine the merits of
> the ultimate claim against Decoulos and Decoulos & Decoulos. "A client in
> a malpractice action based on an allegation of attorney negligence must show
> that, but for the attorney's failure, the client probably would have been
> successful in the prosecution of the litigation giving rise to the malpractice
> claim." Colucci v. Rosen, Goldberg, Slavet, Levenson & Wekstein, P.C., 25
> Mass.App.Ct. 107, 113, 515 N.E.2d 891, 895 (1987); see also Ryan v. Ryan, 419

---

[285] Plaintiff's Proposed Conclusions of Law at 9.

[286] Id.

93

Mass. 86, n.6, 642 N.E.2d 1048, n.6 (1994). One of the elements of malpractice charged in this litigation is the allegation that plaintiff was damaged as a result of Decoulos' failure to prosecute the Essex action. The inquiry is then whether ABP probably would have been successful in the prosecution of the Essex action had that been handled properly by Decoulos.[287]

She thus urges the Court to find "that ABP would more likely than not have been successful had that action been prosecuted on a timely basis,"[288] and "that as a direct and result of the Essex defendants' actions, damage was caused to ABP in that it lost its entire business," the shares of which had a fair and reasonable value on a discounted basis at the time and place of conversion of $850,000.[289] The Trustee also asks the Court to find that it was probable that the actions of Everett Savings Bank, the Contis and NEBP would have been found to have risen to level of rascality warranting ch. 93A damages.[290]

2. Counts III and IV

Through Counts III and IV, the Trustee seeks the recovery of damages against Decoulos, *as an attorney*, for professional negligence and breach of his fiduciary duty of care and loyalty. Relying upon <u>Bays v. Theran</u>, 418 Mass. 685, 690-91, 639 N.E.2d 720, 723-24 (1994), she asserts that she established the existence of an attorney/client relationship between Decoulos and the estate of ABP because no formal retention was required. She states that Decoulos, while acting as Receiver, concurrently acted as an attorney in

---

[287] <u>Id.</u> at 10-11.

[288] <u>Id.</u> at 11.

[289] <u>Id.</u> at 14.

[290] <u>Id.</u> at 15.

furtherance of his obligation to administer the estate and that he owed a duty "'to act with all good fidelity both to his clients and to the court.'"[291]   She maintains that this Court should conclude that Decoulos breached his duty to act with the degree of reasonable care and skill required of an attorney and breached his fiduciary duty as well, adding that "[u]nder these circumstances, it does not matter whether Decoulos may have generally received judicial approval of certain actions."[292]  The Trustee asks this Court to conclude that Decoulos committed malpractice and breached his fiduciary duty by "[p]erforming only selective legal work," "blocking the effective execution of the legal work that was ordered to be done" and "refusing to perform his duty for personal reasons over the interests of the ABP estate."[293]

The Trustee urges this Court to conclude that she has established that the ABP estate was harmed by the conduct of Decoulos in his capacity as an attorney and that that harm "'was more likely caused by the defendant['s] negligence than by some other agency.'"[294] She asserts that this Court should conclude that had Decoulos pursued the Essex action, "he more than likely would have been successful" and that judgment more than likely would have been trebled under ch. 93A.[295] Because, in her view, the measure of damages

_____

[291] Id. at 33 (citing Berman v. Coakley, 243 Mass. 348, 354, 137 N.E. 667 (1923)).

[292] Id. at 28 and 35.

[293] Id. at 31 and 38-39.

[294] Id. at 31 and 39 (citing Girardi v. Gabriel, 38 Mass. App. Ct. 554, 557, 649 N.E.2d 805 (1995)).

[295] Id. at 31 and 39.

95

is presumptively the value of the property lost as a result of the professional negligence and breach of fiduciary duty , she asserts that Decoulos's negligence and breach of duties was the proximate cause of $3.3 million in damages to the estate.[296]  Alternatively, she claims that the measure of damages is the sum of uncollected receivables ($741,544.25) and the full value of ABP's equipment ($150,000).  Moreover, she urges this Court to conclude that the defendants in the Essex action possessed sufficient resources to ensure that judgments against them would be collectible.[297]

### 3. Counts V and VI

Through Counts V and VI, the Trustee seeks damages against Decoulos for violation of Mass. Gen. Laws ch. 93A, §11.  She asserts that Decoulos engaged in the conduct of trade and/or commerce as an attorney and/or as a receiver, acting on behalf of ABP and that he violated  ch. 93A, § 11 by negligently performing his duties and breaching his fiduciary duty of care and loyalty and by preventing and discouraging others from taking action.

The Trustee, citing Tetrault v. Mahoney, Hawkes & Goldings, 425 Mass. 456, 462,

---

[296] Id. at 32 and 39.

[297] Id. at 32 and 39-40.  She states the following:
There was substantial evidence that the Essex defendants possessed sufficient funds or resources to ensure collectability [sic] of any judgment ABP may have obtained. Tr. 8/31 at 13-14. Robert Conti was a man of "wealth." Tr. 8/31 at 13-14; 9/3 at 166-171; Conti owned the Wolfeboro Hotel (Tr. 9/3 at 171)[;] Conti later sold and netted personally over $2 million from the sale. Tr. 9/3 at 190. New England Bridge Products is an ongoing business over ten years after it was created in 1993. Tr. 9/3 at 240. New England Bridge had sufficient cash to write Conti a $450,000 check. Tr. 9/3 at 239.
Id. at 32 and 40.

681 N.E.2d 1189, 1195 (1997), states that "'the proper party to assert a c. 93A claim against an attorney is a client or someone acting on a client's behalf,'" although she recognizes that liability requires that the attorney be acting in a business context. She also asserts that a lawyer may be liable under ch. 93A "to a non-client or an adversary of its client."[298]

The Trustee requests that this Court find that Decoulos, as part of his law practice, was in the business of providing receivership services and was acting as an attorney providing legal services to the receivership. Although she recognizes that negligence alone is insufficient to sustain a cause of action under ch. 93A, she maintains the "rascality standard" is satisfied due to Decoulos's failure to, among other things, properly investigate and pursue the Essex Action. In her words:

> Decoulos's rationale for failing to investigate himself and, at the same time failing to take steps that someone would in fact prepare the Essex action for trial, as well as conduct discovery and attach assets was a purely personal motive, i.e. in Decoulos choosing not to get "inundated" between the two sides (Tr. 9/24 at 67), he ended up favoring the Essex defendants by allowing them to retain the ABP property, equipment, receivables and every other thing of value to ABP.[299]

---

[298] Id. at 41 (citing St. Paul Fire and Marine Ins. Co. v Ellis & Ellis, 262 F.3d 53 (1st Cir. 2001), in which the court stated:
    Chapter 93A proscribes "those engaged in trade or commerce from employing '[u]nfair methods of competition and unfair or deceptive acts or practices' in business transactions."
    Though ch. 93A provides a broad remedy, it is only directed at conduct that occurs in the course of trade or commerce. "[U]nfair or deceptive acts or practices" therefore can only form the basis of a ch. 93A claim if those acts "are perpetrated in a business context."
262 F.3d at 66 (citations omitted).

[299] Id. at 45.

### 4. Counts IX and X

Through Counts IX and X, the Trustee seeks damages against the law firm of Decoulos & Decoulos on the same legal grounds as set forth above. She requests that the Court impose liability on Decoulos & Decoulos because at all relevant times Decoulos was acting in the ordinary course of business of the law firm, with its authority and within its scope of business. Through Count X she asks this Court to conclude that the conduct of the firm warrants the imposition of multiple damages.

### B. The Defendant

Decoulos in his proposed Conclusions of Law organized his legal arguments topically. He did not specifically address each and every count of the Trustee's Amended Complaint.

### 1. Attorney/Client Relationship

Citing, *inter alia*, In re Milestone Educ. Inst., Inc., 167 B.R. 716 (Bankr. D. Mass. 1994), and Bell v. American Protective League, 163 Mass. 558, 40 N.E. 857 (1895),[300] Decoulos

---

[300] In Milestone, this Court considered whether to dismiss a Chapter 11 petition filed by a receiver, observing the following:

> The overriding issue is whether this Court has jurisdiction over a bankruptcy case filed by a receiver acting under authority granted by the state court on behalf of a corporate debtor. The answer to that question requires an examination of the statutory and case law of receiverships, as well as federal bankruptcy law on the subject. The Court has been unable to locate any direct precedent on this issue. Moreover, the Court is hampered in its analysis by the absence of copies of the Articles of Incorporation, the by-laws of Milestone, and the complete record before the Superior Court.

167 B.R. at 718-19. In Bell the court formulated the issue as follows: "The question presented in this case is as to the correctness of the ruling of the superior court that the receiver, by reason of the facts reported, became liable, by privity of estate, upon the covenants of the lease, and continued so liable until the receiver assigned the lease to one Clancy." 163 Mass. at 561, 40

argues that his role was not that of attorney for ABP, the plaintiff in the Essex Action. He

maintains that the Order of Appointment did not by its terms "order the receiver to pursue

the Essex action as the Plaintiffs' attorney."[301] Relying upon the general principle that "the

receiver ordinarily must apply to the court for permission to institute an action" and that

if such permission is granted, "the receiver must bring the action in the name of the party

whose property is in receivership,"[302] Decoulos states that he never appeared in the Essex

Action as the attorney for ABP, did not request court authority to prosecute the case, and

told Bingham by letter dated December 18, 1995 that it was not his responsibility to

prosecute the claims of ABP.   Therefore, he concludes there was no attorney/client

relationship and, thus, no professional negligence or malpractice.  Citing, among other

cases, Lamare v. Basbanes, 418 Mass. 274, 636 N.E. 2d 218 (1994);[303] he urges the Court to

---

N.E. at 858.  The court, in reversing the superior court, concluded: "on principle, it seems to us
that, if a receiver of an insolvent corporation takes possession of its leasehold estate, he is liable
only for a reasonable rent during the time that he retains possession; that he does not become an
assignee of the term, and is not liable on the covenants of the lease." Id. at 563, 40 N.E. at 859.

[301] Defendants' Proposed Rulings of Law at 70.

[302] Joseph R. Nolan and Laurie J. Sartorio, 31 Mass. Prac. 2d ed., Equitable Remedies, §
196 (1993).

[303] In Lamare, the court stated:
   . . . Absent an attorney-client relationship, the court will recognize a duty of
   reasonable care if an attorney knows or has reason to know a nonclient is relying
   on the services rendered. However, the court will not impose a duty of reasonable
   care on an attorney if such an independent duty would potentially conflict with the
   duty the attorney owes to his or her client. To impose a duty of care where there is
   the potential for conflicting interests would be inconsistent with S.J.C. Rule 3:07,
   Canon 4, DR 4-101 . . . .
   The rule is founded on the realization that, if a duty was owed to the adversary of

conclude that it

cannot square the case authority holding the Receiver's position as acting as
a "hand of the court" and the Receiver's possession and custody of the assets
of the corporation as being the Court's *in custodia legis* with the proposition
that the Receiver was *ipso facto* American Bridge's attorney in the Essex
action. In the absence of an attorney/client relationship between the
Receiver and ABP, Decoulos owed no duty of care to ABP and cannot have
committed malpractice. As the Receiver Decoulos owed a duty of care to the
appointing Court, not to non-clients whose interests would potentially
conflict with his duties as Receiver.[304]

### 2. No Personal Liability

Noting that, generally, the order appointing a receiver requires the receiver to wind

up the affairs of a corporation and liquidate its assets, Decoulos cites a case in which the

court stated: "A receiver is an officer of court, and amenable to it for a proper discharge

of the trust confided to him. When he is in doubt as to what he ought to do, he should take

the advice of the court." In re Angell, 131 Mich. 345, 350-51, 91 N.W. 611, 612(1902).

Decoulos also maintains that the "'contracts, misfeasances, negligence, and liabilities of

receivers are official, and not personal and judgments against . . .[the receiver] . . . are

payable only from funds in his hands.'" Archambeau v. Platt, 173 Mass. 249, 251, 53 N.E.

---

an attorney's client, an unacceptable conflict of interest would be created, and
because it would be inimical to the adversary system for an adverse party to be
allowed to rely on an opposing party's attorney. It is well-established that
attorneys owe no duty to their client's adversary. Within the adversary system,
"there is no room for existence of a duty running to the adversary."
418 Mass. at  276, 636 N.E.2d at 219 (citations omitted).

[304] Defendants' Proposed Rulings of Law at 71-72.

816, 817 (1899)(citing <u>McNulta v. Lochridge</u>, 141 U.S. 327, 332 (1891)).[305]  Citing <u>Kermit</u>

<u>Constr. Corp.</u>, 547 F.2d at 3 ("a receiver who faithfully and carefully carries out the orders

of his appointing judge must share the judge's absolute immunity"), Decoulos asserts, as

a consequence, that he is immune from suit.

> 3. Statute of Limitations

Decoulos also relies upon the statute of limitations as a defense to Counts I, II, III,

IV, V, VI, VII, IX and X.   Specifically, he relies upon the thee year statute of limitations set

forth in Mass. Gen. Laws Ch. 260, § 4, stating the following:

> claims for breach of fiduciary duty, legal malpractice, negligent infliction of
> emotional distress, and 93A claims arising from an attorney's representation
> were all held to be time barred by the 3-year rule as the cause of action
> accrued when the client learned or should have learned that he was harmed
> by the attorney's actions.[306]

Decoulos adds that the statute of limitations begins to run, not when a case is finally

concluded, but when appreciable harm is discovered.

---

[305] In <u>Archambeau</u>, the receivers were federally appointed, had been discharged, and
"were guilty of no act or omission which would have been a cause of action apart from their
official relation to one of the plaintiffs." 173 Mass. at 250, 53 N.E. at 817.

[306] Defendants' Proposed Conclusions of Law at 79.  Decoulos cites, *inter alia*, <u>Rosen</u>
<u>Constr. Ventures, Inc. v. Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.</u>, 364 F.3d 399,
404-405 (1st Cir. 2004)("Under Massachusetts law, the limitations period begins to run '[o]nce a
client or former client knows or reasonably should know that he or she has sustained appreciable
harm as a result of the lawyer's conduct. . . .' '[A] plaintiff [must] have (1) knowledge or
sufficient notice that she was harmed, and (2) knowledge or sufficient notice of what the cause of
the harm was.'"), and <u>LoCicero v. Leslie</u>, 948 F.Supp. 10 (D. Mass. 1996). In <u>Leslie</u>, the court
stated the following: "A plaintiff has three years to file claims for breach of fiduciary duty . . .,
legal malpractice . . . A claim under chapter 93A for unfair and deceptive trade practices . . .
must be commenced within four years after the cause of action accrues. Mass.Gen.Law ch. 260, §
5A." 948 F.Supp. at 12. (citations omitted).

With respect to the facts of this case, Decoulos argues that ABP, Agarwal and Kilroy

"asserted loud, long and often that ABP had been harmed by the Receiver's actions during

the Essex Action"[307] beginning when they filed a Chapter 11 petition in October of 1993.

Decoulos cites Agarwal's letter to the Board of Bar Overseers, as well as the motions to

remove him as Receiver. Thus, Decoulos states that the continuing representation doctrine

is unavailable to toll the running of the statute of limitations. He urges this Court to

conclude that "[e]ven if the very latest of these triggering events is used for accrual

purposes (the July and October 1995 removal motions), the statute of limitations on these

claims expired long before this case was commenced on March 9, 2000."[308]

### 4. Collateral Estoppel

Decoulos maintains that the doctrines of collateral estoppel or issue preclusion

compel judgment in his favor. He states:

> The Massachusetts Courts have held that Orders either appointing a Receiver
> or refusing to remove a Receiver are final Orders for purposes of the parties'
> rights to appeal those orders. Wax v. Monks, 327 Mass 1, 2-3, 96 N.E.2d 704,
> 705 [1951], Cambridge Savings Bank v. Clerk of Courts, 243 Mass. 424, 427,
> 137 N.E. 872 [1923], New England Theatres, Inc. v. Olympia Theatres, Inc.,
> 287 Mass. 485, 490, 192 N.E. 93, 96 (1934) [sic] A review of the allegations set
> forth in the removal motions reveals they are substantially identical to the
> claims asserted in this Adversary Proceeding. The Plaintiff [sic] has already
> litigated, and lost, this claim before the Superior Court (at least twice). The
> Defendants' claim to the defensive use of collateral estoppel is appropriate
> in these circumstances. Accordingly, the Plaintiff's claims against the

---

[307] Defendants' Proposed Conclusions of Law at 82.

[308] Id. at 84.

Defendants are barred on the grounds of collateral estoppel.[309]

Decoulos asserts that the allegations in the removal motions are substantially identical to

the claims in the adversary proceeding because the "Plaintiff" has already litigated, and

lost, this claim before the Superior Court, although Chapter 7 Trustee was neither a

Plaintiff nor a party to the Essex Action.

5. Professional Negligence

Addressing the Plaintiff's claims for professional negligence and attorney

malpractice, Decoulos argues that the Trustee has failed to meet her burden of proof on

each element of the cause of action: duty, breach, proximate causation and resulting

damages. He states that the Trustee was required to "establish that ABP probably would

---

[309] Id. at 86-87. In Wax the court stated the following:
In Cambridge Savings Bank v. Clerk of Courts, 243 Mass. 424, 427, 137 N.E.
872, it was said that a decree denying a petition to vacate the appointment of a
receiver for lack of jurisdiction to appoint him is a final decree and appealable as
such. A like decision was made in New England Theatres, Inc. v. Olympia
Theatres, Inc., 287 Mass. 485, 490, 192 N.E. 93. A refusal to revoke an
appointment is much the same thing as an appointment. Silver v. Kingston Realty
Corp., 114 Conn, 349, 158 A. 889.
 The receivers in the present case were not appointed merely to take possession of
and hold the property. They were directed to complete contracts made by the
defendant and contracts thereafter made by the receivers, to enforce the rights of
the defendant in their own names and to collect any money due her. The decree
took these rights away from the defendant, and appeal would be futile unless the
decree could be vacated by prompt entry of the appeal in the full court. Vincent v.
Plecker, 319 Mass. 560, 564, note 2, 67 N.E.2d 145; Ferrick v. Barry,320 Mass.
217, 219, 68 N.E.2d 690; Lynde v. Vose, 326 Mass. 621, 96 N.E.2d 172. For
these reasons we consider the decree appealed from to be a final decree, and
consider presently the questions argued.
327 Mass. 2-3, 96 N.E. at 705-06.

have obtained a better result had the Receiver exercised adequate skill and care."[310]

Decoulos adds that "where former counsel is replaced by successor counsel and the client's claim is still viable and successor counsel is able to proceed with discovery and investigation to adequately prepare for trial, there can be no recovery against the former counsel."[311] Decoulos argues that the Trustee failed to introduce evidence that a better result probably would have been obtained if he had exercised adequate skill or care, adding that Gilleran, Braunstein, and Ottenberg all testified that the claims asserted in the Essex Action were viable upon the commencement of the bankruptcy case and that Gilleran and Braunstein both testified that they were not prejudiced in the prosecution of the litigation.[312] Decoulos concluded:

> Plaintiff offered no evidence as to what the range of a reasonable settlement of the Essex action claims might have been if the case was prepared for trial by competent counsel. Plaintiff's various experts offered no opinion on this subject and admitted that they were completely unaware of the results ultimately achieved in the case. Finally, the plaintiff offered inadequate evidence to establish that any judgments obtained against the defendants in the Essex action would have been collectable. In this regard, any judgment obtained in favor of ABP would have first been applied to satisfaction of the first position, all asset security interest of USTrust whose claims against ABP during the litigation were approximately $400,000. Attorney Gilleran's testimony was uncontradicted that at the time the Essex litigation was prepared and eventually settled, Robert Conti's assets consisting of real estate holdings were largely encumbered with little equity available for attaching creditors. Plaintiff's scant evidence offered as to the income of New England Bridge years after the settlements were approved by both the Superior Court and this Court are not compelling on this point. Plaintiff has

---

[310] Id. at 88.

[311] Id. at 89.

[312] Id. at 90.

104

failed to meet its burden of proof, especially as to the proximate cause and damages elements of its negligence and tort claims. Accordingly, Judgment shall enter for the Defendants as to all counts.[313]

  6. Chapter 93A

Finally Decoulos asserts that, as a state court appointed receiver, he did not engage in an act of trade or commerce with ABP.  In other words, Decoulos urges this Court to conclude that his actions cannot create a commercial relationship between him and the corporation over which he was appointed.[314]

**IV. DISCUSSION**

  A. <u>Counts I and II</u>

    1. General Principles Applicable to the Duties, Standard of Care, and Personal Liability of Receivers

The law applicable to receivers warrants close examination for purposes of determining Counts I and II of the Trustee's Amended Complaint. Decoulos's conduct and potential liability can only be understood with reference to applicable law, particularly decisions holding receivers personally liable for their conduct.  Reference to treatises also is helpful as there are few recent decisions on the subject.

Generally, the appointment of a receiver is a remedy, not a right, and the appointment of a receiver "is an interlocutory order and not a final order." 1 Ralph Ewing Clark, <u>A Treatise on the Law and Practice of Receivers</u>, § 49, at 54 (3d ed. 1959)(hereinafter

---

[313] <u>Id.</u> at 91-92.

[314] <u>Id.</u> at 92-93.

"Clark on Receivers"). [315] *See also* Howard J. Alperin, Lawrence D. Shubow and Roland F.

Chase, Summary of Basic Law, 14B Mass. Prac. 3d § 12.61 (1996 & Supp. 2004). "Before a

court will appoint a receiver the litigant must bring a proper suit before the court and claim

a substantive right has been violated, and the court at its discretion appoints a receiver to

preserve the res . . . ." Id. § 48, at 52 (footnote omitted).

In Massachusetts, the courts have held that "a decree denying a petition to vacate

the appointment of a receiver for lack of jurisdiction to appoint him is a final decree," and

"[a] refusal to revoke an appointment is much the same thing as an appointment." Wax v.

Monk, 327 Mass 1, 3, 96 N.E.2d 704, 705 (1951). The court in Wax, citing New England

Theatres, Inc. Olympia Theatres, Inc., 287 Mass. 485, 192 N.E. 93 (1934), held that the refusal

to vacate the appointment of receivers was a final and appealable decree. Wax, 327 Mass.

at 3, 96 N.E.2d at 706.

A receiver should hold the res in a neutral capacity and should be impartial until

substantive rights are determined by the court. Clark on Receivers, § 45, at 46. "The

property upon the appointment of the receiver is in custodia legis, held by the court for the

purpose of administration and disposition in accordance with the rights of the parties to

the litigation." Wellman, 256 Mass. at 500, 152 N.E. at 888.

In Wellman, the court articulated the following criteria applicable to receivership

---

[315] *See* Id. § 122.1 at 177 ("The appointment of a receiver is in itself an administrative order because its purpose is to preserve the property in litigation rather than to determine the rights or interests in the property . . . [and] . . . [a]n administrative order is subject to change and is not a final order").

106

property and the receiver's obligations with respect to that property: "[t]he proceeding by receivership is quasi in rem so far as involves a sequestration of assets. The receiver is the representative of the court and of all parties interested in the litigation." Id. at 500-01, 152 N.E. at 888. Similarly, in Iglehart v. Todd, 203 Ind. 427, 178 N.E. 685 (1931), the court determined, with respect to an insolvent corporation, that the receiver represented the creditors, as well as the stockholders, and held property for the benefit of both. 178 N.E. at 690. The Indiana court added that "as trustee for creditors, [he] can maintain and defend actions which the corporation could not." Id. It stated the following general rule:

> "the receiver of an insolvent corporation has no greater lights [sic] than those possessed by the corporation itself, and a defendant in a suit brought by him may take advantage of any defense that might have been made if the suit had been brought by the corporation before its insolvency, it is equally true that when an act has been done in fraud of the rights of the creditors of the insolvent corporation the receiver may sue for their benefit, even though the defense set up might be valid as against the corporation itself. In such a case he may maintain an action which the corporation itself could not."

Id. (quoting Lyons v. Benney, 230 Pa. 117, 79 A. 250, 251 (1911)).  See also 2 Clark on Receivers, § 362, at 619; Joseph R. Nolan and Laurie J. Sartorio, 31 Mass Prac. 2d Equitable Remedies § 197 (1993).

Considered officers of the appointing court, receivers are subject to the court's directions and orders and "at all time are entitled to apply to the court for instructions." 1 Clark on Receivers, § 35, at 37 (footnotes omitted).  Indeed, a "receiver should ask for the court's instructions on any important matter affecting the rights of any one." Id., § 38 at 40.

After securing a copy of the order of appointment, "the receiver should make

107

demand upon the defendant corporation . . . to turn over to him the property of which he

has been appointed receiver." Nolan and Sartorio, *supra* at § 195; *see also* Mass R. Civ. P.

66.[316] A receiver has a duty to find assets and bring them under his control. 1 <u>Clark on</u>

<u>Receivers</u>, § 123, at 178. It is also his duty to prepare an inventory and value the items

---

[316] Rule 66 provides the following:

a) An action wherein a receiver has been appointed shall not be dismissed except by order of the court. The practice in the administration of estates by receivers or by other similar officers appointed by the court shall be in accordance with the practice heretofore followed in the courts of this Commonwealth and with the laws thereof. In all other respects the action in which the appointment of a receiver is sought or which is brought by or against a receiver is governed by these rules.

(b) Every receiver, within thirty days after his appointment, shall file a detailed inventory of the property of which he has possession or the right to possession, with the estimated values thereof, together with a list of the encumbrances thereon; and also a list of the creditors of the receivership and of the party whose property is in the hands of the receiver, so far as known to him.

(c) Every receiver shall file, not later than the fifteenth day of February of each year, a detailed account under oath of his receivership to and including the last day of the preceding year, substantially in the form required for an account by a guardian in the probate courts, together with a report of the condition of the receivership. He shall also file such further accounts and reports as the court may order.

(d) When an attorney at law has been appointed a receiver, no attorney shall be employed by the receiver or receivers except upon order of court, which shall be made only upon the petition of a receiver, stating the name of the attorney whom he desires to employ and showing the necessity of such employment.

(e) No order discharging a receiver from further responsibility will be entered until he has settled his final account.

(f) The court, in its discretion, may relieve any receiver from any requirement imposed by sections (b)-(e) of this rule.

Mass. R. Civ. P. 66.

comprising the inventory. Id., § 125.1, at 181. The assets, or receivership res, may consist

of the following:

> [E]quitable interests in property, choses in action, the recovery of property
> conveyed in fraud of creditors, accounts, bills receivable, notes receivable
> and choses in action generally. In such cases the receiver may be called upon
> to bring suit or take other measures to collect such proper, accounts, bill and
> notes receivable and choses in action.

Id. §163, at 249 (citing Rochester Tumbler Works v. Mitchell Woodbury Co., 215 Mass. 194,

198, 102 N.E. 438, 440 (1913)). Additionally, the res may include "[c]laims of a corporation

for malfeasance or any breach of duty on the part of its directors or officers." Boucher v.

Hamilton Mfg. Co., 259 Mass. 259, 270, 156 N.E. 424, 428 (1927)(citing, inter alia, Bartlett v.

New York, New Haven & Hartford R.R., 221 Mass. 530, 109 N.E. 452 (1915)). The rights to

enforce the claims also "constitute assets of the corporation to be dealt with by the receiver

under the direction of the court." Boucher, 259 Mass. at 270, 156 N.E. at 428. Similarly, a

receiver can bring corporate claims for conversion. Smith v. Texas & N.O.R. Co., 101 Tex.

405, 108 S.W. 819 (1908). Cf. Groman v. Watman (In re Watman), 301 F.3d 3, 12 (1st Cir.

2002)("There is substantial support in bankruptcy case law for the proposition that such

intangible assets as goodwill and overall going concern are valuable and should be

preserved for the bankrupt [sic] estate."); Robinson v. Watts Detective Agency, Inc., 685

F.2d 729, 734 (1st Cir. 1982)(property for purposes of the Bankruptcy Act defined as

"'anything of value-anything which has debt paying or debt securing power.'").

   Notably, bank deposits are among the assets a receiver must investigate and bring

under his control. "A bank deposit is a credit or debt and not tangible property . . . [and]

. . . [a] debt owing by the bank to the depositor is a credit belonging to the depositor and must pass to his receiver." 1 <u>Clark on Receivers</u>, § 260, at 392 (footnote omitted). Because of the creditor/debtor relationship between a depositor and the bank, "the receiver acquires a chose in action against the bank, which passes to the receiver and under control of the court [which] is a claim against the bank." <u>Id.</u>, § 260, at 394.

In addition to his duties to take possession of assets and file and inventory of those assets with the court, the receiver has a duty "to determine the validity and the preference to be accorded to the claims of creditors . . . [and] . . . file in a court a report as to such claims." Nolan and Sartorio, *supra* at § 198. "The receiver may allow or disallow a claim or report the facts and seek instructions from the court. If the validity of the claim depends upon contested facts the court may hear and determine the claim or refer it to a master." <u>Id.</u> (citing <u>Old Colony Trust Co. v. Puritan Motors Corp.</u>, 244 Mass. 259, 138 N.E. 321 (1923)).

A receiver cannot relinquish any rights or interests in property of the receivership or contractually bind the estate without an order of the court which appointed him. 2 <u>Clark on Receivers</u>, § 355, at 611. He cannot surrender property, or waive valuable rights, without an order of the court because the property is in custodia legis. <u>Id.</u>, § 355(h), at 614; § 357, at 616. Moreover, he cannot abandon property without court authority. <u>Campbell v. Hargraves</u>, 181 Ark. 492, 26 S.W.2d 876 (1930). Because receivership property is in custodia legis, the court must finally determine how it will be distributed. 2 <u>Clark on Receivers</u>, § 391, at 653-54 (citing, *inter alia*, <u>Attorney General v. Supreme Council A.L.H.</u>,

196 Mass. 151, 81 N.E. 966 (1907)).

If a receiver acts "beyond the scope of the receivership and beyond the scope of his authority or without color of authority," he is not acting as receiver and the official protection usually accorded receivers does not extend to those acts. 2 Clark on Receivers, § 355(a), at 612.  As a consequence, he may be guilty of contempt or liable to the parties injured as a result of his failure to obey court orders. Id., § 360, at 618.

As noted above, a receiver has a duty to take possession of the property covered by the order of appointment, and he can seek an order of contempt against any person who fails and refuses to deliver property to him. Id., § 376, at 631.  With the authority of the appointing court, he may recover possession of property by filing suit. Id. See also § 408, at 696.

In Rochester Tumbler Works, the court distinguished between debts owed to an entity in receivership and debts owed to a receiver:

> A receiver is appointed to preserve property the title to which is in litigation until it is determined to whom that property belongs, or in some cases (generally statutory ones) to wind up the affairs of an insolvent, reduce its property to cash and distribute it among its creditors. But whichever of the two be the nature of a particular receivership, money due for a sale by the company before the receivership and money due for a sale by the receiver are quite different in character. In case of a debt due the company for a sale made by it the receiver collects a chose in action of the company. The chose in action is due under a contract made by the company subject to all equities by way of set-off or otherwise which exists between the company and the debtor. In case of a company debt the receiver sues in the name of the company which was party to the contract unless the chose in action has been assigned to him and he is allowed by the law of the forum to bring an action in his own name as assignee. But in case of a debt due for a sale made by a receiver, the receiver is the party to the contract of sale; the action for that reason must be brought in his own name and is not subject to any equities by

111

> way of set-off or otherwise which could be set up by the company. The
> difference between the two is elementary and needs no citation of authorities
> in its support. We should not have thought it necessary to explain the
> distinction at length had it not been that the defendant's argument is
> founded upon a failure to recognize it.

215 Mass. at 198, 102 N.E. at 440. *See also* Nolan and Sartorio, *supra*, § 196. In addition to

filing suit and seeking contempt orders, receivers may seek restraining orders or

injunctions "to prevent an act by anyone which will interfere with the possession or value

of the property that they are administering as receivers, where the record of rights of the

party causing the injury shows on its face that they have not a legal right to do what they

are attempting to do." 2 Clark on Receivers, § 377, at 632 (footnote omitted).

In performing his duties, the receiver must "exercise ordinary care and prudence

and . . . deal faithfully and carefully with the assets as he would his own." Id., § 378, at 633

(footnote omitted). Indeed, "a receiver is a fiduciary and in the nature of a trustee . . . [and]

. . . the law requires a very high degree of care of a trustee handling other people's money."

Id. (footnote omitted). As the court stated in Fleet Nat'l Bank v. H & D Entm't, Inc., 926 F.

Supp. 226, 240 (D. Mass. 1996), *aff'd*, 96 F.3d 532 (1st Cir. 1996), *cert. denied*, 520 U.S. 1155

(1997), "[i]t is axiomatic that receivers are bound by fiduciary obligations to the court

appointing them and to the estates they serve." (citations omitted) *See also* Ebel v. Ebel (In

re Ebel), 144 B.R. 510, 516 (D. Colo. 1992)("Although the receiver acts as an officer of the

court which appointed him, he is also a fiduciary of the party ultimately determined to

have rights in the property.").

A receiver is protected from personal liability while acting within the scope of

authority of the appointing court. Nevertheless, "[a] receiver generally is chargeable with the value of property which by reasonable diligence will have come into his hands and has been lost by his omission to act. . . ." 2 Clark on Receivers, § 389, at 650 (citing, *inter alia*, Commonwealth v. Gould, 118 Mass. 300 (1875)). Moreover, a receiver is chargeable with the value of property which would have come into his hands but was lost due to his failure to act. Id., § 390, at 651 (footnote omitted). Additionally, a receiver may be liable for failure to ask for authority to bring suit if his lack of diligence results in loss of the claim. Id.

The United States Supreme Court outlined the general rule with respect to the liability of receivers as follows:

> If actions were brought against the receivership generally, or against the corporation by name, "in the hands of" or "in the possession of" a receiver, without stating the name of the individual, it would more accurately represent the character or status of the defendant. So long as the property of the corporation remains in the custody of the court, and is administered through the agency of a receiver, such receivership is continuous and uninterrupted until the court relinquishes its hold upon the property, though its personnel may be subject to repeated changes. Actions against the receiver are in law actions against the receivership or the funds in the hands of the receiver, and his contracts, misfeasances, negligences, and liabilities are official, and not personal, and judgments against him as receiver are payable only from the funds in his hands.

McNulta, 141 U.S. at 331-32.[317] *See also* Kermit Constr. Corp. v. Banco Credito Y Ahorro

---

[317] McNulta was a negligence suit against a railroad operated by a court appointed receiver. The receiver who operated the railroad at the time the suit arose had been replaced prior to the time that the suit was filed, and so his successor was named as defendant. The successor receiver contended that he could not be personally liable for the acts of his predecessor. As noted by the bankruptcy court in Schechter v. State of Illinois (In re Markos Gurnee P'ship), 182 B.R. 211 (Bankr. N.D. Ill. 1995),

> [t]he Supreme Court rejected this defense, on the ground that a suit against a receiver was really a suit against his office, so that it made no difference that the

Ponceno, 547 F.2d 1, 3 (1st Cir. 1976); Wood v. Comins, 303 Mass. 367, 369, 21 N.E. 2d 977,

978-79 (1939). In Rosso v. Freeman, 30 F.2d 826, 828 (1st Cir. 1929), the United States Court

of Appeals for the First Circuit, citing McNulta v. Lochridge, observed that it was well

settled "in the absence of any personal or individual misconduct on the part of the receiver,

his liability is official rather than personal." Nevertheless, it stated:

> There have been cases . . . where the courts have held that the defendant
> could not shield himself from liability on the ground that he was a receiver.
> Kain v. Smith, 80 N.Y. 458; Lyman v. Central Vt. R. Co., 59 Vt. 167, 10 A. 346.
> In both of these cases the receiver, duly appointed by a state court, was
> operating as lessee a railroad which did not constitute a part of the
> receivership property. In the New York case the railroad was outside of the
> jurisdiction of the court appointing the receiver, and in the Vermont case it
> was not. In both cases the court held the defendants personally liable.

---

identity of the individual receiver had changed. Id. at 331, 12 S.Ct. at 12-13. The
Court stated that the trustee's position was analogous to that of a corporation sole,
i.e., a person whose office carries with it control over a separate corporate entity.
Id. The Court then engaged in the following discussion, clearly identifying the
receivership as separate from the receiver personally.

> If actions were brought against the receivership generally or
> against [the railroad] by name, 'in the hands of,' or 'in the
> possession of,' a receiver without stating the name of the
> individual, it would more accurately represent the character or
> status of the defendant. So long as the property of the [railroad]
> remains in the custody of the court and is administered through the
> agency of a receiver, such receivership is continuous and
> uninterrupted until the court relinquishes its hold upon the
> property, though its personnel may be subject to repeated changes.
> *Actions against the receiver are in law actions against the*
> *receivership, or the funds in the hands of the receiver, and his*
> *contracts, misfeasances, negligences and liabilities are official and*
> *not personal, and judgments against him as receiver are payable*
> *only from the funds in his hands.*

Id. at 331-2, 12 S.Ct. at 13 (emphasis added).
182 B.R. at 216 (footnote omitted).

114

30 F.2d at 828. *See also* Shapiro v. Goldman, 253 Mass. 60, 148 N.E. 217 (1925). In Shapiro, the Massachusetts Supreme Court ruled that a bankruptcy court receiver, who had wrongfully withheld a deposit from a sale which he subsequently abandoned, was personally liable for transactions outside his authority, "even when the wrongful actions were in his capacity as an officer of the court without personal interest in his part." 253 Mass. at 63, 148 N.E. at 219.

As noted above, there are exceptions to the general rule that receivers are insulated from personal liability, particularly when he acts beyond the scope of his receivership. In those instances, "he . . . does not act as a receiver and the protection usually accorded receivers does not extend to such acts." 2 Clark on Receivers, § 392, at 654. For example, a receiver may be personally liable for property or funds in custodia legis which are transferred or paid without court authority, id., § 403, at 691, and he may be personally liable for damages "[i]f the property be lost or injured by a negligent or dishonest execution of . . . trust. . . ." Id., § 406(a), at 695. *See, e.g.,* Prescott v. Coppage, 266 Md. 562, 296 A.2d 150 (1972); Vander Vorste v. Northwestern Nat'l Bank, 81 S.D. 566, 138 N.W.2d 411,(1965); Morea v. Muratore, 214 N.Y.S.2d 491 (1961); Morris v. Pierce, 188 Okla. 396, 110 P.2d 294 (1940); Campbell v. Hargraves, 181 Ark. 492, 26 S.W.2d 876 (1930). *See generally* 75 C.J.S. § Receivers § 192 (2004)("A receiver who acts outside his statutory authority or orders of the appointing court, or who is guilty of negligence or misconduct in the administration of the receivership is personally liable for any losses resulting therefrom"); 65 Am. Jur. 2d *Receivers* § 298 (Supp. 2004)("A receiver is personally liable for improper distribution of

assets.").

Although the number of reported decisions in which receivers have been held personally liable is not large and does not include any recent Massachusetts cases, cases from other jurisdictions are instructive for purposes of analyzing the counts of the Trustee's Amended Complaint.  In addition to cases where a receiver takes possession and control of non-receivership property, other cases involving personal liability of receivers for waste of receivership property, improper distribution of receivership assets and other gross misconduct also are instructive.

The principles set forth in <u>Prescott v. Coppage</u>, 266 Md. 562, 296 A.2d 150 (1972), are particularly applicable to this adversary proceeding.  The case involved a suit by one receiver against another and his counsel, individually, as well as the surety, to recover a sum in excess of $40,000.00 claimed to have been a priority obligation of the defendant's receivership but which was not paid as such.  The facts, as summarized by the appeals court, are as follows:

> Coppage was receiver for Security Financial Insurance Corporation (Security); Medley was receiver for Maryland Thrift Savings and Loan Company (Maryland Thrift). Maryland Thrift was indebted to Security on two promissory notes in the face amounts of $40,000.00 and $38,000.00, dated respectively January 9, 1962 and January 17, 1962. Although receivership assets of Maryland Thrift were sufficient to pay the principal and interest on both notes in full, Medley, Receiver, paid only $44,839.20, including interest. He thereafter made distribution to depositors of Maryland Thrift after petition and order of court. The rights of depositors to distribution were inferior to the rights of Security. The distribution by Medley, Receiver, depleted the assets below the amount required to pay the balance of the obligation due Security.

266 Md. at 565-66, 296 A.2d at 152.  On appeal, Medley argued that, as receiver, he was

116

excused from personal liability because he acted pursuant to a court order.  Prescott, the

attorney, agreed, adding that his "negligence, if any, was not the proximate cause of the

loss to Security, and that contributory negligence of Medley bars recovery against him on

the cross-claim." 266 Md. at 566, 296 A.2d at 153.  With respect to the receiver's personal

liability the court stated the following:

> Medley and Aetna rely upon Clark on Receivers as supporting their
> contention that the receiver is not personally liable because he acted under
> an order of court. Their reliance is misplaced. It is true that Clark in general
> discussions in the chapter 'Liabilities of a Receiver' states broadly in § 388
> and § 392 that 'it is not conceivable that such receiver would be liable
> personally' for an act done pursuant to the lawful order of the appointing
> court. However, in the instant case, the order for distribution was obtained
> ex parte on the basis of the very representations that are said to have been
> negligently made.

> It seems plain that the rule stated by Clark has no application to a fiduciary
> who negligently distributes to persons other than the beneficiary as the result
> of a course of action pursued by the fiduciary himself that was bottomed
> upon an order obtained through incorrect information submitted by him to
> the court. The correct rule as to personal fiduciary liability is set forth in
> Restatement of the Law of Trusts, 2d, in § 226 . . .

> That Maryland subscribes to the doctrine announced in the Restatement is
> apparent from <u>Prince de Bearn v. Winans</u>, 111 Md. 434, 472, 74 A. 626, 632
> (1909):
> > 'If * * * the trustees were in any doubt as to the proper
> > disposition to be made of the fund in their hands, they should
> > have applied to a court of equity, in accordance to the long
> > existing practice in this state, by a bill convening all parties in
> > interest, and procured a construction of the deed of trust and
> > a disposition of the fund under the direction and supervision
> > of the Court. If they had adopted that course and made the
> > distribution of the fund under the court's decree, they would
> > have been protected, and the appellant would have been
> > concluded by it.'
> *See also* <u>County Corporation v. Semmes</u>, 169 Md. 501, 523, 182 A. 273, 283
> (1936), wherein receivers, empowered by court order to continue the

117

operation of a business, were found accountable where subsequent operations of that business produced substantial operational deficits: '* * * when, in the exercise of such caution and diligence as would commonly be expected under the known facts and circumstances, a reasonably prudent person, who was in charge of the affairs of the utility, would, except through his default, have known of the actual financial loss then incurred and involved in the further operation of the business of public carrier; and would, in consequence of such knowledge, have submitted * * * these facts to the court and requested its further direction * * *.'

A receiver is personally liable for an improper distribution of assets.

266 Md. at 567-70, 296 A.2d at 153-154.[318]

Another decision in which the court determined that a receiver was personally liable

for negligence in caring for property is <u>Vander Vorste v. Northwestern Nat'l Bank</u>, 81 S.D.

---

[318] According to the Maryland court, § 266 of the Restatement of the Law of Trusts, 2d provides:

> § 226. Liability for payments or conveyances made to persons other than the beneficiary.
>
> If by the terms of the trust it is the duty of the trustee to pay or convey the trust property or any part thereof to a beneficiary, he is liable if he pays or conveys to a person who is neither the beneficiary nor one to whom the beneficiary or the court has authorized him to make such payment or conveyance.

The court quoted Comment b as follows:

> 'b. Mistake of law or fact.
> The trustee is liable although he makes the payment or conveyance under a reasonable mistake of law or of fact. If he is in doubt as to the proper person to whom a payment or conveyance should be made, he can apply to the court for instructions and will be protected by the order of the court against claims of all persons who were made parties to the proceedings.
> The trustee is liable although he reasonably believes that the person to whom he pays or conveys is the beneficiary or that the payment or conveyance is authorized or directed by the beneficiary or by the termination of the trust.' (Italics supplied)

266 Md. at 568-569, 296 A.2d at 153.

566, 138 N.W.2d 411 (1965), a case in which Northwestern National Bank (the "bank") was appointed receiver of an individual named Vander Vorste. The plaintiff in the proceeding "claimed the bank, as receiver, took possession of certain items of his personal property temporarily stored on a tract of land in Sioux Falls and that it carelessly and negligently cared for such property causing it to be damaged resulting in a diminution of its value, and that numerous items thereof were stolen or otherwise disappeared." 81 S.D. at 569, 138 N.W.2d at 412. The South Dakota Supreme Court began its discussion by noting the duty of receivers and the standard of care governing the exercise of that duty.[319] It then set forth the evidence presented at trial:

> Shortly after the receiver's appointment it had the property inspected and inventoried and in the fall of the year had antifreeze put into all of the radiators that would hold it. It also attempted to find indoor storage for the property, but concluded such was too expensive. A 24-hour guard was also considered, but rejected for the same reason. However, the trust officer admitted that he did not consider utilizing the services of a private merchant police then available in Sioux Falls and which was rendering such service to other properties in the same area; or putting a fence around the property or having the area lighted. From his testimony the jury could conclude that the

---

[319] The duty and standard of care are consistent with the principles set forth in <u>Clark on Receivers</u>. The court stated the following:

> [R]eceiver has the duty to preserve and protect the property and assets of the estate over which it has been appointed for the benefit of all persons interested. 75 C.J.S. Receivers § 168. In caring for or managing such property a receiver must use ordinary care and prudence. The standard of care required of it is that care and diligence which an ordinarily prudent man would use in caring for and handling his own property under like circumstances. If it uses such care it has fulfilled its duty as receiver and is not liable for losses which occur to the property in its charge; but when it fails to exercise this degree of care and diligence it becomes answerable for the consequences of its neglect and dereliction [sic]. 45 Am.Jur., Receivers, § 354.

81 S.D. at 570, 138 N.W.2d at 413.

> receiver made no periodic observations of the equipment, but went out to see
> it only when the occasion arose.

81 S.D. at 571, 138 N.W.2d at 413-14. The court rejected the receiver's arguments that the

plaintiff's resistance to the sale caused the diminution in value of the property, stating the

following:

> This may well be, but in doing so he was exercising a right that was his. The
> receiver's duty to preserve and protect the property was not thereby
> diminished. If it were uncertain as to how it should protect the property
> during this extended period it could have petitioned the court for
> instructions.

81 S.D. at 572, 138 N.W.2d at 414. Finally, the court concluded the receiver was personally

liable. It held:

> While the judgment is entitled against the bank as receiver we construe it to
> adjudge a liability against the receiver that is personal rather than official.
> Shapiro v. Goldman, 253 Mass. 60, 148 N.E. 217. When the assets in the
> receivership state are wasted because of the negligence of the receiver it is
> personally liable for the loss resulting therefrom. Marlin v. Harrison, 218
> Ark. 531, 237 S.W.2d 24; 75 C.J.S. Receivers § 190; 45 Am.Jur., Receivers, §
> 354. In other words, the judgment is not against the fund or property in the
> hands of the receiver, but binds the receiver personally. 45 Am.Jur.,
> Receivers, § 427. However, this judgment obligation of the receiver is not
> owed to the plaintiff. Rather, it is an item that the receiver owes to the trust
> estate which he is administering. It is in the nature of a restoration of the loss
> suffered by the trust estate by reason of his negligence. 75 C.J.S. Receivers §
> 378. As such it becomes an asset of the trust estate.

81 S.D. at 572-73, 138 N.W.2d 414-15.

The court in Morea v. Muratore, 214 N.Y.S.2d 491 (1961), surcharged a receiver

appointed for the purpose of collecting rents in the amount of a deficiency from a

foreclosure sale because he failed to perform his duties as receiver. The court stated: "[t]he

nonfeasance of the receiver affords him no more of a defense to a surcharge than would the

defalcation of a person who collected rents with his approval." Id. at 493. The court added

that "[r]eceivership by its very nature involves a deep responsibility, and the failure to

discharge it cannot be excused because of inadvertence, neglect, insufficient diligence or

a misapprehension of legal principles." Id. at 494.

The facts in Morris v. Pierce, 188 Okla. 396, 110 P.2d 294 (1940), are similar to the

facts in Vander Vorste. In Morris, the Supreme Court of Oklahoma surcharged a receiver

for the depreciation in value and losses occasioned by his failure to exercise the ordinary

care and prudence expected of a receiver. The receiver removed and stored equipment in

a vacant lot adjacent to that of his employer. He later sold some of the property at a

receiver's sale, although certain articles were missing and others were greatly depreciated

due to the receiver's failure to properly care for and preserve them. 110 P.2d at 294.

In Campbell v. Hargraves, 181 Ark. 492, 26 S.W.2d 876 (1930), the court determined

that a receiver, appointed at the behest of a mortgagee, was liable to the mortgagor for the

value of livestock, which he determined was old and worthless. The court stated:

> He [the receiver] was appointed by the court, and the mortgagor would not
> have the right to interfere with his possession of the live stock without
> permission of the court. It was his duty to have reported the matter to the
> court and to have secured his discharge to the end that the mortgagor might
> have been notified that he might retake possession of the live stock. Not
> having done so, the receiver was guilty of negligence in the discharge of his
> duty and was liable to the mortgagor for any loss or damage occasioned
> thereby.

26 S.W.2d at 877.

In Miller v. Everest, 212 N.W.2d 522 (Iowa 1973), the court distinguished between

mismanagement and misappropriation of receivership assets, on the one hand, and torts

by receivers against third parties on the other.  Id. at 525.  It stated: "Where property is committed to the charge of a receiver . . . and he personally commits a tort and thereby injures a third party, he is individually liable . . .; but if he omits to perform or performs an official act within the scope of his authority and in line of his duties as receiver, and thereby injures another, any judgment recovered therefor must be against him officially. . . ."  Id. at 526 (citation omitted).  *But see* J.L.B. Equities, Inc. v. Dumont, 310 N.J. Super. 366, 373, 708 A.2d 779, 783 n.6 (1998) (rejecting Miller to "the extent it can be read to indicate that management of assets can give rise to a personal claim against the receiver . . . [because] . . . [a] primary responsibility of a court-appointed receiver is to manage the assets of the property, which includes selling the property.").

The decisions in which courts have found receivers personally liable for misconduct, such as those cited above, are not without critics.  For example, in In re Markos Gurnee P'ship, 182 BR. 211 (Bankr. N.D. Ill. 1995), the court, in determining whether a Chapter 11 trustee was personally liable for unpaid state taxes collected but not remitted, observed the following about the personal immunity of trustees and receivers:

> [T]hey may be held liable for negligence in carrying out their duties if the negligence involves positive acts (as opposed to omissions) and the trustee or receiver personally commits the acts. E. Allan Tiller, Personal Liability of Trustees and Receivers in Bankruptcy, 53 Am.Bankr.L.J. 75, 81 (1979). The commentator suggests that this rule may reflect an understanding that positive acts of negligence are outside the scope of the receiver/trustee's authority. Such a rule, however, seems not well grounded. First, courts have recognized that imposing personal liability for unintentional tortious acts of a bankruptcy trustee could create a significant disincentive to trustee service. State v. Better Brite Plating, Inc., 168 Wis.2d 363, 386, 483 N.W.2d 574, 583 (1992). Second, the holdings of the reported decisions do not appear actually to support the rule. For example, one of these decisions cited in the

122

commentary, <u>Richins v. Mitchell</u>, 19 Utah 2d 406, 408, 432 P.2d 39, 40 (1967), implies that a receiver might be held personally liable if he were shown to be "guilty of something more than a mere omission in connection with his duties," but the decision actually holds that the receiver was not personally liable for failing to procure workmen's compensation insurance. Another cited decision, <u>Chiesur v. Superior Court</u>, 76 Cal.App.2d 198, 201, 172 P.2d 763, 765 (1946), holds that a party allegedly injured because of a receiver's negligence in maintaining a building had no cause of action against the receiver personally. And <u>Chiesur</u> states the rule of personal immunity quite broadly: "[A] receiver is liable to those who are not interested in the estate, in his official capacity only, for negligence in the performance of his authorized duties, and . . . the recovery is a charge upon the estate in receivership." 76 Cal. App.2d at 201, 172 P.2d at 765. Thus, the decisions appear to be consistent with the pronouncement of the United States Supreme Court in <u>McNulta</u>: that a receiver's "misfeasances, negligences, and liabilities are official and not personal." 141 U.S. at 332, 12 S.Ct. at 13. *See also* <u>United States v. Ramsey</u>, 197 F. 144, 148 (8th Cir. 1912), holding that a federal law restricting hours of employment was applicable to a railroad in receivership, but that violation of the law resulted only in official liability.
  On the other hand, bankruptcy trustees may not carry out their duties, with personal impunity, in deliberate disregard of applicable nonbankruptcy law. Title 18 U.S.C. § 1911 provides criminal penalties for willful disregard of applicable state law by federal trustees and receivers, and the fact of a deliberate violation of state law may be relevant in determining whether the act was within the scope of a bankruptcy trustee's authority. Furthermore, although a tortious act may be within the scope of a trustee's authority, and thus require that the injured party proceed only against the estate, the estate may have a resulting claim against the trustee for its loss. . . .

182 B.R. at 218.

  Upon consideration of the case law discussed above, this Court recognizes that the Trustee has a heavy burden to establish personal liability on the part of Decoulos. *Cf.* <u>Richins v. Mitchell</u>, 19 Utah 2d 406, 408, 432 P.2d 39, 40 (1967)("In the absence of some indication to the contrary, it is presumed that the defendant Mitchell [the receiver] was acting within the scope of his authority and properly discharging his duties as receiver."). Nevertheless, the Court finds cases in which a receiver who has been authorized to operate

a business and been shielded from personal liability for negligence in the operation of that

business to be distinguishable from those cases in which a receiver, charged with collecting

assets, reducing them to cash and distributing the proceeds to creditors and, if applicable,

shareholders of the corporation in receivership, fails to exercise ordinary care and diligence

and breaches his fiduciary duty through gross misconduct.  Thus, cases such as Prescott

v. Coppage and Morea v. Muratore, are more analogous to the factual circumstances of the

instant case and are more compelling.  Thus, this Court agrees with the bankruptcy court

in In re Sundance Corp, Inc., 149 B.R. 641 (Bankr. E.D. Wash. 1993), which concluded that

McNulta does not guaranty immunity from personal liability.[320]  Rather it restricts the

situations in which personal liability may imposed to those in which the receiver

---

[320] In Sundance, the court observed the following:
Generally, there are two classes of claimants to whom receivers or trustees might
incur personal tort liability. The first class of claimants are those whose cause of
action is independent of any interest in the receivership itself. . . . These claims are
independent of any interest they might have in the receivership and could be
asserted by one with no interest in the receivership at all. The other class of
claimants are those who have an interest in the receivership itself. Their claims
arise when a receiver breaches its fiduciary duties by mismanaging the
receivership.

149 B.R. at 650.  The court added:
[A] receiver or trustee is not completely immune from personal liability under the
McNulta rule. As Tiller states in his article:
Rather than guaranteeing immunity from personal liability, the
McNulta rule restricts the situations in which personal liability will
result. In regards to tort liability, McNulta has been interpreted to
prescribe strictly official liability when a third person is injured by
a receiver "acting within the scope of his authority" but the
receiver is personally liable for torts "personally committed by
him." 53 Am.Jur.L.J. at 81 (footnotes omitted).
Id. at 651.

personally commits a tort or willfully and deliberately breaches his duty. Id. at 651 (citing

E. Allan Tiller, Personal Liability of Trustees and Receivers in Bankruptcy, 53 Am.Jur.L.J.

75, 81 (1979)).

The decision in Sundance Corp. is an important decision for yet another reason.  The

court determined that because bankruptcy courts have the power to compensate receivers

under 11 U.S.C. § 503(b)(3)(E), "it would be impossible to perform the tasks of determining

reasonable compensation if a bankruptcy judge could not review the quality of a receiver's

performance." 149 B.R. at 650.  It concluded:

> Although the duty to review a receiver's performance might have best been
> delegated to the appointing court, Congress chose to confer those powers on
> the bankruptcy courts. Accordingly, pursuant to § 543(c) and § 503(b)(3)(E),
> this court has jurisdiction to review and, if necessary, surcharge [the receiver]
> regarding the performance of its state court duties.

Id.

### 2. Application of the Law to the Facts

This Court finds both because it has jurisdiction to review Decoulos's performance

as Receiver, *see* 11 U.S.C. § 543(b)(2) and Fed. R. Bankr. P. 6002, and because Decoulos

submitted himself to the jurisdiction of this Court by filing an application for

compensation, as Receiver, which application is still pending , the Chapter 7 Trustee has

standing to bring claims against him in his capacity as Receiver arising out of the

performance of his duties in the Essex Action.

The evidence presented, coupled with the perspective of time, lends clarity to the

circumstances incident to the receivership of ABP.  The evidence presented, including

125

Ottenberg's unrebutted expert testimony, unequivocally establishes that Decoulos was grossly negligent and breached his fiduciary duties as Receiver of ABP, proximately causing damages to ABP's creditors and the bankruptcy estate. Decoulos failed to adhere to the orders issued by the Essex Superior Court. He failed to take possession of ABP's assets in a timely manner, resulting in their loss and diminution in value, and he failed to recognize and proceed with causes of action, which, if pursued, more likely than not, would have resulted in full payment of ABP's trade creditors. Legitimately skeptical of Agarwal and Webber as a result of their receipt of funds belonging to the receivership, Decoulos failed to act impartially in considering the allegations in ABP's Complaint, as well as the information presented to him by Kilroy, Agarwal, Mahoney, and Bingham, and, thus, he failed to take steps, not only prevent the activities of the Contis and NEBP, but to marshal assets for the benefit of the creditors of ABP, assets which NEBP began converting within days of his appointment without protest on his part. Additionally, he failed to seek, let alone obtain, appropriate court orders, either to commence his own action against the Everett Savings Bank, the Contis, NEBP and the other defendants in the Essex Action or to substitute himself as plaintiff in the Essex Action for the purpose of pursuing causes of action against them. *See* Rochester Tumbler Works v. Mitchell Woodbury Co., 215 Mass. 194, 102 N.E. 438 (1913); *cf.* Bezanson v. Thomas (In re R & R Assocs. of Hampton), 402 F.3d 257, 271 (1st Cir. 2005). As Ottenberg testified, Decoulos failed to take the most rudimentary steps to secure ABP's assets, to establish a record based upon sworn testimony, upon which to build a case against the defendants in the Essex Action, and to

126

secure judgments against Everett Savings Bank, the Contis and NEBP, in particular.

Specifically, as Receiver, Decoulos failed to secure the premises occupied by ABP. As Mahoney testified, as a result, NEBP continued the business of ABP "without missing a beat" by keeping ABP's telephone number, AISC certificate, job files, quality control manual, shop drawings, and inventory on the premises. In short, NEBP appropriated ABP's going concern value and was thus able to complete and get paid for a number of ABP's existing contracts without compensating the receivership for the portion of the work ABP had performed. *Cf.* Robinson v. Watts Detective Agency, Inc., 685 F.2d 729, 734 (1st Cir. 1982)(Noting that the district court analyzed the transfers of guards, customers and goodwill susceptible of being property and having value in a bankruptcy setting, the First Circuit observed that "what was transferred to Watts amounted in the aggregate to a transfer of the business itself. The whole was greater than its parts."). Because Decoulos failed to secure the Brookline Street premises prior to obtaining court authority to reject ABP's lease with RCPC, NEBP secured for itself the benefit ABP's work and work in progress. That work included two contracts where ABP had completed shipments (BR-86 valued at $23,911.56 and BR-96 valued at $3,613.38, as well as three contracts that were fully assembled or completed but not shipped (BR-87 valued at $2,560.91 of which $884.91 was paid to NEBP, BR-93 valued at $8,032.72 of which $7,791.81 was paid to NEBP and BR-94 valued at $13,505.00 of which $12,227.50 was paid to NEBP). Decoulos permitted NEBP to obtain the benefit of these contracts without prior court approval and without a prior determination of the amount owed to ABP as a result of the work it had performed prior

127

to the receivership.  As a result, 19 months later, Decoulos reported to the court that its auspices were needed to decide how much NEBP owed ABP.  Obviously, had Decoulos secured the facility, thereby preserving the status quo, NEBP, if it had wished to complete ABP's contracts and secure its going concern value and the good will of its customers, would have had to compensate the receivership estate *first*, rather than simply helping itself to ABP's assets, leaving the Receiver to litigate how much it owed the receivership years after the fact.

Decoulos's conduct in this regard must be viewed as outside of the scope of the receivership and the protection afforded by the Supreme Court's decision in <u>McNulta</u>. Decoulos failed to seek instructions from the court with respect to NEBP's presence at the premises occupied by ABP.  As Bingham accurately pointed out in his numerous letters to Decoulos, by remaining silent when he had a duty to seek instructions, Decoulos's actions were tantamount to misrepresentations to the Superior Court.  His conduct enabled NEBP to convert shop drawings and material, including partially fabricated material, to its own use, resulting in loss of ABP's assets.  Decoulos's Report # 3, however, contains insufficient information from which to determine the value of the material used by NEBP and the identity of ABP's creditors which NEBP paid.

In addition to failing to secure the premises from which ABP conducted its business, Decoulos did not file and, indeed, because of the activities of NEBP on the premises once occupied by ABP, could not file within thirty days of his appointment "*a detailed inventory of the property of which he ha[d] possession, with the estimated values thereof,*

*together with a list of the encumbrances thereon.*" Not only did he fail to file the inventory within the time required by his order of appointment, when he eventually filed Receiver's Report #1 in June of 1994, he did not do so *under oath.* Indeed, none of Decoulos's Reports were ever filed under oath. This conduct on the part of Decoulos constituted a failure to abide by the orders of the appointing court and raises questions about the integrity of all his Reports. The failure to file an inventory of ABP's assets, together with a list of encumbrances, within the time prescribed by the Order of Appointment and Mass. R. Civ. P. 66, contributed to the failed receivership, as did his decision to permit Hyte to appraise ABP's assets under the direction of one of the defendants in the Essex Action, John Conti.

Decoulos waited over 11 weeks before sending Hyte to the Brookline Street premises to conduct an appraisal of ABP's assets. He did not accompany Hyte, and Hyte was deliberately misled by John Conti as to the nature of the assets belonging to ABP. In his Report #1, filed over eight months after he was appointed Receiver, Decoulos informed the court that "only metal used to fabricate the corporation's product was found on the premises and that it had a value of $750.00." This representation was false. John Conti's own counsel represented to Decoulos that his client "believe[d] that at this time [October 1, 1993] there [was] approximately thirty to thirty-five thousand dollars worth of equipment being held by the corporations and some fifteen thousand dollars worth of materials on the site." Moreover, Hyte noted "the large amount of other assets on the premises." Thus, the conclusion is inescapable: as Receiver, Decoulos misrepresented facts

129

to the Superior Court in his Receiver's Report #1 because he had compelling evidence that

ABP's assets were worth substantially more than $750. His failure to secure inventory and

equipment belonging to ABP resulted in the loss and waste of ABP's assets.

Although a bill of sale for equipment was not produced, as a result of Mackey's

letter, the Contis and NEBP would have been estopped from asserting that ABP did not

own the equipment in view of Mackey's letter. With respect to the value of the equipment,

the overwhelming weight of the evidence was that the equipment was worth either

$75,000, the sum Conti paid for it, or $35,000, the sum Kilroy and Martinez paid Conti for

it. Thus, at a minimum, the estate sustained damages measured by the difference between

$35,000 and the price of approximately $6,000 Decoulos obtained for the equipment from

the auction sale.

With respect to the inventory, Mahoney testified that there were materials worth

between $120,000 and $130,000 on the premises, approximately eight times more than what

John Conti represented was on the site. In view of Mahoney's position as a purchasing

agent and John Conti's involvement in the conversion of ABP's assets, this Court concludes

that the $120,000 figure for the value of the inventory is more credible, particularly in view

of Hyte's statements that he "questioned him [John Conti] about the large amount of other

assets on the premises at which he said 'that's part of another company, nothing else

belongs to them.'"

Decoulos in his Report #3 indicated that ABP had 13 contracts in progress with a

total value of $691,105.95, although two contracts worth $27,524.94 involved products

130

which had already been shipped.  In view of the size of ABP's contracts, it would appear more likely than not that ABP had ordered substantial amounts of steel, aluminum and bolts for its jobs.  Thus, the Court credits Mahoney's testimony, which was more conservative than Agarwal's testimony, as to the value of the materials on the premises. The Court concludes that Decoulos, as a result of his conduct, is personally liable for damages proximately caused in the amount of $120,000 for the value of material converted by NEBP, as well as in the amount of $29,000 for the value of the equipment converted by NEBP.

The Court finds that the issue raised by Decoulos in his Receiver's Report #3 of whether NEBP was entitled to a credit for work it completed is not relevant to any determination of the value of ABP's inventory at the commencement of the receivership. A competent receiver would have secured the materials and sold them to NEBP or to a higher offeror, rather than permit NEBP to help itself to the materials on the site.  Because NEBP was not even in existence until the commencement of the receivership, it could not claim ownership of those materials or the equipment.

In conjunction with his duty to inventory the assets of ABP, Decoulos failed to conduct a UCC search.  Had he thoroughly investigated ABP's debt structure, he would not have been sanguine about reporting to the court that ABP had only $750 worth of inventory. Moreover, he would have been aware of the claim of USTrust.  Thus, the likelihood of the default entering in USTrust's favor would have been substantially diminished.

131

Additionally, Decoulos failed to inventory the tools turned over to him by Kilroy's son which were then transferred to the Contis, ostensibly for the purpose of completing a job on the Tobin Bridge. Decoulos was unable to state with certainty what happened to these tools and, thus, his conduct again resulted in waste of receivership assets. Similarly, despite collecting some accounts receivable from certain entities with which ABP had contracts, Decoulos personally took no steps to collect retainages or to investigate back charges. The failure to aggressively pursue the collection of accounts receivable and retainages for completed contracts constituted a waste of receivership assets. The Court, however, did not receive any evidence of the value of the tools or the total amount of the retainages Decoulos failed to collect. Moreover, although ABP had accounts receivable in excess of $600,000, the Court did not have persuasive evidence about the percentage of accounts receivable which would have been ultimately collectible for jobs that were not fully assembled or shipped. The Court concludes, however, that Decoulos is liable for the full amount of the contracts which were 100% completed and shipped prior to the receivership. These contracts were identified at BR-86 and BR-96 with a total contract price of $27,524.94. Additionally, the Court concludes Decoulos should be liable to for the amount paid to NEBP for contracts that were fully assembled, but not shipped. These contracts were identified as BR-87, BR 93 and BR-94 for which NEBP received $20,904.22. Decoulos's failure to collect amounts due and to ship and obtain payments for these contracts proximately caused damage to the creditors and the bankruptcy estate.

As noted above, Decoulos failed to assess and secure the benefit of partially

132

performed contracts of ABP because he did not secure the premises of ABP, thereby

enabling NEBP to utilize ABP's telephone number, quality control manual, and AISC

certification without compensation, as well as its shop drawings and fabricated or partially

fabricated materials.   In short, he permitted NEBP to convert receivership property and

ABP's going concern value.   Even if ABP's contracts were breached as a result of his

appointment, NEBP had no right to its job files, work in process and other assets, including

goodwill. *Cf.* Saccomano v. North Idaho Shingle Co., Inc., 73 Idaho 284, 252 P.2d 518

(1953).[321]  Decoulos was aware that NEBP was operating with Robson's involvement, and

---

[321] In Saccomano, the court observed the following:
Both the evidence and admissions of appellants in their pleadings and by their
counsel, show they were in possession of the mill and its property without legal
right from June, 1949, to January, 1951, and they offered to pay rent. The first
receiver was derelict, through the attorney for appellants and the Bank, in turning
over the property to appellants for them to operate in direct violation of the court's
order, and appellants should not have so taken the property and operated it. They
are responsible to the creditors of the Company for this illegal possession and
operation of the property in three particulars:
 First, for the reasonable rental value of the property. 65 C.J. 143, § 245(3); 53
Am.Jur. 903, § 114.
 Second, for any decrease in value of the property of the corporation during that
period of time. 65 C.J. 147-8, § 271, n. 4; 53 Am.Jur. 903, § 114.
 Third, for an accounting to the receiver and for the value, with interest, of any
equipment, property or material belonging to the Company or which they acquired
by contracts for raw material made by the Company prior to the receivership and
which they have not or cannot return to the receiver. Commercial Standard Ins.
Co. v. Remay, 58 Idaho 302, 72 P.2d 859; 120 A.L.R. 1, § 6; 65 C.J. 131, § 247.
73 Idaho at 290, 252 P.2d at 521-22.  The court added:
 Appellants are not entitled to any credit for expenses in the management of the
mill, Ashworth v. Fleenor, 178 Va. 104, 16 S.E.2d 309, since they operated it
without legal right and retained whatever profit they made and did not care for it
merely as caretakers. No debts incurred by them while operating the mill are
chargeable against the Company or its property.
73 Idaho at 290, 252 P.2d at 522.

133

that as a start-up company it could not conduct its business without ABP's job files. Although he obtained court orders requiring the Contis and NEBP to produce documents, he failed to take the necessary steps to enforce the court's orders. The waste of ABP's assets as a result of their conversion by NEBP subjects Decoulos to personal liability as set forth above.

Additionally, the payment by NEBP of certain of ABP's creditors subjects Decoulos to personal liability. NEBP paid certain of ABP's creditors in order to secure the good will of those creditors for the start up of its business. Decoulos, by failing to secure ABP's operating manual either by obtaining possession of it or enjoining NEBP's use of it, enabled NEBP to take advantage of ABP's SOMBA certification, thus perpetuating a fraud on the Commonwealth of Massachusetts, as NEBP took advantage of the benefits of ABP's advantageous SOMBA-certified contacts without meeting the requirements of the SOMBA program.

Decoulos was charged with the responsibility of ensuring equal payment to similarly situated creditors. His conduct in permitting NEBP to operate using ABP's assets unchallenged, despite the identity of its principal as a defendant in the Essex Action, resulted in a distribution of a least a portion of the value of receivership assets to some of ABP's trade creditors as well as to the defendants, the Contis and NEBP, who reaped the benefit of ABP's going concern value. Not only were did Decoulos's conduct permit unequal payment of similarly situated creditors, it permitted payment of unsecured creditors ahead of secured creditors. By seizing ABP's assets, particularly those, which

134

while not inherently valuable, contributed to the company's goodwill, the Contis and the other defendants, who claimed to have been owed hundreds of thousands of dollars, were able, through Decoulos's acquiescence, to compensate themselves from the existing business, the shares of which Lynch valued in excess of $850,000. *See* 2 Clark on Receivers, § 391, at 653-54. Decoulos failed to adequately inform the Superior Court that NEBP was operating at the premises of ABP, using its assets and paying ABP's creditors, the effect of which was an unauthorized and improper distribution of receivership assets. When Decoulos did report to the court in his Receiver's Report #2, he cast the conduct in form of "allegations" made by representative of ABP. While he indicated that the "allegations" appeared to be valid, he did not indicate how NEBP came to convert ABP's work in process in the first place, and he did not indicate that he had or would take any steps to thwart further conversion of the assets.

Because Decoulos did not obtain prior authorization from the court for the payment of ABP's creditors, including the defendants, Decoulos breached one of the most fundamental duties of a receiver. This Court, however, cannot measure the damages caused by this breach of duty because it is impossible to distinguish creditors of ABP from other payees of NEBP in the Receiver's Report # 3. Moreover, the Court finds that Lynch's testimony was not compelling because of the paucity of reliable financial information from which he drew his conclusions.

Decoulos admitted in his testimony that he performed legal services in conjunction with his role as Receiver of the estate of ABP. His performance of legal services as Receiver

135

was below the standard of care applicable to attorneys and constituted malpractice. Decoulos was derelict and breached his fiduciary duty by failing to act expeditiously to preserve assets and testimony through legal means. Decoulos failed to take the depositions of all parties to the Essex Action, despite his representations to the Superior Court in his Application for Order #14. His testimony that taking depositions would be a "waste of time" was shocking. Under the circumstances, then, he should not have been surprised that the books and records that the Conti faction claimed it did not have and refused to produce were at the Brookline Street premises all along. Notably, Decoulos, despite obtaining court orders for their turnover, failed to file appropriate pleadings with the court compelling compliance or seeking orders that the Contis and NEBP be held in contempt for failing to produce business records, the very records which enabled them to finish ABP's contracts and pocket $48,429.16 for work that had been either shipped or fully assembled by ABP.

Decoulos's malpractice as an attorney is manifest in his failure to recognize or, alternatively, in the conscious decision to abandon, the causes of actions that would have proved more valuable to the creditors of the receivership than the personalty belonging to ABP. Bingham recognized these causes of action immediately. Decoulos's excuses for failing to pursue them, namely that they belonged to the shareholders and that it was up to the court to determine them, are unavailing to shield him from personal liability for his conduct. Although Decoulos testified that it was up to the court to determine ownership of receivership property, he did not substitute himself as plaintiff in the Essex Action or file

136

pleadings that would enable the court to determine the issues.  Moreover, he did not

hesitate to make unilateral decisions as to ownership of receivership assets by abandoning

any claim to them following Hyte's $750 appraisal and by recommending the

relinquishment of valuable claims based on faulty legal reasoning, as well as an inability

to try them.  Decoulos relied upon Bingham to do the bulk of the work in the receivership

with respect to claims against Everett Savings Bank and NEBP, but refused to seek

authority to substitute himself as plaintiff in the Essex Action or to seek Bingham's

employment as special counsel, resulting in the diminution in value of the claims through

the passage of time and the failure to produce a record suitable for use at trial.

The trial testimony established that ABP was a SOMBA-certified company which

Conti seized.  Although Conti  ostensibly invested in the company, he and the entities he

controlled, as well as John Conti, filed proofs of claim in the receivership totaling close to

one million dollars.  Although Decoulos, in his Motion to Dismiss the involuntary petition,

represented to this Court that the claims in the receivership had been adjudicated, a

misrepresentation tantamount to fraud on this Court, there was no evidence proffered by

any of the witnesses that the Contis actually infused that much money into ABP, either in

their own right or through entities Conti controlled.  On the contrary, Conti used his

position at Everett Savings Bank to forge endorsements on checks payable to ABP, and he

transferred, with the assistance of Everett Savings Bank personnel, at least $337,594.18

among accounts he controlled.  Conti controlled ABP's finances and, because he did so, he

controlled ABP.  He engineered the termination of Kilroy and Agarwal by refusing to

compensate them, and he ensconced his son to oversee the day to day operations of the

SOMBA-certified company. This was the thrust of the complaint filed in the Essex Superior

Court.

Decoulos failed to appreciate that Conti, beginning in the late fall of 1992, was

arguably the alter ego of ABP, and, as such, could have been and should have been liable

for its debts. *Cf.* S.I. Acquisition, Inc. v. Eastway Delivery Serv. Inc. (In re S.I. Acquisition,

Inc.), 817 F.2d 1142 (5th Cir. 1987). Contrary to Conti's testimony that ABP "never made

a dime," ABP did make money and was making steady financial progress as reported by

Hackett in his internal bank memorandums. Because ABP had the potential to be a very

successful business, because Conti's son wanted to run the business, and because Conti,

more likely than not, wanted to continue to conceal his all too cozy relationship with

Everett Savings Bank which enabled him to funnel money to his various enterprises,

including the Wolfeboro Inn in New Hampshire, Conti engineered the take over of ABP

by withholding funds and forging endorsements on checks payable to the company.

Moreover, and more importantly, Decoulos failed to recognize the independent

duty Everett Savings Bank had to its customer, ABP. By failing to honor its obligations to

ABP and by permitting Conti to use its accounts as well as those he controlled, Everett

Savings Bank violated banking laws and was liable to ABP for the amount of the forged

endorsements and improper transfers. Additionally, it had significant exposure under ch.

93A for treble damages, even if Conti infused more money into its accounts than he

withdrew. *Cf.* Govoni & Sons Constr. Co., Inc. v. Mechanics Bank, 51 Mass. App. Ct. 35,

742 N.E.2d 1094 (2001).  Thus, both Conti <u>and</u> Everett Savings Bank were liable to the receivership as a result of their conduct.  Decoulos's conclusion in his Report #3 that ABP's claim against Everett Savings Bank should be dismissed is incomprehensible and raises serious questions about the legitimacy of his motives as receiver.

The Superior Court instructed Decoulos to get to the bottom of the fraud involving ABP; Everett Savings Bank was the lynchpin of that fraud.  Decoulos deliberately disobeyed the court's order.  Instead of taking an aggressive approach to discerning the truth about fraudulent endorsements of ABP checks, he did nothing, relying upon Bingham to do his work for him and then "hanging him out to dry" with respect to his substantial legal fees.  He, in effect, abandoned one of the receivership's most valuable assets without court authority, even before filing his Receiver's Report # 3 because his failure to conduct discovery precluded his ability to try a case against Everett Savings Bank.  <i>See</i> 1 <u>Clark on Receivers</u>, § 260, at 392 and 394.  Although Braunstein testified that he was not hampered by Decoulos's failure to pursue an action against Everett Savings Bank and was not prejudiced as a result, this Court is not swayed by that testimony.  As McGlynn stated in his unrebutted testimony, there can be no doubt that immediate, aggressive action on the part of Decoulos against Everett Savings Bank could have resulted in a far greater recovery than the $180,000 recovery which Braunstein was able to achieve in 1998, which was coupled with the release of claims against the Contis.  Indeed, the Court concludes that Decoulos is personally liable for $157,594.18, the difference between the $337,594.18 in admittedly wrongful deposits and the $180,000 Braunstein recovered years later.

139

Decoulos's conduct as Receiver was replete with instances where he failed to act. Although such omissions are normally insufficient to warrant an exception to the McNulta rule, this Court must determine whether the gross negligence on the part of Decoulos in permitting the waste and abandonment of receivership assets and the improper and unauthorized distributions to some creditors is sufficient for him to be held personally liable for the resulting damages. The Court must discern those circumstances in which Decoulos engaged in conduct outside the scope of the receivership as opposed to the instances where he simply failed to act. The Court must also discern whether Decoulos, through his omissions in his Reports, misrepresented or omitted material facts in seeking orders from the Superior Court.

When Decoulos was appointed Receiver, the business premises of ABP were in disarray. The parties to the Essex Action were bombarding him with inconsistent statements. Rather than adopt an aggressive, *impartial* approach to his duties as Receiver, Decoulos elected to handle the ABP receivership in a leisurely manner when urgent action was required to preserve ABP's assets. He invariably sided with the defendants in the Essex Action to the detriment of the creditors of ABP. He was unwilling and unprepared to perform the investigative work required to ensure payment of ABP's creditors. He closed his eyes to the existence of assets and acquiesced in their conversion by NEBP. He elected to rely upon Bingham's services while appeasing and ultimately misleading the Superior Court with promises of action. Given the totality of the circumstances, the Court simply cannot find that Decoulos acted within the scope of his receivership. His failure to

take control of the property in custodia legis and to obtain court authority for his decisions, particularly those that resulted in payments in cash or receivership assets to some of ABP's creditors and the defendants, compels the conclusion that he wasted and abandoned valuable assets and acted outside the scope of the receivership.

In view of the case law discussed above, the Court finds that Decoulos is personally liable for waste of corporate assets of ABP and improper distributions to creditors and the defendants. The damages caused by Decoulos's conduct total, at a minimum, $355,023.34 comprised of the following: $120,000 for wasted inventory and materials; $29,000 for the diminution in value of the equipment, $48,429.16 for work which ABP had completed and for which NEBP was paid, and $157,594.18, the difference between the amount of money Everett Savings Bank admitted it improperly channeled among accounts Conti controlled and the Debtor's and the settlement amount obtained by Braunstein, the result of Decoulos's decision to abandon ABP's claim against Everett Savings Bank.

Apart from any personal liability, the Court also concludes that Decoulos must disgorge sums paid to him as Receiver in the total sum of $24,150.44. "An order allowing a receiver compensation is purely an administrative order subject to its allowance or change with the development of the administration," 1 Clark on Receivers, §122, at 178, Moreover, "[a] receiver who has strayed from his duty to the injury to anyone interested in the estate can and should be surcharged when he asks approval of his final accounting." Phelan v. Middle States Oil Corp., 154 F.2d 978, 991-92 (1946)(citing Crites, Inc. v.

141

Prudential Co. of America, 322 U.S. 408 (1944)).[322] There is law to the effect, however, that

if the court fixes the amount of compensation and directs payment out of the fund in the

receiver's hands, such an order is a final order. Id. (footnote omitted). The Court has been

unable to find any Massachusetts cases addressing the issue of whether an award of

compensation to a receiver is a final order, the review of which by a federal court would

implicate the Rooker-Feldman doctrine. That doctrine "recognizes that U.S. district courts

are courts of original, not appellate jurisdiction . . . [and] . . . 'lower federal courts are

without subject matter jurisdiction to sit in direct review of state court decisions.'" See

Xytest Corp. v. Mitchell (In re Mitchell), 255 B.R. 97, 106 (Bankr. D. Mass. 2000). This Court

concludes that until such time as a receiver is discharged, his compensation is subject to

final review, modification or disgorgement, an approach contemplated by 11 U.S.C. §

543(c)(3), which provides that the court may surcharge a custodian for improper

disbursements,[323] and consistent with federal bankruptcy law with respect to interim

---

[322] Decoulos did not cite the decision of the First Circuit in Iannochino v. Rodolakis (In re Iannochino), 242 F.3d 36 (1st Cir. 2001). ABP objected to Decoulos's Application for Order, and the court conducted a hearing. It is unclear, however, whether the order should be considered a final order or whether it should be considered an interlocutory order subject to modification or amendment pending the discharge of the Receiver. Where the Essex Superior Court intended to conduct a trial on the merits, this Court infers that, had it done so, Decoulos's conduct would have been exposed, and the court would have exercised its discretion in either requiring Decoulos to disgorge fees received or surcharged him for the amount of fees received.

[323] Section 543(c) is reproduced in relevant part at footnote 2 supra. It does state that the surcharge may be for any improper or excessive disbursement, "other than a disbursement that has been made in accordance with applicable law or that has been approved after notice and a hearing, by a court of competent jurisdiction." Decoulos submitted no evidence that his applications for compensation were notice to the entire creditor body of ABP or that the Superior Court treated the requests as final orders.

compensation. *See* 11 U.S.C. § 330.

### 3. The Statute of Limitations Defense and Collateral Estoppel

Decoulos raised a statute of limitations defense to the claims asserted by the Trustee with respect to Counts I and II. Moreover, he asserted that the Trustee is collaterally estopped from bringing the claims because of the denials of ABP's motions to remove him as Receiver. For the reasons set forth below, the Court rejects both arguments.

### i. The Statute of Limitations

Any determination of a receiver's liability, whether personal or official, is not subject to a statute of limitations defense in the absence of his discharge. "The position of a receiver is one in which liability to account would not easily be barred, and so long as he is living he must be held to have been a trustee of the money received therefore the defense of the statute of limitations is not a bar to a claim against him." 2 Clark on Receivers, §418, at 705-706. *See also* Riley v. Decoulos, Adv. P. No. 00-1142, Slip Op. (Bankr. D. Mass. February 5, 2002), in which this Court noted that Decoulos neither received a discharge in the Essex Action nor filed a report and account in accordance with Fed. R. Bankr. P. 6002.

### ii. Collateral Estoppel

In Grella v. Salem Five Cent Sav. Bank, 42 F.3d 26 (1994), the United States Court of Appeals succinctly summarized the elements required for application of collateral estoppel. It stated:

> The principle of collateral estoppel, or issue preclusion, bars relitigation of any factual or legal issue that was actually decided in previous litigation "between the parties, whether on the same or a different claim." When there is an identity of the parties in subsequent actions, a party must establish four

essential elements for a successful application of issue preclusion to the later action: (1) the issue sought to be precluded must be the same as that involved in the prior action; (2) the issue must have been actually litigated; (3) the issue must have been determined by a valid and binding final judgment; and (4) the determination of the issue must have been essential to the judgment. An issue may be "actually" decided even if it is not explicitly decided, for it may have constituted, logically or practically, a necessary component of the decision reached in the prior litigation.

Id. at 30-31. Massachusetts courts have referred to the Restatement (Second) of Judgments in applying the doctrine of collateral estoppel or issue preclusion. "Under Massachusetts law, '[w]hen an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties whether on the same or a different claim.'" Cousineau v. Laramee, 388 Mass. 859, 862 n. 4, 448 N.E.2d 756, 759 n. 4 (1983)(citing Restatement (Second) of Judgments § 27 (1982)); see also Friedman v. Internal Revenue Service (In re Friedman), 200 B.R. 1, 4 (Bankr. D. Mass. 1996). In Massachusetts, a party against whom estoppel is asserted must have been a party to the prior action or must be in privity with a party to the prior action. See In re Brennan, 275 B.R. 172, 175 (Bankr. D. Mass. 2002). The purposes of the doctrine of collateral estoppel is to conserve judicial resources, to prevent the unnecessary litigation costs, and to ensure the finality of judgments. Martin v. Ring, 401 Mass. 59, 61, 514 N.E.2d 663, 664 (1987).

Decoulos raised the issue of collateral estoppel, arguing that the Superior Court's refusal to remove him as Receiver now collaterally estops the Trustee from proceeding against him on any grounds. For Decoulos to prevail, there must be sufficient evidence in the record from which this Court could find the elements set forth above have been fully

144

satisfied. The Court finds that it lacks that evidence - - evidence which Decoulos had the

burden of producing.

The issues determined by this Court include whether Decoulos acted within or

outside the scope of his authority, committed waste or made improper distributions to

creditors. The Court does not have transcripts from the hearings on ABP's two motions

to remove Decoulos. The Superior Court denied the first motion, finding "no cause" in an

endorsement order. The second was simply denied. It would appear that the state court

denied the motions based upon oral argument. As Bingham noted, and as this Court finds

from Decoulos's representations in seeking dismissal of this case, Decoulos was not above

obfuscating facts.   Accordingly, the Court cannot find that the decisions denying the

motions to remove Decoulos, which were made without receipt of evidence, collaterally

estops the Trustee from recovering a judgment against him. The issues incident to his

performance of his duties were never actually litigated or determined by a final judgment.

B. Counts III and IV

1. Applicable Law

i. Standing

The first issue the Court must address, and one not mentioned by the parties in their

proposed conclusions of law, is the Trustee's standing to assert causes of action against

Decoulos, in his capacity as attorney.  If the Trustee asserts claims on behalf of creditors

of the bankruptcy estate of ABP, she lacks standing because the claims belong to the

creditors, not the estate. Section 704(1) of the Bankruptcy Code authorizes the Trustee to

145

"collect and reduce to money the property of the estate for which such trustee serves...."

11 U.S.C. § 704(1). For purposes of § 704(1), causes of action which belonging to the debtor

are included as property of the estate under 11 U.S.C. § 541(a)(1). *See* Schertz-Cibolo-

Universal City, Ind. School Dist. v. Wright (In re Matter of Educators Group Health Trust),

25 F.3d 1281, 1284 (5th Cir. 1994); Mixon v. Anderson (In re Ozark Rest. Equip. Co.), 816

F.2d 1222, 1225 (8th Cir. 1987), *cert. denied*, Jacoway v. Anderson, 484 U.S. 848 (1987); S.I.

Acquisition, Inc. v. Eastway Delivery Serv., Inc. (In re S.I. Acquisition , Inc.), 817 F.2d 1142

(5th Cir. 1987)(an action based upon alter ego properly belongs to the estate, because the

debtor could have pierced its own corporate veil under Texas law; and it was unable to

meet its corporate obligations due to the misuse of the corporate form, causing a derivative

injury to an individual creditor).[324] If a cause of action belongs solely to the estate's

creditors, the trustee has no standing to sue a third party. 25 F.3d at 1284 (citing Caplin v.

---

[324] In Schimmelpenninck v. Byrne ( In re Schimmelpenninck), 183 F.3d 347, 356 n17 (5th Cir. 1999), the court recognized the following:

The Second, Fourth, and Seventh Circuits agree with the holding in S.I. Acquisition that a creditor's alter ego claim belongs to the corporate debtor in bankruptcy. *See* Kalb, Voorhis & Co. v. American Financial Corp., 8 F.3d 130 (2d Cir.1993) (applying Texas law); St. Paul Fire and Marine Ins. Co. v. PepsiCo, Inc., 884 F.2d 688 (2d Cir.1989) (applying Ohio law); Steyr-Daimler-Puch of America Corp. v. Pappas, 852 F.2d 132 (4th Cir.1988) (applying Virginia law); Koch Refining v. Farmers Union Central Exch., Inc., 831 F.2d 1339 (7th Cir.1987), *cert. denied*, 485 U.S. 906, 108 S.Ct. 1077, 99 L.Ed.2d 237 (1988) (applying both Illinois and Indiana law). The Sixth and Eighth Circuits, however, disagree. Both courts denied the corporation in bankruptcy the right to bring alter ego claims on behalf of its creditors. *See* Spartan Tube and Steel, Inc. v. Himmelspach (In re RCS Engineered Prods. Co.), 102 F.3d 223 (6th Cir.1996) (applying Michigan law); Mixon v. Anderson (In re Ozark Restaurant Equip. Co.), 816 F.2d 1222 (8th Cir.) (applying Arkansas law), *cert. denied sub. nom.*, Jacoway v. Anderson, 484 U.S. 848, 108 S.Ct. 147, 98 L.Ed.2d 102 (1987).

Marine Midland Grace Trust Co., 406 U.S. 416, 434 (1972)). *See also* In re American Spring Bed Mfg. Co., 153 B.R. 365, 376 (Bankr. D. Mass. 1993). "The trustee steps into the shoes of the debtor for the purposes of asserting or maintaining the debtor's causes of actions, which become property of the estate." Regan v. Vinick & Young (In re Rare Coin Galleries of America, Inc.), 862 F.2d 896, 900 (1st Cir. 1988)(citing In re Ozark, 816 F.2d at 1225).

In Educators Group Health Trust, the Fifth Circuit observed the following:

> Whether a particular state cause of action belongs to the estate depends on whether under applicable state law the debtor could have raised the claim as of the commencement of the case. As part of this inquiry, we look at the nature of the injury for which relief is sought. If a cause of action alleges only indirect harm to a creditor (i.e., an injury which derives from harm to the debtor), and the debtor could have raised a claim for its direct injury under the applicable law, then the cause of action belongs to the estate. Conversely, if the cause of action does not explicitly or implicitly allege harm to the debtor, then the cause of action could not have been asserted by the debtor as of the commencement of the case, and thus is not property of the estate.

25 F.3d at 1284 (citations omitted).

## ii. Attorney/Client Relationship and Professional Negligence

In order to sustain a claim of legal malpractice, a plaintiff must show that the attorney owed him a duty of care. *See* Spinner v. Nutt, 417 Mass. 549, 552, 631 N.E.2d 542, 544 (1994); DaRoza v. Arter, 416 Mass. 377, 382, 622 N.E.2d 604, 608 (1993).[325] Normally, "'an attorney's liability for negligence arises out of a duty owed to a client,'" in other words, an attorney/client relationship. One Nat. Bank v. Antonellis, 80 F.3d 606, 609 (1st

---

[325] Whether a duty exists is a question of law. One Nat. Bank v. Antonellis, 80 F.3d 606, 609 (1st Cir. 1996).

Cir. 1996)(citing Norman v. Brown, Todd & Heyburn, 693 F.Supp. 1259, 1265 (D. Mass.

1988)). According to the First Circuit, there is an exception to the general rule enabling

non-clients to make claims for legal malpractice based upon foreseeable reliance. Id.

> As defined in the case law, the foreseeable reliance exception demands that two requirements be met. First, a duty is only owed to nonclients "who the attorney knows will rely on the services rendered." It is not enough that a plaintiff claims actual reliance: "[i]t must be shown that the attorney should reasonably foresee that the nonclient will rely upon him for legal services." Second, "the court will not impose a duty of reasonable care on an attorney if such an independent duty would potentially conflict with the duty the attorney owes to his or her client."

Id. (citations omitted). *See also* Miller v. Mooney, 431 Mass. 57, 61, 725 N.E.2d 545, 549

(2000).[326] With respect to this second prong of the test, the First Circuit noted that "[t]he

conflict requirement of the reasonably foreseeable test does not demand that an actual

conflict arise. . . . [A] potential conflict between an attorney's duty to his or her client and

the alleged duty to the nonclient is sufficient to defeat the nonclient's malpractice claim."

Id.

Another theory relied upon by courts for imposing liability on attorneys for conduct

---

[326] In Miller, the court stated:
Existence of an attorney-client relationship is an element of a malpractice plaintiff's proof, and may be shown by an express contract, or it "may be implied 'when (1) a person seeks advice or assistance from an attorney, (2) the advice or assistance sought pertains to matters within the attorney's professional competence, and (3) the attorney expressly or impliedly agrees to give or actually gives the desired advice or assistance.... In appropriate cases the third element may be established by proof of detrimental reliance, when the person seeking legal services reasonably relies on the attorney to provide them and the attorney, aware of such reliance, does nothing to negate it.'"
431 Mass. at 61 (citations omitted).

that injures nonclients is if the nonclients are third party beneficiaries of the contractual

relationship between the attorney and the client. This Court could find just one case

involving a claim of negligence on the part of counsel to a receiver, namely Prescott v.

Coppage, 266 Md. 562, 296 A.2d 150 (1972). The court in Prescott considered his appeal

from the appeals court's reversal of the trial court. It rejected the conclusion that there was

a lack of privity between Coppage and Prescott, concluding, instead, that Coppage was a

third party beneficiary of Prescott's representation of Medley. It stated:

> [T]he intention of the parties to recognize a person or class as a primary party
> in interest as expressed in the language of the instrument and consideration
> of the surrounding circumstances as reflecting upon the parties' intention,
> are controlling factors in making the judgment whether there is or is not a
> class of persons meeting the definition of creditor beneficiary.
>
> In the instant case, the order of appointment of Medley, Receiver, itself
> makes clear that all creditors of Maryland Thrift were third party
> beneficiaries. The order of appointment of Prescott by necessary implication
> bound him to those creditor beneficiaries.
>
> Their acceptance of the duties thus imposed created conditions that gives
> Coppage standing to sue.

266 Md. at 574, 296 A.2d at 156.

### 2. Analysis

In this case, for the Trustee to prevail on her claims against Decoulos as an attorney,

this Court must conclude that she submitted sufficient evidence for the Court to find that

she or her predecessors in interest either relied upon or were third party beneficiaries of

Decoulos representation of himself. The Court cannot so find.

The Trustee stepped into the shoes of ABP for purposes of her claims of malpractice

149

and breach of fiduciary duty. She did not elaborate how as successor to ABP she would have standing to sue Decoulos as Receiver. Arguably, the creditors of the receivership were third party beneficiaries of Decoulos's performance of legal services on behalf of the receivership; indeed, some may have actually relied upon his services, but the Court has no evidence to support these conjectures. In contrast to the situation involving probate estates where attorneys have been held to owe duties to the beneficiaries of the testator's will, this circumstances of this case are much less clear. Similarly, the case is distinguishable from <u>Prescott v. Coppage</u>, 266 Md. 562, 296 A.2d 150 (1972), where the order of appointment made clear that creditors were third party beneficiaries and Coppage was an aggrieved creditor.

The receivership's creditors were diverse, including secured creditors, as well as the defendants in the Essex Action. The Court cannot find that Decoulos owed a duty to them based upon a third party beneficiary theory. Even if the Court were to so find, the Trustee would lack standing to assert the claim as a successor to the creditors of the receivership estate. *See* <u>In re Matter of Educators Group Health Trust</u>, 25 F.3d at 1284; <u>In re Rare Coin Galleries of America, Inc.</u>, 862 F.2d at 900. Moreover, a conflict of interest arose between the shareholders of ABP and Decoulos within months, if not weeks, of his appointment. In view of these circumstances, the Trustee is barred from asserting claims against Decoulos; and, even if she were not barred on the grounds discussed above, the statute of limitations defense raised by Decoulos with respect to his conduct as an attorney has merit. *See* Mass. Gen. Laws ch. 260, § 4.

150

C. The Remaining Counts

    1. Applicable Law

The remaining counts of the Trustee's Amended Complaint involve violations of

Mass. Gen. Laws ch. 93A, § 11. Section 11 provides in pertinent part the following:

> Any person who engages in the conduct of any trade or commerce and who
> suffers any loss of money or property, real or personal, as a result of the use
> or employment by another person who engages in any trade or commerce
> of an . . . unfair or deceptive act or practice declared unlawful by section two
> or by any rule or regulation issued under paragraph (c) of section two may
> . . . bring an action . . . for damages and such equitable relief . . . as the court
> deems to be necessary and proper. . . . If the court finds in any action
> commenced hereunder, that there has been a violation of section two, the
> petitioner shall, in addition to other relief provided for by this section and
> irrespective of the amount in controversy, be awarded reasonable attorneys'
> fees and costs incurred in such action.

Mass. Gen. Laws ch. 93A, § 11. *See also* Mass. Gen. Laws ch. 93A, § 2 ("[u]nfair methods of

competition and unfair or deceptive acts or practices in the conduct of any trade or

commerce are hereby declared unlawful."). Under § 11, the Trustee was required to

establish that she is a person entitled to relief; that Decoulos and his firm used or employed

unfair or deceptive acts or practices declared unlawful; and that she suffered damages as

a result. *See* Richard W. Bishop, 17 Mass. Prac., Prima Facie Case, § 15.4 (2004).

Additionally, under § 2, she was required to show that the acts or practices occurred within

a business context. Lantner v. Carson, 374 Mass. 606, 608, 373 N.E.2d 973, 975 (1978)("G.L.

c. 93A is not available where the transaction is strictly private in nature, and is in no way

undertaken in the ordinary course of a trade or business."). To establish a private person's

liability under § 11, the Supreme Judicial Court has directed an assessment of "the nature

Case 00-01142   Doc 348   Filed 06/29/05   Entered 06/29/05 09:22:23   Desc Main
Document     Page 152 of 154

of the transaction, the character of the parties involved, and the activities engaged in by the parties." Begelfer v. Najarian, 381 Mass. 177, 191, 409 N.E.2d 167, 176 (1980). In Begelfer, the court listed other criteria for determining whether liability exists under § 11: "whether similar transactions have been undertaken in the past, whether the transaction is motivated by business or personal reasons (as in the sale of a home), and whether the participant played an active part in the transaction." Id. The court added: "[w]e do not read § 11 as requiring that a commercial transaction must take place only in the ordinary course of a person's business or occupation before its participants may be subject to liability under G.L. c. 93A, § 11." Id.

The court in Tetrault v. Mahoney, Hawkes & Goldings, 425 Mass. at 462, 681 N.E.2d at 1195, determined that "the proper party to assert a c. 93A claim against an attorney is a client or someone acting on the client's behalf." (citing Schaeffer v. Cohen, Rosenthal, Price, Mirkin, Jennings & Berg, P.C., 405 Mass. 506, 514, 541 N.E.2d 997 (1989), and Robertson v. Gaston Snow & Ely Bartlett, 404 Mass. 515, 527, 536 N.E.2d 344, *cert. denied*, 493 U.S. 894, 110 S.Ct. 242, 107 L.Ed.2d 192 (1989)), and that the attorney had to be acting in a business context. Thus, for the Court to find liability, the Trustee was required to establish the identity of a predecessor in interest with whom Decoulos engaged in trade or commerce.

2. Analysis

The Trustee's argument is notably vague in a key respect. Because she was not in privity with Decoulos, she was required to identify the party or parties which were in

privity with him.  Those parties were either ABP or the creditors of the receivership.  Neither were clients of Decoulos or his law firm.  As noted above, if she relies upon the creditors' claims against Decoulos and his law firm, she lacks standing and would be barred by the applicable statute of limitations.  If she relies upon ABP as the client, she failed to discuss, let alone point to evidence, establishing ABP as either a third party beneficiary of a contractual relationship between Decoulos as Receiver or Decoulos as an attorney and partner in the firm of Decoulos & Decoulos.  Similarly, she did not address the alternative theory of reliance.  In this regard, it was incumbent on her to show that ABP was solvent and would benefit from the receivership.

Further, the Court concludes that the statute of limitations defense raised by Decoulos and his firm are meritorious.  Regardless of whether the creditors or ABP were beneficiaries of Decoulos's services, the statute of limitations applicable to the c. 93A claim expired long before she was appointed Trustee.  *See* Mass. Gen. Laws ch. 260, 5A.

## V. CONCLUSION

> The power of a court of equity to appoint a receiver is something like the power of a skillful surgeon to use a sharp knife.  If used skillfully by the court and with proper exercise of discretion, the power to appoint a receiver is frequently a great aid in business affairs, but when used unskillfully and without discretion it often results in loss to everyone concerned.[327]

Sadly, the above quotation is all to apt in the context of this bankruptcy case and the receivership that preceded it.  ABP had potential; what it didn't have were capable and committed management and committed investors for it to overcome its growing pains.

---

[327] 1 Clark on Receivers, § 53, at 58-59.

153

The decision to seek financial aid from Conti was a two-edged sword. The business got off the ground and showed promise. So much so, Conti seized it for himself and his son, incorporating NEBP to continue the business when the Essex Action was commenced. The shareholders of ABP, Kilroy and Agarwal, had no financial stake in the venture, but the Court has no doubt Kilroy used his best efforts to generate business for ABP and saw it as a means of providing a fruitful living for himself and his family. After all, he understood that SOMBA certified companies had financial advantages over others in the workplace.

The appointment of Decoulos as Receiver was unfortunate. He clearly viewed his job as perfunctory: sell a few hard assets, obtain compensation, distribute some monies to creditors, receive a discharge. He was so ill-equipped and unmotivated to handle the morass before him that he failed to honor the most important obligation of a receiver which is to abide by court orders. His performance as Receiver was so devoid of competence as to result in his personal liability for the losses sustained. Accordingly, the Court shall enter judgment on Counts I and II in favor of the Trustee, and against Decoulos, in the lesser of 1) the sum needed to pay all creditors and administrative claimants of the estate of ABP in full; or 2) the sum of $379,173.78. Additionally, the Court shall enter an order denying Decoulos's pending Motion for Compensation.

By the Court,

Joan N. Feeney
United States Bankruptcy Judge

Dated: June 29, 2005

cc: Lynne F. Riley, Esq., Christopher A. Byrne, Esq., Nicholas J. Decoulos, Esq., William Harris, Esq., Paula R.C. Bachtell, Esq.

154